# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| PETER GABIOLA and ANTONIO HAMMOND, on behalf of themselves and all other similarly situated individuals, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | No. 16 cv 02076 |
| MUGSHOTS.COM, LLC, a Delaware Limited Liability Company; *et al.*, | ) ) ) | |
| *Defendants*. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**[1]

---

[1] The Motion was originally filed by Thomas Keesee, Marc Gary Epstein, Hammermill & Masterson, LLC. Ari Epstein requested, and was granted, leave to join that motion. Those four Defendants are referred to collectively as "Defendants" herein.

## TABLE OF CONTENTS

I.    DEFENDANTS MISSTATE THE NATURE OF PLAINTIFFS' COMPLAINT ...…7

II.   DEFENDANTS' "BLOCK PLEADING" ARGUMENTS ARE MERITLESS .……9

III.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY
      THE FIRST AMENDMENT …………………………………………………10

      A.   Plaintiffs' Claims Are Not Based On the
           Publication of Public Records ………………………………………11
      B.   To the Extent Defendants' Actions Constitute Speech,
           Those Actions Are Unprotected Commercial Speech …………………………14
      C.   Defendants' As-Applied Constitutional Challenges
           Should Be Rejected ………………………………………………17

           1.   Mugshots Act ………………………………………………....17
           2.   Illinois Consumer Fraud Act ………………………………20
           3.   Fair Credit Reporting Act ………………………………21
           4.   Illinois Right of Publicity Act ………………………….23

IV.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE
      COMMUNICATIONS DECENCY ACT ……………………………………24

      A.   Defendants' CDA Argument Is Improper On A Motion to Dismiss …………24

      B.   Defendants' CDA Arguments Are Meritless ……………………………24

V.    PLAINTIFFS HAVE STATED VALID CAUSES
      OF ACTION UNDER THE ICFA …………………………………………28

      A.   Defendants' Arguments Are Restated Improper CDA Arguments …………28

      B.   Plaintiffs Properly Pleaded Damages ………………………………28

      C.   Plaintiffs Need Not Plead Nor Prove Actual Malice …………………30

CONCLUSION …………………………………………………………………31

APPENDIX: Statutes Prohibiting the Solicitation or Acceptance
           of Monies for the Removal of Mugshots ………………………………32

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>** **<u>Page</u>**

*Anthony v. Yahoo! Inc.*,
    421 F. Supp. 2d 1257 (N.D. Cal. 2006)……………………………………...25, 26, 28

*Armour v. City of Indianapolis*,
    ___U.S.___, 132 S. Ct. 2073 (2012)……………………………………………...17

*Barry v. Arrow Pontiac, Inc.*,
    100 N.J. 57, 494 A.2d 804 (1985)…………………………………………………..21

*Batzel v. Smith*,
    333 F.3d 1018, 1033-34 (9th Cir. 2003)………………………………………....27, 28

*Calder v. IRS*,
    890 F.2d 781, 783-84 (5th Cir. 1989)…………………………………………….…12

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
    447 U.S. 557, 561 (1980)……………………………..………………14, 18, 20, 21, 23, 30

*Chi. Lawyers' Comm. for Civ. Rights Under Law, Inc. v. Craigslist, Inc.*,
    519 F.3d 666 (7th Cir. 2008)………………………………………………………..25

*Cicilline v. Jewel Food Stores, Inc.*,
    542 F. Supp. 2d 842 (N.D. Ill. 2008)………………………………………………..23

*City of Chicago v. StubHub!, Inc.*,
    624 F.3d 363, 366 (7th Cir. 2010)………………………………………………...25

*Curran v. Amazon.com, Inc.*, Civil Action No. 2:07-0354,
    2008 U.S. Dist. LEXIS 12479, at *32 (S.D. W. Va. Feb. 19, 2008)………………………24

*Curtis v. Thompson*,
    840 F.2d 1291 (7th Cir. 1988)……………………………………………………17

*Doe v. GTE Corp.*,
    347 F.3d 655, 657 (7th Cir. 2003)………………………………………………..25, 27

*Durso v. Lyle Stuart, Inc.*,
    33 Ill. App. 3d 300, 304, 337 N.E.2d 443, 447 (1975)………………………………30, 31

*Edenfield v. Fane*,
    507 U.S. 761, 768 (1993)……………………………………………………………16

*Endo v. Albertine,*
    812 F. Supp. 1479, 1497 (N.D. Ill. 1993)...……………………………………………10

*Falanga v. State Bar,*
    150 F.3d 1333, 1339 (11th Cir. 1998)………………………………………………...19

*Fannie Mae v. Hamer,*
    No. 12 C 50230, 2013 U.S. Dist. LEXIS 20262, at *15 (N.D. Ill. Feb. 13, 2013)…………18

*Harte-Hanks Communications v. Connaughton,*
    491 U.S. 657, 692 (1989)…………………………………………………………………31

*Holland v. Holland,*
    53 Va. Cir. 512, 520 (Cir. Ct. 1999)……………………………………………………19

*Houchins v. KQED, Inc.,*
    438 U.S. 1 (1978)……………………………………………………………………...11

*In re VMS Sec. Litig.,*
    752 F. Supp. 1373 (N.D. Ill. 1990)……………………………………………………10

*Individual Reference Servs. Group, Inc. v. FTC,*
    145 F. Supp. 2d 6, 42 (D.D.C. 2001)……………………………………………22, 23

*King v. General Info. Servs.,*
    903 F. Supp. 2d 303 (E.D. Pa. 2012)…………………………………………………...23

*Kwanzaa v. Brown,* No. 05-5976 (RMB),
    2007 U.S. Dist. LEXIS 43797, at *24 (D.N.J. June 15, 2007)………………………………18

*L.A. Police Dep't v. United Reporting Publ'g Corp.,*
    528 U.S. 32 (1999)………………………………………………………………....12, 13

*Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.,*
    298 F.3d 600 (7th Cir. 2002)……………………………………..………………………14

*Lititz Mut. Ins. Co. v. Lengacher,*
    248 F.2d 850, 854 (7th Cir. 1957)………………………………………………………29

*MGM Studios Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005)……………………………………………………………………...25

*Martin v. Hearst Corp.,*
    777 F.3d 546 (2d Cir. 2015)…………………...………………………………29, 30, 31

*Medline Indus. v. Strategic Commer. Solutions, Inc.,*

553 F. Supp. 2d 979 (N.D. Ill. 2008)……………………………………………………...29

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990)………………………………………………………………………16, 17

*Millstone v. O'Hanlon Reports, Inc.*,
  383 F. Supp. 269, 274 (E.D. Mo. 1974)…………………………………………21, 22, 23

*Novak v. Overture Servs.*,
  309 F. Supp. 2d 446 (E.D.N.Y. 2004)………………………………………………24

*Orphan v. Furnco Construction Corp.*,
  466 F.2d 795 (7th Cir. 1972)…………………………………………………………………9

*P&G v. Amway Corp.*,
  242 F.3d 539, 557 (5th Cir. 2001)……………………………………………………...30

*Procunier v. Martinez*,
  416 U.S. 396, 413-14, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974)…………………………18

*Reese v. Barton Healthcare Systems*,
  606 F.Supp.2d 1254 (E.D.Cal. 2008)……………………………………………..…………10

*Rosetta Stone ltd. v. Google, Inc.*,
  732 F.Supp.2d 628 (E.D.Va. 2010)…………………………………………………...26

*Serpas v. Schmidt*,
  827 F.2d 23, 31 (7th Cir. 1987)…………………………………………………………...11

*Smith v. Prime Cable*,
  276 Ill. App. 3d 843, 658 N.E.2d 1325 (1995)…………………………………………...27, 29

*Spottsville v. Barnes*,
  135 F. Supp. 2d 1316, 1323 (N.D. Ga. 2001)…………………………..……………11, 12, 13

*Stephenson v. United States*,
  No. 10-MC-712 (RJD), 2015 U.S. Dist. LEXIS 137740 (E.D.N.Y. Oct. 7, 2015)………..19

*Stewart v. Rolling Stone LLC*,
  181 Cal. App. 4th 664, 683, 105 Cal. Rptr. 3d 98, 114 (2010)……………………………30

*Trans Union LLC, Appellant, v. Federal Trade Commission, et al. Appellees*,
  Fed. Banking L. Rep. (CCH) P 100-592………………………………………………22

*United States v. Benson*,
  561 F.3d 718 (7th Cir. 2009)…………….………………………………………...15, 16, 18

*United States Healthcare, Inc. v. Blue Cross of Greater Phila.*,
    898 F.2d 914, 933 (3d Cir. 1990)……………………………………………………14

*Zauderer v. Office of Disciplinary Counsel of Supreme Court*,
    471 U.S. 626, 638 (1985)……………………………………………………13, 30

*Zoch v. City of Chicago*,
    94 C 4788, 1997 U.S. Dist. LEXIS 2325, at *57 (N.D. Ill. Feb. 4, 1997)………………..7

**Statutes**                                               **Pages**

815 ILCS 505/2QQQ…………………………………………………………………….7, 17

15 U.S.C. § 1681………………………………………………………………………..21, 22

§ 230(c)……………………………………………………………………24, 25, 26, 27

## I.     DEFENDANTS MISSTATE THE NATURE OF PLAINTIFFS' COMPLAINT

Defendants spend their entire motion to dismiss arguing that this case is about the dissemination of public arrest records, protected by the First Amendment.  But that clearly contradicts the well-pleaded allegations of the Class Action Complaint.  On a motion to dismiss, "this court must accept as true all well-pled allegations and draw all reasonable inferences in favor of the plaintiff."  *Zoch v. City of Chicago*, 94 C 4788, 1997 U.S. Dist. LEXIS 2325, at *57 (N.D. Ill. Feb. 4, 1997).

Plaintiffs do not dispute that Defendants have the right to *publish* public arrest records under the First Amendment.  Instead, this case is about what Defendants *do* with those arrest records.  Plaintiffs allege that Defendants are engaging in an unlawful scheme to commercialize those public records by using a *fake reputation management service* to solicit payment for the takedown of those records from mugshots.com.   Defendants coerce arrestees and others into paying for the takedown of those records by a "carrot and stick" approach.  The stick is search engine optimization used to ensure that arrestees' mugshots and arrest records are among the top web search results for that arrestee, and posting incorrect or out of date records that Defendants make no effort to verify or maintain, because out-of-date or inaccurate records ensure arrestees are more likely to pay for their removal.   The carrot is the advertisement of unpublisharrest.com as an independent reputation management firm which offers to help desperate arrestees to remove their profiles from mugshots.com – for a fee.

This scheme constitutes Defendants' "takedown service," as alleged in the Complaint.  It is also expressly prohibited by the Illinois Mugshots Act, codified at §2QQQ of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), which bars the solicitation or

acceptance of payment for the removal of a mugshot or arrest record. [2]  And Defendants do not comply with the federal Fair Credit Reporting Act, which requires certain disclosures be made by the disseminator of public credit records and information.

The Complaint alleges that Defendants operate two websites, mugshots.com and unpublisharrest.com, and only mugshots.com disseminates arrest records.  The two websites are operated as a single enterprise solely for the purpose of illegally commercializing those public arrest records by coercing arrestees whose records are posted on mugshots.com into paying or hundreds, or in some cases, thousands, of dollars for their removal.  Defendants incentivize (or coerce) arrestees into paying for this "takedown service" by using search engine optimization and posting out-of-date or inaccurate arrest records.  In fact, the Defendants post these mugshots and arrest records <u>solely</u> for the purpose of incentivizing the arrestees to pay to remove those photographs and arrest information, based on a schedule of fees ranging from $398 to $2,000 *per record*.  Compl't., ¶¶ 149-154.  Plaintiffs and other members of the putative Class are directed to unpublisharrest.com by Mugshot.com.   As such, the Complaint does not allege that Defendants are a passive website.

The websites are owned, operated, and controlled by Marc Gary Epstein, Thomas Keesee, Ari Epstein and Michael Robertson (the "individual defendants"), who use phony LLC's with no offices or business addresses.  Compl't., ¶¶ 20-56.  The LLC's are alter egos of the individual defendants.  Compl't, ¶¶ 79-93.   However, the individual defendants never disclosed who owned and controlled both Mugshots.com and the "sister" websites, or that the owners are the same for both websites.  Compl't., ¶¶ 68-79, 186-206.   Nor have they adequately disclosed that payment

---

[2] Six states - California, Colorado, Georgia, Missouri, Utah, and Virginia - have passed functionally identical statutes, and several others (including Connecticut, South Carolina, and Texas) have bills to do the same pending in their respective state legislatures.

of fees does not guarantee removal or correction of photographs or any other information; material regarding many class members who actually paid fees was routinely not removed. Compl't., ¶¶ 155-169. Unpublisharrest.com also utilizes phony LLC's in the same manner as Mugshots.com. Compl't.,¶¶ 200-206.

On or about October 10, 2014, Plaintiff Gabiola telephoned the number listed on unpublisharrest.com, and was told that removal of two images would require payment of $2,000 to mugshots.com plus a "representation fee," and that removal of all information about his criminal history would require payment of $ 15,000 to mugshots.com plus an additional "representation fee." Compl't,¶¶ 306-312. Plaintiff Hammond, too, cannot afford to pay the fees necessary for removal of his arrest records and mugshots.

In short, contrary to Defendants' arguments, <u>Plaintiffs are not suing Defendants because Defendants post public records</u>. The Complaint alleges that the Defendants commercialize arrest records *on purpose* through the deliberate solicitation of takedown fees and the deliberate operation of a fake reputation management service. Because it is this scheme, not the dissemination of records, that is the gravamen of Plaintiffs' complaint, Defendants' motion to dismiss should be denied.

## II.    DEFENDANTS' "BLOCK PLEADING" ARGUMENTS ARE MERITLESS

Defendants first argue that Plaintiff has failed to plead with sufficient specificity what role each Defendant played in the operation of the subject matter websites. This argument is meritless; a complaint is sufficiently detailed as long as it gives defendants fair notice of the claims against them and it cannot be said that no state of facts could be proven to support it. *Orphan v. Furnco Construction Corp.,* 466 F.2d 795 (7th Cir. 1972). Here, plaintiffs have laid out in explicit detail an intricate fraudulent scheme hidden

behind phony LLC's that popped in and out of existence like whack-a-mole pegs. Compl't ¶¶11-95. What acts were committed by which defendant will be exposed in discovery.

Further, as explained in *Endo v. Albertine*, 812 F. Supp. 1479, 1497 (N.D. Ill. 1993) (emphasis supplied; internal citations omitted), "[t]he Complaint does not impermissibly 'lump' the defendants together [because] **Plaintiffs need not allege facts which are in the exclusive knowledge or control of the defendants.** Here, the plaintiffs have no way of knowing which defendant made which misrepresentations or omitted which material facts." As Plaintiffs specifically allege in the Complaint, only Defendants know which person was responsible for which specific act; Defendants utilize false LLCs and proxy servers *for that very purpose*: to hide their identities. Plaintiffs have pleaded specifically the role of each LLC and person to the extent knowable, including who has a primary ownership interest in the websites; when, where, and how LLCs are created and dissolved; who acts as the attorney for the companies; and who is responsible for each entity. The Complaint also makes clear that Defendants purposefully hide their business model and its participants. *See also In re VMS Sec. Litig.*, 752 F. Supp. 1373 (N.D. Ill. 1990) (denying motion to dismiss where certain facts were known only to defendants).

The liberal notice pleading standard relies upon the discovery rules and summary judgment motions to root out spurious claims, and, until that process is completed, plaintiffs are not required to assign particular acts to particular defendants. *Reese v. Barton Healthcare Systems,* 606 F.Supp.2d 1254 (E.D.Cal. 2008). Surely, the highwayman is not entitled to act with impunity because he wore a bandana.

## III. PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE FIRST AMENDMENT

The Defendants next invite this Court to invalidate **three** different statutes on First Amendment grounds. This Court should reject that invitation.

### A. Plaintiffs' Claims Are Not Based On the Publication of Public Records

To begin, the Defendants argue that "[t]he state and federal statutes relied upon by Plaintiffs cannot be constitutionally applied to penalize or restrain the *publication* of criminal records." Mot. at 8 (emphasis supplied). But the gravamen of Plaintiff's complaint is the so-called "takedown service," through a fake reputation management service. That the takedown service is distinguishable from the posting of the arrest records is demonstrable simply by the fact that the Defendants' websites do not need to take down the mugshots for a fee, or solicit a fee at all, in order to post truthful records in the first instance (or even to monetize them).[3] In short, the actions that the Defendants are saying are protected by the First Amendment *are not what the Plaintiffs are suing about*.

This Court "[has] a duty to avoid unnecessary constitutional adjudication[, including] a case where the challenged statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a constitutional question." *Serpas v. Schmidt*, 827 F.2d 23, 31 (7th Cir. 1987). Not one of the cases cited by Defendants addresses an unlawful scheme of the type alleged here, or a fake reputation management "service" which purports (falsely) to be a separate entity. Because Defendants are seeking to obtain the arrest records solely for the purposes of selling their takedown service, there is no First Amendment infirmity in restricting Defendants' ability to do so. This is because "there is no First Amendment right of access to public information." *Spottsville v. Barnes*, 135 F. Supp. 2d 1316, 1323 (N.D. Ga. 2001) (citing *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) ("There is no discernable basis for a constitutional duty to

---

[3] Notably, the Mugshots Act, ICFA, and FCRA (and this lawsuit) do *not* prohibit Defendants from monetizing the arrest records. Defendants can advertise, for example, for products and services not their own, and that would not run afoul of the statutory causes of action in Plaintiff's Complaint. But Defendants cannot post the arrest records for the purpose of soliciting arrestees to pay to take them down, and that is what Defendants are doing right now.

disclose, or for standards governing disclosure of or access to information."); *Calder v. IRS*, 890 F.2d 781, 783-84 (5th Cir. 1989) (holding that a statute restricting access to IRS information does not violate the First Amendment)). "Quite simply, the right to speak and publish does not carry with it an unrestricted license to gather information." *Id.*

On this point, *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32 (1999), is controlling. In *United Reporting*, the plaintiff sued to invalidate on First Amendment grounds a statute which "place[d] two conditions on public access to arrestees' addresses – that the person requesting an address declare that the request is being made for one of five prescribed purposes, *and that the requestor also declare that the address will not be used directly or indirectly to sell a product or service.*" *Id.* (emphasis supplied). Like the Mugshots Act in the case at bar, the California statute in *United Reporting* did not bar the publication of arrest records *per se*, it simply barred their disclosure or publication for the use of selling a product or service. The U.S. Supreme Court rejected the challenge: "This is not a case in which the government is prohibiting a speaker from conveying information that the speaker already possesses. The California statute in question merely requires that if respondent wishes to obtain the addresses of arrestees it must qualify under the statute to do so. . . . California could decide not to give out arrestee information at all without violating the First Amendment." *Id.*

Similarly, in *Spottsville*, the Court upheld a statute which limited public records of motor vehicle accidents to a specific group of requestors. As the Court explained, "[i]f States were required to choose between keeping proprietary information to themselves and making it available without limits, States might well choose the former option. In that event, disallowing selective disclosure would lead not to more speech overall but to more secrecy and less speech. . . . [A]s governmental agencies obtain more and more sensitive information about us, and that information

is more readily accessible through the Internet, reasonable distinctions may be made by the State in terms of limiting wholesale access to personal information. . . . Based upon this Court's reading of *United Reporting*, that is not unconstitutional." *Id*.  By stating that Defendants are prohibited from soliciting or accepting monies for the removal of arrest records, Illinois has done precisely what Georgia did in *Spottsville* and what California did in *United Reporting*: it is simply limiting access to arrest records to those entities who do not use them as the basis of a for-profit takedown service.  And, as was emphasized in *United Reporting*, the statutes under which Plaintiff brings suit here – the FCRA and Mugshots Act, chief among them – do not prevent Defendants from posting the information in question, or even from making a profit from that information via advertising.  Instead, the statutes merely regulate how that information may be monetized.  *See Spottsville*, 135 F. Supp. 2d 1316, 1323 ("Plaintiff is free to solicit all the clients he wishes. He cannot, however, compel the State to subsidize his efforts.").[4]

Therefore, there is actually no First Amendment interest implicated here.  "The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading, *or that proposes an illegal transaction*."  *Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626, 638 (1985) (emphasis supplied).  The transactions solicited by Defendants are unlawful because they violate the FCRA and Mugshots Act, not because they involve the dissemination of public records.  The Mugshots Act prohibits commercialization of mugshots and arrest records by payment for removal; the FCRA regulates the dissemination of credit information.  Neither prohibits the dissemination or publication of mugshots or public arrest records, and neither infringes on Defendants' First Amendment right to

---

[4] As part of a settlement reached in *Lashaway v. D'Antonio*, No. 2012-6547 (a putative class case filed in Ohio), several of Defendants' competitors agreed to discontinue their own takedown services.  Those websites all still exist. It is therefore incorrect that the takedown service is necessary to the survival of mugshots.com as a business.

do so.  Notably, Defendants do not argue – and cannot argue – that the <u>takedown service</u> is protected by the First Amendment in any way.

### B. To the Extent Defendants' Actions Constitute Speech, Those Actions Are Unprotected Commercial Speech

Citing, *inter alia, Best v. Berard*, 776 F. Supp. 2d 752, 757 (N.D. Ill. 2011), Defendants argue that Plaintiffs seek to "impose[] sanctions on the publication of truthful information of public concern."  But as previously explained, Plaintiffs are challenging the *takedown* service, not the *publication* of the arrest records.  The takedown service, using a fake reputation management firm, is not a matter of public concern at all, and therefore is commercial speech unprotected by the First Amendment entirely in this context.  Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 561 (1980).  The takedown service and unpublisharrest.com are clearly – and solely – commercial speech and commercial speech alone.  "The Supreme Court has cited three factors to consider in deciding whether speech is commercial: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *United States Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990).  The first factor is clearly satisfied; Defendants advertise the takedown service with links such as these:

UNPUBLISH MUGSHOT        CLICK HERE for Unpublishing or Call 1-800-810-3965

And statements like this:

UNPUBLISHING NOTICE: IF YOU WERE FOUND GUILTY; YOU MAY QUALIFY TO BE UNPUBLISHED.

These are advertisements, both alleged to exist in the Complaint *and* of which this Court may take judicial notice.  *See Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d

600 (7th Cir. 2002). And the second factor, too, is satisfied; the links and statements clearly

refer to a specific product or service; namely, Defendants' takedown service. The links lead to

unpublisharrest.com. Each link or statement describes the removal of a mugshot or arrest record,

and is clearly intended to attract website visitors to purchase the service in hopes of removing

the mugshot. Third, Defendants have a clear economic motivation for this speech; a website

visitor to mugshots.com who clicks on an "unpublish" link is taken to unpublisharrest.com, and

is greeted with this:

**Which service would you like to purchase?** *
- ◉ 1 arrest including mugshot(s) – $399.00
- ○ 2 arrests including mugshots – $798.00
- ○ 3 arrests including mugshots – $1197.00
- ○ 4 arrests including mugshots – $1479.00
- ○ 5 arrests including mugshots – $1799.00

**That** is a plain economic motivator. **That** is the crux of Plaintiffs' lawsuit. And commercial speech is not entitled to the same protections as other speech; it may be regulated or banned entirely consistent with the First Amendment.

On this point, *United States v. Benson*, 561 F.3d 718 (7th Cir. 2009), is controlling. In

*Benson*, the defendant argued that his website, which offered false methods for visitors to avoid

paying income taxes, was protected First Amendment speech on a matter of public concern. The

Seventh Circuit Court of Appeals rejected that argument.

> Benson was engaged in false commercial speech. . . . Specifically, Benson
> promised potential customers that his products would free them from taxation and
> protect them from, or defend them in the event of, prosecution. **These false
> statements were made for the purpose of promoting the sale of his materials
> and were therefore commercial.** Benson purported to be selling a way to avoid
> tax liability; what he was actually selling was a way to increase tax and criminal
> liability for failing to pay taxes. **That is false advertising, which may be banned
> consistent with the First Amendment**.

*Benson*, 561 F.3d at 725-26. Benson also objected that the injunction against his website violated

his right under the First Amendment to protest against the tax code; the Seventh Circuit responded

that "according to our great tradition of tolerating nutty opinions, the marketplace of ideas remains

open to Benson; the commercial marketplace, however, is appropriately limited to speech that is not deceptive." *Id.* Simply put, "the First Amendment . . . does not prohibit the State from insuring that the stream of commercial information flow[s] cleanly as well as freely, and our cases make clear that the State may ban commercial expression that is fraudulent or deceptive without further justification." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993).

The same is true here. Defendants are advertising unpublisharrest.com as an independent reputation management service, which it is not. They advertise that if the arrestee pays a fee they will remove that arrestee's mugshots and records, when they may actually opt instead to publish the mugshot permanently. They advertise that they will work with the owners of mugshots.com to have a payor's mugshot removed; instead, *they are the owners of mugshots.com*. These are false statements which may be banned entirely under the First Amendment. And the practice of collecting fees for the removal of mugshots and arrest records is very different from the practice of posting them in the first instance.

So neither Defendants, nor their websites, are media enterprises. Or, to put it another way: the *New York Times* does not solicit the payment of a fee to take down a story published *for the sole purpose* of incentivizing the payment of that fee. To the extent Defendants' takedown service is speech at all, it is *commercial* speech, not related to matters of public concern because it is separate and apart from the posting itself.

One more point. The U.S. Supreme Court held expressly in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), that the First Amendment does not protect the publication of matters of public concern when they are "provable as false." In other words, when Defendants post a truthful arrest record, that action is protected under the First Amendment. When they knowingly post a *false* arrest record, that action is *not* protected. For example, Plaintiff Gabiola's profile on

mugshots.com *still* states (falsely) that his current "inmate status" is "parole."  Plaintiff Gabiola has exited parole, and therefore that statement is easily provable as false.  Defendants cannot seek First Amendment protection for making statements they *know* to be false solely for purposes of commercial gain.[5]

### C. Defendants' As-Applied Constitutional Challenges Should Be Rejected

In this light, examining the statutes Defendants seek to have constitutionally adjudicated demonstrates that they are plainly constitutional as applied to Defendants.[6]

### 1. Mugshots Act

Section 2QQQ of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Mugshots Act"), states as follows:

> It is an unlawful practice for any person engaged in publishing or otherwise disseminating criminal record information through a print or electronic medium to solicit or accept the payment of a fee or other consideration to remove, correct, or modify said criminal record information.

815 ILCS 505/2QQQ  This statute does not bar the publication of arrest records, and Plaintiffs do not ask that it be interpreted in that manner.  The Mugshots Act also does not bar monetization of arrest records in any manner other than solicitation or acceptance of payment for removal or modification of records (so advertising, for instance, is not prohibited).  "Statutory interpretation begins with the plain language of the statute. This court assumes that the purpose of the statute is

---

[5] Though *Milkovich* applied to state defamation law, it would be strange indeed to hold that defamatory content is actionable under the common law where provable as false, but those same statements are *not* actionable under state or federal *statutes* where the same considerations are implicated.  The First Amendment does not bar one and not the other.

[6] Notably, Defendants do not engage in the appropriate constitutional analysis, despite having the burden of doing so; they apply none of the multi-part tests for constitutionality issued by the Supreme Court for the various levels of scrutiny.  A legislative enactment is presumed constitutional, and the burden falls on Defendants, the parties challenging the statutes, to demonstrate otherwise.  *Armour v. City of Indianapolis*, ___U.S.___, 132 S. Ct. 2073 (2012).

communicated by the ordinary meaning of the words Congress used; therefore, absent any clear indication of a contrary purpose, the plain language is conclusive." *Fannie Mae v. Hamer*, No. 12 C 50230, 2013 U.S. Dist. LEXIS 20262, at *15 (N.D. Ill. Feb. 13, 2013). All the Mugshots Act *does* bar is the solicitation or acceptance of a fee to *take mugshots down*, which (to the extent it is speech at all) is commercial speech and commercial speech alone and may be appropriately regulated by states. For example, in *Curtis v. Thompson*, 840 F.2d 1291 (7th Cir. 1988), the Seventh Circuit Court of Appeals held constitutional a statute which barred solicitation by realtors. (The statute says nothing at all about putting mugshots *up*, so it certainly does not prohibit it.)

The U.S. Supreme Court has developed a four-part analysis of statutes which regulate commercial speech. "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 566.

Here, the Defendants' "speech" – to the extent the takedown service is speech at all – is plainly misleading for the reasons previously provided, and is therefore exempt from First Amendment protection as explained in *Benson*. But even assuming the contrary *arguendo*, the State of Illinois has a clear and substantial interest here. First, Illinois has a substantial interest in rehabilitating former inmates and arrestees. *See*, *e,g.*, *Kwanzaa v. Brown*, No. 05-5976 (RMB), 2007 U.S. Dist. LEXIS 43797, at *24 (D.N.J. June 15, 2007) ("the State has an important and substantial interest in . . . the rehabilitation of inmates." (citing *Procunier v. Martinez*, 416 U.S. 396, 413-14, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974)). This rehabilitation is made more difficult

by the posting of false arrest records online, which limit former arrestees' employment prospects and increase recidivism rates. As one court noted, "there is also an impressive body of proof that unemployment is strongly linked with recidivism. . . . If an ex-offender's inability to find employment puts in jeopardy his or her reentry into society, I am hard pressed to imagine a circumstance more 'extreme.'" S*tephenson v. United States*, No. 10-MC-712 (RJD), 2015 U.S. Dist. LEXIS 137740, at *8-9 (E.D.N.Y. Oct. 7, 2015) (collecting authorities). For this reason, the State of Illinois actually requires parolees to show they have housing as a condition of parole; incidentally, the court in *Stephenson* noted that criminal convictions make finding housing more difficult. Further, as alleged in the Complaint, the Illinois Department of Corrections *removes* arrestees' records from its own website after disposition or completion of sentence.

Similarly, Illinois has a "substantial interest in safeguarding [people] from the hardships of poverty." Poverty is exacerbated when people are unable to obtain jobs as a result of an inaccurate arrest record on mugshots.com, or when unemployed arrestees are required to pay monies to take down inaccurate arrest records (or any arrest records, for that matter). *See Holland v. Holland*, 53 Va. Cir. 512, 520 (Cir. Ct. 1999). Further, "the State has a substantial interest in . . . ensuring the accuracy of commercial information in the marketplace[.]" *Falanga v. State Bar*, 150 F.3d 1333, 1339 (11th Cir. 1998). By posting inaccurate arrest records for the purpose of incentivizing payment by the arrestees, or advertising a fake reputation management service, Defendants infringe on that State interest.

In response to these clear and substantial interests, Illinois has promulgated a narrowly tailored statute: the Mugshots Act. The Mugshots Act, notably, does not infringe on Defendants' rights to report on matters of public concern, because it does not bar the publication of truthful mugshots or arrest records, or the monetization of those records generally. Instead, the Mugshots

Act merely states that the solicitation or acceptance of a fee for the removal of those records is a statutory violation. This statute targets only commercial speech (to the extent it targets any speech at all), and is narrowly tailored to one specific practice of Defendants. By prohibiting that practice, the statute disincentivizes the use of inaccurate records because there is no longer monetary reward for their publication. The statute also protects those who would otherwise pay for the promise of removal of those (often inaccurate) records, particularly given the Defendants do not always remove the records of payors. There is no overbreadth here; the statute does not impact Defendants' ability to post records truthfully, or even to monetize truthful records in other ways. It simply prohibits Defendants from soliciting or accepting payments for the removal of those records.

2. <u>Illinois Consumer Fraud Act</u>

For the same reasons, Plaintiffs' claims for unfair and deceptive business practices under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") do not chill Defendants' First Amendment rights. Once again, the operation of the takedown service is the gravamen of the Plaintiffs' ICFA claim; the posting of the mugshots is merely a means to the end that is the takedown service.

In short, what Plaintiffs allege is that Defendants violated ICFA by operating a takedown service for profit; by posting inaccurate information to incentivize payments; and by operating a fake reputation management business. This "speech" by Defendants is not subject to First Amendment protections. Or, to put it another way, "[t]he government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity." *Cent. Hudson*, 447 U.S. at 563-64. This is both. First, Defendants operate a fake reputation management service, which is in and of itself deceitful; second, Defendants use

inaccurate records to incentivize (or coerce) the use of that service.

Consumer fraud statutes are intended to prohibit speech which fails the first prong of the *Central Hudson* test.  *See Barry v. Arrow Pontiac, Inc.*, 100 N.J. 57, 494 A.2d 804 (1985) (considering the New Jersey Consumer Fraud Act, which is almost verbatim identical to the ICFA).  Defendants' takedown service does so here, and can therefore be regulated by the ICFA.

### 3.  Fair Credit Reporting Act

We can apply the same analysis to the Plaintiffs' claims under the Fair Credit Reporting Act ("FCRA").  Once again, and for the same reasons as discussed above, the Defendants' speech is misleading and therefore not subject to First Amendment protections.  But even assuming the contrary *arguendo*, Defendants' provision of credit information is not protected by the First Amendment for another reason: "four Courts of Appeals have been quite uniform at holding that the activities and publication of retail credit reports [under the Fair Credit Reporting Act] are not speech which should be protected under the First Amendment."  *Millstone v. O'Hanlon Reports, Inc.*, 383 F. Supp. 269, 274 (E.D. Mo. 1974).  Notably, in their Motion, Defendants do not contest the allegations in the Complaint that the websites are a Consumer Credit Agency furnishing consumer credit information and reports for purposes of the FCRA.

Further, even applying the remainder of the *Central Hudson* analysis, the FCRA is constitutional as applied to Defendants because it is narrowly tailored to meet a specific and substantial government interest.  The Plaintiffs have asserted claims under three sections of the FCRA.  In Count V, Plaintiffs allege that Defendants violated §1681(e)(d)(2) of the FCRA by failing to provide the required statutory notice.[7]  In Count VI, the Plaintiffs alleged that Defendants violated §1681b(b)(1) by failing to provide required statutory disclosures.  And in Count VII, the

---

[7] Notably, after this lawsuit was filed, Defendants added a purported "FCRA Disclaimer" to mugshots.com.

Plaintiffs alleged that Defendants violated §1681(e) by failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. These provisions were enacted in order to address a substantial governmental interest, as addressed in the preamble of the FCRA, which includes Congressional findings and a statement of purpose. 15 U.S.C. § 1681.

In *Individual Reference Servs. Group, Inc. v. FTC*, 145 F. Supp. 2d 6, 42 (D.D.C. 2001), the court recognized a substantial privacy interest in the context of the FCRA: "Courts have repeatedly recognized that the protection of consumer privacy - in various forms - is a substantial governmental interest." *See also Trans Union LLC, Appellant, v. Federal Trade Commission, et al. Appellees*, Fed. Banking L. Rep. (CCH) P 100-592.

And each of the three FCRA provisions under which Plaintiffs bring claims are narrowly tailored to address those substantial interests. By requiring Defendants to provide a statutory notice or disclosures, the FCRA does not limit Defendants' ability to post truthful arrest records or public records. It does not limit Defendants' ability to opine about those records. *It merely requires Defendants to provide a notice and statutory disclosures when doing so*. And the FCRA's requirement of "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates" does not chill Defendants' ability to report truthful public records because it simply requires Defendants to have a procedure in place to ensure the maximum possible accuracy of those records.

In fact, courts have already addressed this very issue. In *Millstone*, the defendant credit reporting agency brought an as-applied challenge to the FCRA's "maximum possible accuracy" requirement in §1681(e). The plaintiff in *Millstone* alleged, and the court found, that "Defendant's methods of reporting on consumer's credit backgrounds as shown at trial were so slipshod and

slovenly as to not even approach the realm of reasonable standards of care as imposed by the statute." As a result, the court concluded, "[t]he facts of this case indicate that the credit reports of O'Hanlon concerning Millstone were distributed for commercial purposes and clearly without regard to social concerns or grievances. Thus, it becomes patently obvious that the protections of the First Amendment will not extend to activities such as those of the defendant, and this case is therefore justiciable." *Millstone*, 383 F. Supp. at 274-75.

Repeatedly, courts have held the FCRA constitutional in First Amendment as-applied challenges. *See*., *e.g.*, *King v. General Info. Servs.*, 903 F. Supp. 2d 303 (E.D. Pa. 2012); *Cicilline v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d 842 (N.D. Ill. 2008); *Millstone, supra*. And "[C]onsumer reports [are] speech solely in the individual interest of the speaker and its specific business audience. . . . There is simply no credible argument that this type of credit reporting requires special protection to ensure that debate on public issues will be uninhibited, robust, and wide-open." *Individual Reference*, 145 F. Supp. 2d at 40-41 (internal citations and quotation marks omitted). Defendants cannot plausibly argue that their right to post truthfully on matters of public concern is chilled by a statute which requires a notice be distributed with those posts, or that their posting be conducted in a manner which ensures the maximum truthfulness of what they are posting about.

4. Illinois Right of Publicity Act

Finally, applying the *Central Hudson* analysis, Plaintiff Gabiola states a valid cause of action under the Illinois Right of Publicity Act because Defendants are attempting to monetize a deliberately inaccurate public record using a fake reputation management service. Because the speech in question is commercial speech but not truthful, it is not protected by the First Amendment for the same reasons set forth above.

## IV. PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE COMMUNICATIONS DECENCY ACT

### A. Defendants' CDA Argument Is Improper On A Motion to Dismiss

It is well established that "immunity pursuant to § **230(c)** of the CDA constitutes an affirmative defense. This affirmative defense is generally not fodder for dismissal under Rule 12(b)(6). Instead, such a defense is generally addressed as a Rule 12(c) or Rule 56 motion." *Curran v. Amazon.com, Inc.*, Civil Action No. 2:07-0354, 2008 U.S. Dist. LEXIS 12479, at *32 (S.D. W. Va. Feb. 19, 2008). Plaintiffs are also entitled to discovery prior to responding to such a motion. *Id. See also Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003) ("Affirmative defenses do not justify dismissal under Rule 12(b)(6); litigants need not try to plead around defenses."); *Novak v. Overture Servs.*, 309 F. Supp. 2d 446 (E.D.N.Y. 2004).

Plaintiffs therefore object to Defendants bringing their CDA argument in a Rule 12(b) motion, and request it be denied or stricken without prejudice to a Rule 12(c) or Rule 56 Motion, after appropriate discovery has been conducted.[8] Without waiving this objection, Plaintiffs respond below only if this Court considers Defendants' arguments on the merits.

### B. Defendants' CDA Arguments Are Meritless

Defendants rely on Subsection (c)(1) of the CDA: "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230. Plaintiffs concede that Defendants are not the original creators of the public arrest records on mugshots.com. However, just because the CDA may insulate Defendants from liability for the original *content* of the arrest records does not mean Defendants are similarly insulated from liability for what they *do* with those public records.

---

[8] That discovery would include; *inter alia*, interrogatories and document requests regarding who creates and maintains the content on the subject matter websites.

First, the Seventh Circuit Court of Appeals has held that "subsection (c)(1) does not create an 'immunity' of any kind." *City of Chicago v. StubHub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010). Instead, it simply defines who and what a "publisher" is on the internet. *Chi. Lawyers' Comm. for Civ. Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008); *Doe*, *supra*. But merely being a publisher of third party content is not a guarantee of immunity, as the Seventh Circuit has explained. "To appreciate the limited role of § 230(c)(1), remember that 'information content providers' may be liable for contributory infringement if their system is designed to help people steal music or other material in copyright." *Chi. Lawyers' Comm.*, 519 F.3d at 670 (citing *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)). This makes intuitive sense: the CDA does not allow a person to use third party content to violate a statute with impunity; it merely protects a publisher from liability for the actions of a third party. But here, Plaintiffs are alleging that *Defendants themselves* committed statutory violations through their own affirmative acts.

Instructive is *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006). In *Anthony*, the plaintiff was a subscriber to defendant's dating service. The plaintiff alleged that defendant defrauded subscribers by using outdated and fake profiles, "thus giving the misleading impression that these individuals are still available for dates." 421 F. Supp. 2d at 1260. The defendant in *Anthony* invoked §230(c) of the CDA and moved to dismiss, arguing (as Defendants do in the case *sub judice*) that "it cannot be liable 'based on profile content' under the CDA." *Id*. at 1262. The court rejected defendant's arguments.

> Anthony alleges that Yahoo! creates false profiles, not merely fails to delete them. In addition, Anthony claims that Yahoo! sends users false profiles for the purpose of luring them into renewing their subscriptions. No case of which this court is aware has immunized a defendant from allegations that *it* created tortious content. . . . One need look no further than the face of the statute to see why. The CDA only immunizes "information provided by *another* information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). If, as Anthony claims, Yahoo! manufactured false profiles, then it is an "information content provider" itself and the CDA does

not shield it from tort liability.

> In addition, the CDA does not defeat Anthony's allegations that Yahoo! sent "profiles of actual, legitimate former subscribers whose subscriptions had expired and who were no longer members of the service, to current members of the service." Admittedly, third parties created these profiles. Nevertheless, the CDA only entitles Yahoo! not to be "the publisher or speaker" of the profiles. It does not absolve Yahoo! from liability for any accompanying misrepresentations**.** Because Anthony posits that Yahoo!'s manner of presenting the profiles – not the underlying profiles themselves – constitute fraud, the CDA does not apply.

*Id*. (internal citations omitted; emphasis original).

Furthermore, the subject matter websites are not a forum for third party advertising, and they are not a social network. Defendants produce themselves the only content <u>relevant</u> to this action – the takedown service. The website unpublisharrest.com contains no mugshots, no arrest records, and no public records. It is simply the home page of a fake reputation management firm, and all of the content on unpublisharrest.com is original content created by Defendants. Yet Defendants are asking this Court to hold that §230(c) applies to content posted to the internet *by its creator*. That is exactly what §230(c) does *not* say; §230(c) states that ""[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by ***another*** information content provider." It provides no insulation for content created *by the same people*. Here, plaintiffs are not aggrieved by an act of a third party. Mugshots.com, unpublisharrest.com and the individual defendants are alter egos. They are the <u>same party</u>.

So for this reason, *Rosetta Stone ltd. v. Google, Inc.,* 732 F. Supp. 2d. 628 (E.D.Va. 2010), on which Defendants principally rely, is distinguishable on its face. The gist of the complaint in *Rosetta Stone* is was that Google misappropriated the plaintiffs copyrighted material in ways which directed people using the Google search engine to the plaintiff's competitors and allowed third parties to counterfeit its products. The court held that Google had no liability for the misconduct of third parties, even if they profited from the publication. The court noted that

"the purpose the CDA is to shield interactive computer providers from the fraudulent and abusive conduct **of third parties**." 732 F. Supp. 2d at 633 (emphasis supplied). There are no third parties here; Defendants created the takedown service, unpublisharrest.com, and all of the content on it. This subjects Defendants to liability; "an entity would remain a 'provider or user' – and thus be eligible for the immunity under § 230(c)(2) – as long as the information came from someone else; but it would become a 'publisher or speaker' and lose the benefit of § 230(c)(2) if it created the objectionable information." *Doe*, 347 F.3d at 660.

But even assuming *arguendo* that the focus was on mugshots.com, the CDA would still not apply because the arrest records in question were not intended to be posted on their website for use in the takedown service. As the Ninth Circuit Court of Appeals explained in *Batzel v. Smith*, 333 F.3d 1018, 1033-34 (9th Cir. 2003), a content provider is not insulated under the CDA if the content in question was not supposed to be posted to the internet in the first place, and the content provider knew or had reason to know that fact. Otherwise,

> users and providers of interactive computer services could with impunity intentionally post material they knew was never meant to be put on the Internet. At the same time, the creator or developer of the information presumably could not be held liable for unforeseeable publication of his material to huge numbers of people with whom he had no intention to communicate. The result would be nearly limitless immunity for speech never meant to be broadcast over the Internet. Supplying a "provider or user of an interactive computer service" with immunity in such circumstances is not consistent with Congress's expressly stated purposes in adopting § 230. Free speech and the development of the Internet are not "promote[d]" by affording immunity when providers and users of "interactive computer service[s]" knew or had reason to know that the information provided was not intended for publication on the Internet.

*Id*. (brackets original; citations omitted). *Batzel* is instructive here; as Plaintiffs allege in the Complaint, the Illinois Department of Corrections, as required by law, *removes* mugshots and arrest records from its website after the adjudication of an arrestee's case or an arrestee's sentence is completed. And the Mugshots Act makes clear that musghots and arrest records are not intended

to posted for the purposes of coercive profit by a fake reputation management service. Further, Defendants are not *given* the records in question; Defendants *take* the records, often via computer software which, as the Complaint alleged, crashed the Illinois Department of Corrections website. Finally, as to Plaintiffs' FCRA claims, Defendants are not insulated by the FCRA for the same reason: the FCRA imposes affirmative requirements on what *Defendants* do with the records in question, entirely separate and apart from the content of the records in question.

The holdings of *Batzel* and *Anthony* are clear. Defendants are not immunized from liability because the posting of mugshots and arrest records *is not what this case is about*. What Plaintiffs care about is what Defendants *do* with those arrest records, and nothing in the CDA immunizes Defendants for that, or their own false statements. And certainly nothing in the CDA immunizes Defendants for unpublisharrest.com, an entirely separate website with entirely original content.

## V.  PLAINTIFFS HAVE STATED VALID CAUSES OF ACTION UNDER THE ICFA

### A.  Defendants' Arguments Are Restated Improper CDA Arguments

Defendants argue that Plaintiffs cannot recover under the ICFA because they have not suffered actual damages, or because they are disguised defamation claims and Plaintiffs cannot show actual malice. However, this argument is essentially a restatement of Defendants' improper CDA arguments, and Plaintiffs therefore restate their objections. Plaintiffs respond below only if this Court considers the merits.

### B.  Plaintiffs Properly Pleaded Damages

Plaintiffs need not plead malice because their injuries were caused not solely by the posting of the arrest records and mugshots, but by the scheme Defendants used to coerce Plaintiffs into paying. That scheme included search engine optimization

and, in Gabiola's case, the use of an incorrect record, stating he was still on parole. This scheme is not merely, as Defendants say, "dissemination of truthful matters of public concern."  <u>Absent the takedown service, Defendants would not have posted the mugshots in the first place</u>, because the Defendants' operation is commercial in nature and therefore commercial speech for the reasons already discussed.   In other words, Plaintiffs' injuries were caused by the existence of the takedown service, because, absent the takedown service, the mugshots would never have been posted. As alleged in the Complaint, both Plaintiffs cannot afford to pay the takedown fee, leading to further damages.

Moreover, even if Plaintiffs *could* afford to pay the takedown fee, Defendants routinely opt to leave mugshots posted even after accepting payment.  Compl't at ¶¶ 207-209.  "[T]he law never requires a useless act to be done." *Lititz Mut. Ins. Co. v. Lengacher*, 248 F.2d 850, 854 (7th Cir. 1957).    But even ignoring *that*, Plaintiffs cannot pay the takedown fee because it would eliminate their claims under the voluntary payment doctrine. *Smith v. Prime Cable*, 276 Ill. App. 3d 843, 658 N.E.2d 1325 (1995).  Therefore, this is not solely reputational harm.  But even if it was, reputational damages *are* actual damages, even in statutory actions.  *See*, *e.g.*, *Medline Indus. v. Strategic Commer. Solutions, Inc.*, 553 F. Supp. 2d 979 (N.D. Ill. 2008).[9]

Therefore, *Martin v. Hearst Corp.*, 777 F.3d 546 (2d Cir. 2015), is distinguishable; there

---

[9] Plaintiffs also do not have to prove damages under the Mugshots Act because it is a remedial statute.  "[W]hen a statute is enacted to protect a particular class of individuals, courts may imply a private cause of action for a violation of that statute although no express remedy had been provided. The public policy underlying certain statutes demands implication of a private remedy to compensate an aggrieved individual belonging to that class of persons whom the statute was designed to protect."  *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill. 2d 379, 386-87, 432 N.E.2d 849, 852 (1982).

was no takedown service (or anything close) at issue there.  Whereas, in *Martin,* the media outlet in question published a *news story* about the plaintiff as a matter of public concern, here Defendants are deliberately commercializing arrest records solely for *profit*, and in direct violation of an Illinois statute, and often making those records inaccurate so as to incentivize payment. Further, by arguing that they are acting as a media outlet and the records are merely "out of date," Defendants are impermissibly arguing with the well-pleaded factual allegations of the Complaint.

### C. Plaintiffs Need Not Plead Nor Prove Actual Malice

Defendants' "speech" is solely commercial for the reasons previously stated.  In the context of commercial speech, a plaintiff "does not have to show that the speaker acted with actual malice." *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 683, 105 Cal. Rptr. 3d 98, 114 (2010). "*Central Hudson*, [*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983)], and *Zauderer*, combined with the [Supreme] Court's plain statements that false commercial speech receives no protection, foreclose us from importing the actual-malice standard from defamation into the law of false commercial speech." *P&G v. Amway Corp.*, 242 F.3d 539, 557 (5th Cir. 2001).  In sum, the law is clear that Plaintiffs need not prove malice here.

But even were this Court to conclude that Plaintiffs are required to plead malice, Plaintiffs have plainly done so here.  "In order to prove 'actual malice' the plaintiff need not show malice in the moral sense of hate, vindictiveness, or animosity, but proof of a wanton disregard of the rights of others is sufficient." *Durso v. Lyle Stuart, Inc.*, 33 Ill. App. 3d 300, 304, 337 N.E.2d 443, 447 (1975).  Here, Defendants posted Plaintiffs' arrest records **for the sole purpose** of violating an Illinois statute, the Mugshots Act.  In doing so, Defendants wantonly disregarded the rights of Plaintiffs.  And Defendants' deliberate failure to update the Defendants' pages is (contrary to Defendants' arguments), in and of itself, proof of malice; under Illinois law, "any subsequent

publishing of a libel with knowledge of its falsity is proof of malice." *Durso*, 33 Ill. App. 3d 300, 306, 337 N.E.2d 443, 448 (1975).[10]  Defendants' actions constituted, at the *very* least, a "the purposeful avoidance of the truth" sufficient to establish malice, particularly given the purpose of the publication in question.  *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 692 (1989).

## **CONCLUSION**

Plaintiffs respectfully request that defendants' motion to dismiss be denied.

Respectfully submitted,
PETER GABIOLA and ANTONIO HAMMOND, on behalf of themselves and all others similarly situated


/s/ Berton N. Ring
By one of their attorneys,
Berton N. Ring, P.C.

Berton N. Ring #6183351
Stuart M. Clarke #6311043
Berton N. Ring, P.C.
123 West Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 781-0290

---

[10] It is *Illinois* law which controls here; as such, *Martin v. Hearst Corp.*, 777 F.3d 546 (2d Cir. 2015) is inapposite even if defamation law does apply because it applies the defamation law of Connecticut.

**APPENDIX:**

**STATUTES PROHIBITING THE SOLICITATION OF PAYMENT FOR REMOVAL OF MUGSHOTS FROM WEBSITES**

# ILLINOIS

**815 ILCS 505/2QQQ Criminal record information**

(a)  It is an unlawful practice for any person engaged in publishing or otherwise disseminating criminal record information through a print or electronic medium to solicit or accept the payment of a fee or other consideration to remove, correct, or modify said criminal record information.

(b)  For the purposes of this Section, "criminal record information" includes any and all of the following:

> (1)  descriptions or notations of any arrests, any formal criminal charges, and the disposition of those criminal charges, including, but not limited to, any information made available under Section 4a of the State Records Act or Section 3b of the Local Records Act [5 ILCS 160/4a or 50 ILCS 205/3b];
>
> o  (2)  photographs of the person taken pursuant to an arrest or other involvement in the criminal justice system; or
> o  (3)  personal identifying information, including a person's name, address, date of birth, photograph, and social security number or other government-issued identification number.

815 ILCS 505/2QQQ (LexisNexis, Lexis Advance through P.a. 99-502 of the 2016 Regular Legislative Session).

## CALIFORNIA

THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

**SECTION 1.**

Title 1.81.27 (commencing with Section 1798.91.1) is added to Part 4 of Division 3 of the Civil Code, to read:

**TITLE 1.81.27. Commercial Use of Booking Photographs**
**1798.91.1.**

(a) For the purposes of this section, the following definitions shall apply:

(1) "Booking photograph" means a photograph of a subject individual taken pursuant to an arrest or other involvement in the criminal justice system.

(2) "Subject individual" means an individual who was arrested.

(3) "Person" means a natural person, partnership, joint venture, corporation, limited liability company, or other entity.

(4) "Public entity" means the state, county, city, special district, or other political subdivision therein.

(b) It shall be unlawful practice for any person engaged in publishing or otherwise disseminating a booking photograph through a print or electronic medium to solicit, require, or accept the payment of a fee or other consideration from a subject individual to remove, correct, modify, or to refrain from publishing or otherwise disseminating that booking photograph.

(c) Notwithstanding subdivision (b), a public entity may require and accept a reasonable administrative fee to correct a booking photograph.

(d) Each payment solicited or accepted in violation of these provisions constitutes a separate violation.

(e) In addition to any other sanctions, penalties, or remedies provided by law, a subject individual may bring a civil action in any court of competent jurisdiction against any person in violation of this section for damages in an amount equal to the greater of one thousand dollars ($1,000) per violation or the actual damages suffered by him or her as a result, along with costs, reasonable attorney's fees, and any other legal or equitable relief.

(f) The jurisdiction of a civil action brought pursuant to subdivision (e) shall also include the county in which the subject individual resides at the time of the violation of this section.

# COLORADO

**24-72-305.5. Access to records - denial by custodian - use of records to obtain information for solicitation - definitions**

- (1)  Records of official actions and criminal justice records and the names, addresses, telephone numbers, and other information in such records shall not be used by any person for the purpose of soliciting business for pecuniary gain. The official custodian shall deny any person access to records of official actions and criminal justice records unless such person signs a statement which affirms that such records shall not be used for the direct solicitation of business for pecuniary gain.

- (2)  (a) It is unlawful for a person to obtain a copy of a booking photograph in any format knowing:
  - o  (I)  The booking photograph will be placed in a publication or posted to a web site; and
  - o  (II)  Removal of the booking photograph from the publication or web site requires the payment of a fee or other exchange for pecuniary gain.
    - ▪  (b)  A person who requests a copy of one or more booking photographs from an official custodian shall, at the time of making the request, submit the statement required by subsection (1) of this section; except that a custodian may allow a person who anticipates making multiple requests for booking photographs to submit the required statement once for all booking photographs requested during a specified period of time not to exceed one year. By signing the statement, the person is affirming that any booking photograph obtained from the custodian will not be placed in a publication or posted to a web site that requires the payment of a fee or other exchange for pecuniary gain in order to remove or delete the booking photograph from the publication or web site.
    - ▪  (c)  Notwithstanding the provisions of section 24-72-309, a person who violates a provision of paragraph (a) of this subsection (2) or who submits a false statement pursuant to paragraph (b) of this subsection (2) commits an unclassified misdemeanor and shall be punished by a fine of up to one thousand dollars.
    - ▪  (d)  As used in this subsection (2), unless the context otherwise requires, "booking photograph" means a photograph or other image of a person taken by a criminal justice agency at the time that a person is arrested or detained by a criminal justice agency and prior to conviction.

Colo. Rev. Stat. § 24-72-305.5 (Lexis Advance through all laws passed at the First Regular Session of the Seventieth General Assembly of the State of Colorado (2015))

# GEORGIA

### § 10-1-393.5. Prohibited telemarketing, Internet activities, or home repair

(b.1)  (1) As used in this subsection, the term:

(A)  "Photograph" means a photograph of a subject individual that was taken in this state by an arresting law enforcement agency.

(B)  "Subject individual" means an individual who was arrested and had his or her photograph taken and:

>(i)  Access to his or her case or charges was restricted pursuant to Code Section 35-3-37;

>(ii)  Prior to indictment, accusation, or other charging instrument, his or her case was never referred for further prosecution to the proper prosecuting attorney by the arresting law enforcement agency and the offense against such individual was closed by the arresting law enforcement agency;

>(iii)  Prior to indictment, accusation, or other charging instrument, the statute of limitations expired;

>(iv)  Prior to indictment, accusation, or other charging instrument, his or her case was referred to the prosecuting attorney but was later dismissed;

>(v)  Prior to indictment, accusation, or other charging instrument, the grand jury returned two no bills;

>(vi)  After indictment or accusation, all charges were dismissed or nolle prossed;

>(vii)  After indictment or accusation, the individual pleaded guilty to or was found guilty of possession of a narcotic drug, marijuana, or stimulant, depressant, or hallucinogenic drug and was sentenced in accordance with the provisions of Code Section 16-13-2, and the individual successfully completed the terms and conditions of his or her probation; or

>(viii)  The individual was acquitted of all of the charges by a judge or jury.

>>(2)  Any person who is engaged in any activity involving or using a computer or computer network who publishes on such person's publicly available website a subject individual's arrest booking photograph for purposes of commerce shall be deemed to be transacting business in this

state. Within 30 days of the sending of a written request by a subject individual, including his or her name, date of birth, date of arrest, and the name of the arresting law enforcement agency, such person shall, without fee or compensation, remove from such person's website the subject individual's arrest booking photograph. Such written request shall be transmitted via certified mail, return receipt requested, or statutory overnight delivery, to the registered agent, principal place of business, or primary residence of the person who published the website. Without otherwise limiting the definition of unfair and deceptive acts or practices under this part, a failure to comply with this paragraph shall be unlawful.

(c)  In addition to any civil penalties under this part, any person who intentionally violates subsection (b) of this Code section shall be subject to a criminal penalty under paragraph (5) of subsection (a) of Code Section 16-8-12. In addition thereto, if the violator is a corporation, each of its officers and directors may be subjected to a like penalty; if the violator is a sole proprietorship, the owner thereof may be subjected to a like penalty; and, if the violator is a partnership, each of the partners may be subjected to a like penalty, provided that no person shall be subjected to a like penalty if the person did not have prior actual knowledge of the acts violating subsection (b) of this Code section.

(d)  Any person who intentionally targets an elder or disabled person, as defined in Article 31 of this chapter, in a violation of subsection (b) of this Code section shall be subject to an additional civil penalty, as provided in Code Section 10-1-851.

(e)  Persons employed full time or part time for the purpose of conducting potentially criminal investigations under this article shall be certified peace officers and shall have all the powers of a certified peace officer of this state when engaged in the enforcement of this article, including but not limited to the power to obtain, serve, and execute search warrants. Such Georgia certified peace officers shall be subject to the requirements of Chapter 8 of Title 35, the "Georgia Peace Officer Standards and Training Act," and are specifically required to complete the training required for peace officers by that chapter. Such certified peace officers shall be authorized, upon completion of the required training, with the written approval of the Attorney General, and notwithstanding Code Sections 16-11-126 and 16-11-129, to carry firearms of a standard police issue when engaged in detecting, investigating, or preventing crimes under this article.

(f)  The Attorney General shall be authorized to promulgate procedural rules relating to his or her enforcement duties under this Code section.

Ga. Code Ann. § 10-1-393 (Lexis Advance Through the 2015 Regular Session) (subsection a omitted).

## MISSOURI

### § 407.1150. Publishing or disseminating criminal record information prohibited — definitions — violation, penalty

1.  As used in this section, the following words and phrases shall mean:

    (1) "Booking photograph", a photograph of a subject individual that was taken in this state by an arresting law enforcement agency;

    (2) "Criminal record information", a booking photograph, or the name, address, charges filed, or a description of a subject individual who is asserted or implied to have engaged in illegal conduct;

    (3) "Subject individual", an individual who was arrested and had his or her photograph taken by law enforcement during the processing of the arrest.

2. It shall be unlawful for any person engaged in publishing or otherwise disseminating criminal record information through a print or electronic medium to solicit or accept from a subject individual the payment of a fee or other consideration to remove or correct criminal record information.

3. A person who knowingly and willfully violates the provisions of this section shall be guilty of a class A misdemeanor.

4. Each payment solicited or accepted in violation of this section constitutes a separate violation.

5. In addition to the remedies already provided in this section, any subject individual who suffers a loss or harm as a result of a violation of this section may be awarded an amount equal to ten thousand dollars or actual and punitive damages, whichever is greater, and in addition may be awarded reasonable attorney's fees, court costs, and any other remedies provided by law. Humiliation or embarrassment shall be adequate to show that the plaintiff has incurred damages; however, no physical manifestation of either humiliation or embarrassment is necessary for damages to be shown.

Mo. Rev. Stat. § 407.1150 (LexisNexis, Lexis Advance through all legislation approved as of April 27, 2016, during the 98th General Assembly, Second Regular Session)

## UTAH

**17-22-30. Prohibition on providing copy of booking photograph — Statement required — Criminal liability for false statement.**

(1) As used in this section, "booking photograph" means a photograph or image of an individual that is generated:

    (a)  for identification purposes; and

    (b)  when the individual is booked into a county jail.

(2) A sheriff may not provide a copy of a booking photograph in any format to a person requesting a copy of the booking photograph if:

    (a)  the booking photograph will be placed in a publication or posted to a website; and

    (b)  removal of the booking photograph from the publication or website requires the payment of a fee or other consideration.

(3)  (a)  A person who requests a copy of a booking photograph from a sheriff shall, at the time of making the request, submit a statement signed by the person affirming that the booking photograph will not be placed in a publication or posted to a website that requires the payment of a fee or other consideration in order to remove or delete the booking photograph from the publication or website.

(b)  A person who submits a false statement under Subsection (3)(a) is subject to criminal liability as provided in Section 76-8-504.

Utah Code Ann. § 17-22-30 (LexisNexis, Lexis Advance through the 2015 First Special Session)

# VIRGINIA

### § 8.01-40.3. Unauthorized dissemination, etc, of criminal history record information; civil action

A.  Any person who disseminates, publishes, or maintains or causes to be disseminated, published, or maintained the criminal history record information as defined in § 9.1-101 of an individual pertaining to that individual's charge or arrest for a criminal offense and solicits, requests, or accepts money or other thing of value for removing such criminal history record information shall be liable to the individual who is the subject of the information for actual damages or $ 500, whichever is greater, in addition to reasonable attorney fees and costs.

B.  Nothing in this section shall be construed to impose liability on:

    1.  An interactive computer service, as defined in 47 U.S.C. § 230(f), for content provided by another person.

    2.  Any speech protected by Article I, Section 12 of the Constitution of Virginia.

C.  As used in this section, "criminal history record information" means the same as that term is defined in § 9.1-101.

Va. Code Ann. § 8.01-40.3 (Lexis Advance through Chapter 1-4, 19, 55, and 71 of the 2016 Regular Session of the General Assembly)