### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| PETER GABIOLA, ANTONIO HAMMOND, and JIMMY THOMPSON, on behalf of themselves and all other similarly situated individuals, <br><br> *Plaintiffs*, <br><br> v. <br><br> SAHAR SARID, individually and a/k/a "Michael Robertson"; THOMAS KEESEE, an individual; MARC GARY EPSTEIN, an individual; MUGSHOTS.COM, LLC, a Delaware Limited Liability Company; UNPUBLISH, LLC, a Florida Limited Liability Company; UNPUBLISH, LLC, a Wyoming Limited Liability Company; HAMMERMILL & MASTERSON LLC d/b/a "Unpublisharrest.com," "Mugshots.com," and "Unpublishingpartners.com," a Wyoming Limited Liability Company; and HAMMERMILL & MASTERSON LLC d/b/a "Unpublisharrest.com," "Mugshots.com," and "Unpublishingpartners.com," a Florida Limited Liability Company, <br><br> *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     No. 16 cv 02076 |

### FIRST AMENDED CLASS ACTION COMPLAINT AT LAW AND EQUITY

Plaintiffs PETER GABIOLA ("Gabiola"), ANTONIO HAMMOND ("Hammond"), and JAMES THOMPSON (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, Berton N. Ring and Stuart M. Clarke of Berton N. Ring, P.C., hereby respectfully complain and allege against Defendants, SAHAR SARID, individually and a/k/a "Michael Robertson"; THOMAS KEESEE, an individual; MARC GARY EPSTEIN, an individual; MUGSHOTS.COM, LLC, a Delaware Limited Liability Company; UNPUBLISH, LLC, a Florida Limited Liability Company; UNPUBLISH, LLC, a Wyoming Limited Liability Company; HAMMERMILL & MASTERSON LLC d/b/a "Unpublisharrest.com," "Mugshots.com," and "Unpublishingpartners.com," a Wyoming Limited Liability Company; and

HAMMERMILL & MASTERSON LLC d/b/a "Unpublisharrest.com," "Mugshots.com," and "Unpublishingpartners.com," a Florida Limited Liability Company; as follows:

## <u>PRELIMINARY STATEMENT</u>

This case is about how Sahar Sarid and Thomas Keesee use an enterprise of extortion and racketeering to coerce vulnerable people into paying money to fund their multi-million dollar scam. Sarid owns the website "mugshots.com," on which he posts arrest records, complete with pictures of arrestees, to www.mugshots.com, and use analytics and search optimization to ensure that each record is among the first search results found when the arrestee's name is entered into a search engine such as Google.

However, musghots.com is not a search engine for mugshots or a public safety service. Instead, Sarid posts these mugshots online solely in order to profit by demanding that each arrestee pay a fee of hundreds or thousands of dollars to a website called "unpublisharrest.com," which is owned by Sarid and operated by Thomas Keesee and Keesee's company, Hammermill & Masterson. Sarid deliberately makes no effort to ensure the information posted to mugshots.com is up to date or accurate, because he wants those inaccuracies to incentivize people – whether guilty or not – to pay for the removal of their mugshots from the site. Prospective employers (or anyone else) conducting a web search on an arrestee finds information indicating that people are still charged, incarcerated, or on parole years even after release or an adjudication of not guilty. The end result for the arrestee is job loss, broken families, and homelessness. The end result for Sarid and Keesee is massive profits, including over two million dollars in a five-month period in 2013 alone.

This action seeks to put an end to Defendants' profiteering at the expense of vulnerable people by ending this so-called "takedown service" once and for all.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331, for claims brought pursuant to the Statutes of the United States, and pursuant to Defendants' prior removal of this action from the Circuit Court of Cook County Illinois.

2. This Court has jurisdiction over all non-federal claims brought in this action as additional claims substantially related to Plaintiffs' federal claims.

3. Venue is proper in this court as Plaintiffs Gabiola and Hammond were residents of the County of Cook in the State of Illinois as of the time of the filing of the original Complaint, Hammond remains a resident of Illinois in the County of Cook, and some or all actions complained of by Plaintiffs against Defendants occurred in the County of Cook in the State of Illinois.

## THE PARTIES

### *Plaintiff Gabiola*

4. Plaintiff Peter Gabiola is a natural person and resident of Nebraska.

5. As of the time of filing of the original Complaint in this action, Gabiola was a resident and domiciliary of the County of Cook in the State of Illinois

6. At the time of all events complained of herein, Gabiola was domiciled in Illinois.

7. Gabiola is a former inmate with the Illinois Department of Corrections.

8. On or about July 27, 2012, Gabiola exited parole.

### *Plaintiff Hammond*

9. Plaintiff Antonio Hammond is a natural person and resident of Illinois.

10. Hammond is a former inmate with the Illinois Department of Corrections.

11. On April 3, 2015, Hammond was discharged from Dixon Correctional Facility and entered parole.

*Plaintiff Thompson*

12. Plaintiff Jimmy Thompson ("Thompson") is a natural person and resident of the State of Florida.

13. In or around October of 2003, Thompson was stopped by the Orange County Sheriff's department for a minor traffic violation.

14. During that traffic stop, Thompson was arrested and detained by the Orange County Sheriff's department.

15. That arrest and detention were due to an erroneous charge of check fraud.

16. The check fraud charge was actually pending against a separate individual, also named "Jimmy Thompson."

17. That check fraud charge was in Hillsboro County, Florida.

18. Eight days after Thompson's arrest, the Hillsborough County State's Attorney discovered it had erroneously charged Thompson when a staffer compared driver's license numbers.

19. The Hillsborough County State's Attorney then dismissed all charges against Thompson.

20. In or around September of 2012, Thompson learned that the erroneous arrest record had been posted to mugshots.com.

*The Defendants*

21. Defendant Sahar Sarid ("Sarid") is a natural person and resident of Broward County, Florida.

22. At all times herein relevant, Sarid was the equitable and/or legal owner of all of the subject matter websites.

23. Defendant mugshots.com LLC ("Mugshots.com") is a Delaware Limited Liability Company organized under the laws of the state of Delaware.

24. As of June 23, 2016, according to records maintained by the Delaware Secretary of State, Mugshots.com has been dissolved or is no longer in good standing in the State of Delaware.

25. Sarid organized mugshots.com to operate the website "mugshots.com," including without limitation the publication of arrest records onlint.

26. Unpublish, LLC ("Unpublish LLC" or "Unpublish") purports to be a Limited Liability Company organized under the laws of the island of Nevis in the West Indies.

27. Unpublish uses a WhoIs domain name masking service.

28. Unpublish uses that domain name masking service so as to prevent visitors to the Defendants' websites from tracing those websites' IP addresses.

29. Defendant Unpublish LLC also purports to be a Florida Limited Liability Company with its principal place of business in Florida.

30. Defendant Unpublish LLC also purports to be a Wyoming Limited Liability Company with its principal place of business in Minnesota.

31. According to records maintained by the Wyoming and Florida Secretaries of State, Unpublish LLC's registration in both States was revoked as of 2015.

32. At various times herein, the Unpublish Entities purported to be licensees for the Defendants' "unpublication" or "takedown" service.

33. All of the Unpublish Entities were beneficially or legally owned, and operated, managed, and/or controlled, by Sahar Sarid.

34. Defendant Marc Gary Epstein ("Epstein") is a natural person and resident of the State of Florida.

35. At some or all times herein relevant, the sole member and/or manager for each Unpublish LLC was Defendant Epstein.

36. At some or all times herein relevant, Epstein represented himself as attorney for the subject matter websites, including writing cease and desist letters and appearing in court proceedings on behalf of the websites.

37. At various times herein relevant, Epstein was an equitable or legal owner and/or agent of, or otherwise controlled, one or more of the Unpublish defendants herein.

38. At all times herein relevant, Defendant Hammermill & Masterson LLC ("Hammermill") was an equitable or legal owner of, or otherwise controlled, Unpublish LLC.

39. According to public records, Unpublish LLC continues to operate in Florida and maintain its principal offices there.

40. At all times herein relevant, Defendant Hammermill & Masterson LLC purported to be a Wyoming Limited Liability Company with its principal place of business in Florida.

41. At all times herein relevant, Defendant Hammermill & Masterson LLC also purported to be a Florida Limited Liability Company with its principal place of business in Florida.

42. At all times herein relevant, the sole member and/or manager Defendant Hammermill was and is Defendant Thomas Keesee.

43. At all times herein relevant, Defendant Keesee was and is a resident and citizen of the State of Florida.

44. At all times herein relevant, Keesee was the sole or majority owner, controller, and/or operator of Defendant Hammermill.

45. At all times herein relevant, Sarid hired Keesee and/or Hammermill to operate the takedown services for the subject matter websites.

46. Jokulsa Laekur LLC, Drangur Stadur LLC, and Julkisuudessa, LLC (the "Nevis Companies"), nonparties to this action, purport to be Limited Liability Companies in the island of Nevis in the West Indies.

47. The Nevis Companies were originally organized by Sahir Sarid as holding companies for mugshots.com.

48. The Nevis companies exist solely, or in large part, for the purpose of receiving funds received by the takedown service in offshore bank accounts.

49. However, two or more of the Nevis Companies are still listed, individually or together, on mugshots.com as the owners of mugshots.com.

50. Sarid or his staff list the Nevis Companies as the owners of mugshots.com so as to hide the true ownership of mugshots.com from website visitors and the public.

51. Upon information and belief, the Nevis Companies are not, and have never been, registered Limited Liability Companies under the laws of any State in the United States.

52. Upon information and belief, the Nevis Companies are not, and have never been, authorized to do business under the laws of any State in the United States.

53. According to internet records obtained via internet protocol address tracing, unpublisharrest.com and unpublishingpartners.com are web hosted in and/or registered to an address in or around Fort Lauderdale, Florida.

54. Upon information and belief, one or more of the LLC Defendants are alter egos or buffers for the individual Defendants with no independent assets, offices, or employees.

55. The Nevis Entities are not organized business entities in the United States and do not exist under the laws of any State.

56. Sarid and Keesee use the names of the Nevis Entities solely to hide the true ownership of the subject matter websites from the general public and website visitors.

57. Sarid and Keesee directly operate the subject matter websites in the State of Florida. None of the Defendants' offices are located in Nevis, and few or minimal, if any, of their business activities occur there.

58. Upon information and belief, the Nevis Companies do not exist as legally recognized business entities.

59. Upon information and belief, the Nevis Companies have no members or managers.

60. Upon information and belief, the Nevis Companies are controlled and operated solely by Sarid.

61. Upon information and belief, the Nevis Entities are not legally recognized under the laws of any State in the United States.

62. The websites are operated as a single enterprise, without regard to observing corporate formalities for the individual business entities.

63. All Defendants share the same offices and comingle assets and/or incomes.

64. None of the LLC Defendants are registered or authorized to do business in the State of Illinois.

65. Between 2011 and the present, Sarid has himself, or otherwise ordered that, the various LLC Defendants be incorporated, dissolved, then re-incorporated in different states and foreign countries.

66. On information and belief, Sarid conducted or caused to be conducted this pattern of dissolution and incorporation as a usual business practice in order to hide from or confuse the public about the ownership of the subject matter websites.

67. Unpublish, LLC has been organized, dissolved, and reorganized no fewer than thrice during the relevant time period, including in Nevis, Florida, Australia, and Wyoming.

68. Keesee has organized, dissolved, and reorganized Hammermill & Masterson no fewer than twice during the relevant time period, including in Wyoming and Florida.

69. Mugshots.com LLC has been organized and dissolved at least once in Delaware during the relevant time period.

70. At some or all times herein relevant, Defendants used an Internet Protocol ("IP") masking service called "WHOIS" to hide the actual owners and location for both of the subject matter websites.

71. At some or all times herein relevant, Sarid and Keesee use Whois IP masking and purported Nevis limited liability companies substantially or primarily so as to create the appearance of separation between themselves and the LLC Defendants.

72. According to internet records, mugshots.com is currently hosted by Amazon Web Services, or "AWS."

### **GENERAL ALLEGATIONS COMMON TO ALL COUNTS**

#### ***Background***

73. All allegations in this Complaint, unless expressly otherwise stated, are current as of June 20, 2016.[1]

74. Mugshots.com is a website that displays arrest record information, complete with photographs where available (the namesake "mugshots"), to anyone who searches for the

---

[1] Defendants alter the content of the website on a daily or weekly basis while this suit is pending, including reversing prior changes and making large-scale content changes. Plaintiffs have attempted to provide the most current information possible.

name of the arrestee.

75. The information and pictures posted on mugshots.com are for arrestees, not solely persons convicted of a crime.

76. The website Mugshots.com was founded by Sarid in or about 2008.

77. In or around 2008, Sarid also founded the Nevis Companies.

78. On information and belief, in or around 2008, Sarid retained Epstein as attorney, consultant, or confidential advisor for mugshots.com.

79. In or around 2011, mugshots.com was beginning to generate significant negative media attention.

80. Sarid then purported to sell the mugshots.com website and the Nevis companies to a purported investment group led by a person named "Michael Robertson" ("Robertson") via an auction on the internet trading website eBay.

81. However, on information and belief, "Michael Robertson" does not exist.

82. Alternatively, "Michael Robertson" is a straw person who takes no part in any decisions, and has no control of the aforementioned entities and nonentities and subject matter websites.

83. In reality, the eBay sale was a sham, and Sarid retained ownership or control of some or all of the subject matter websites and the Nevis entities.

84.  In order to mask the fake sale, Sarid created a fake LinkedIn profile for Robertson.

85. As a result of Sarid's fake sale, Plaintiffs did not discover that Sarid still owned mugshots.com until June of 2016.

86. On Michael Robertson's fake LinkedIn profile, Sarid states that mugshots.com is among "the top 1,000 website destinations" on the internet.

87. According to ALEXA, an internet analytics firm, that statement is false.

88. Sarid also designated www.fabulous.com, a domain name service and website founded by another, real person named Michael Robertson, as the WHOIS registrant for one or more of the subject matter websites.

89. In or around 2011, Sarid created a service called the "takedown service" to monetize the arrest records on mugshots.com.

90. The takedown service consisted of solicitation and acceptance of fees by mugshots.com in exchange for the removal of the arrest records on mugshots.com.

91. Sarid hired Ari Epstein ("Ari"), Marc Epstein's son and a dismissed non-party to this action, to operate the takedown service.

92. Sarid instructed Ari to create "affiliates" of mugshots.com which posed as separate reputation management firms.

93. In reality, however, these affiliates operated as extensions of mugshots.com.

94. Sarid referred to mugshots.com and its affiliates collectively as the "mugshots.com enterprise."

95. Each reputation management "affiliate" represented itself on its website as unrelated to mugshots.com and advertised services related to mugshots.com on their websites.

96. These purported services included the removal of mugshots and information from mugshots.com for a fee.

97. On information and belief, the fees for all of these "affiliates" were set by Sarid in advance, and were the same for each affiliate.

98. In or around 2011 and 2012, one "affiliate" firm, mugshotbusters.com, offered online services as a reputation management firm to remove mugshots from mugshots.com.

99. In or around 2011 and 2012, mugshotbusters.com was registered to Defendant Epstein's former wife, Lesli Epstein ("Lesli").

100.    In or around 2011 and 2012, mugshotbusters.com was owned and/or operated by Ari, at Sarid's instructions and directions.

101.    At all times during his involvement with the mugshots.com enterprise, Ari was an agent of Sarid.

102.    Sarid instructed Ari to create a Limited Liability Company entitled "Online Reputation Management Group LLC" to operate the various affiliates.

103.    In or around 2012, Sarid hired Defendant Keesee and/or Hammermill to operate the sales and customer service for the takedown service.

104.    At all times herein relevant, Keesee owned, controlled, and/or operated Hammermill.

105.    In or around 2012, Sarid decided to discontinue and/or terminate the "affiliates" and move the takedown service in-house.

106.    In or around 2012, Sarid, himself or through his agents or employees, replaced mugshotbusters.com and the other affiliates with a single website, unpublisharrest.com.

107.    Sarid owned or controlled unpublisharrest.com at all times herein relevant.

108.    The sole purpose of unpublisharrest.com is to operate the takedown service.

109.    At some or all times herein relevant, "unpublisharrest.com" was a registered trade name of Hammermill in Wyoming.

110.    Sarid hired Defendants Keesee and/or Hammermill to operate the sales and customer service for unpublisharrest.com.

111.    As part of his arrangement with Keesee and/or Hammermill, Sarid did not post

Keesee's arrest records to mugshots.com.

### *How the Websites Work*

112.    Sarid obtains information regarding arrestees for mugshots.com in two primary

ways.

113.    By the first method, Sarid, either himself or through employed staff, uses software

programs called "spiders" or "bots" to copy information from department of corrections

websites.

114.    For example, under Illinois law, the Illinois department of corrections ("IDOC")

posts public records regarding inmates to the department of corrections website for so long

as the inmates remain incarcerated or on parole.

115.    Sometime after an inmate leaves parole or completes his/her sentence, IDOC causes

that information to be removed from the IDOC website.

116.    Past inmate records are treated as confidential by IDOC and may not be viewed on

the IDOC website.

117.    Sarid and/or his staff uses software to "scrape" the information from the department

of corrections website for all or substantially all inmates and arrestees using spiders and

bot programs.

118.    Sarid and/or his agents or employees then post that "scraped" information to

mugshots.com, even after the IDOC removes it from the IDOC website.

119.    By the second method, Sarid and/or his employees or agents file requests under

federal, state, and local Freedom of Information Acts ("FOIA") for inmate and arrest

records or purchase them from public records databases maintained by government agencies.

120.    On information and belief, Sarid and/or his employees or agents have filed one or more FOIA requests to obtain mugshots for use on the websites, including without limitation in Illinois.

121.    On information and belief, Sarid also used the false name "Robertson" to file at least one FOIA request in Iowa using his own name, using a Florida address on the FOIA request application.

122.    The use of a false name in a FOIA request is unlawful in Illinois.

123.    On information and belief, Sarid and/or his employees and agents do not indicate that they are requesting the records for a commercial purpose, thereby using a FOIA request under false prestenses.

124.    After received documents responsive to their FOIA requests, Sarid and/or his agents or employees then post the information from those records including photographs, to their website.

125.    Sarid makes little or no effort to update the information and photographs being posted to mugshots.com.

126.    Sarid makes little or no effort to confirm the accuracy of the information and photographs being posted to mugshots.com.

127.    On information and belief, Sarid instructs his employees and/or agents to take little or no effort to update, or confirm the accuracy of, the information and photographs being posted to mugshots.com.

128.     Sarid does not have any policy or procedure for the manual or automatic update of the information and photographs being posted to mugshots.com.

129.     On information and belief, Sarid does not have any policy or procedure for the confirmation of the accuracy of information and photographs before it is posted to mugshots.com.

130.     At some or all times herein relevant, Sarid did not designate a specific person, employee, or agent to update the information listed on mugshots.com or confirm its accuracy prior to posting.

131.     As a result, the information on mugshots.com is routinely out of date or inaccurate.

132.     Sarid and/or his staff places digital watermarks on each mugshot once posted to an arrestee's page so as to avoid re-use by other persons or entities.

133.     On information and belief, Sarid and his staff have currently posted to mugshots.com incorrect information regarding inmate or parole status for hundreds of thousands of persons nationwide.

134.     Sarid and/or his staff takes little or no action to correct false or inaccurate information before it is posted on mugshots.com, including without limitation the following:

        a.  Guilty findings;
        b.  Case dispositions;
        c.  Incarceration status;
        d.  Existence of certificates of innocence;
        e.  Personal information; and
        f.  Parole Status.

135.     Sarid posts on mugshots.com that they may remove the records or pictures of persons who are exonerated or wrongly committed.

136.     However, until the initial filing of this action, Sarid and/or his employees or agents, did not actually remove those records without payment of the standard fee.

137.     Before the filing of this action, Sarid, Hammermill, and Keesee, and their employees or agents, routinely moved, or threatened to move, such requestors to the mugshots.com home page when they request removal for free.

138.     The Chicago Tribune reported in 2012 that Terrill Swift requested that unpublisharrest.com remove his records and picture from mugshots.com for free in 2012 after he was exonerated.

139.     In response, Sarid, or his employees or agents, moved Swift's record onto the home page of mugshots.com.

140.     Some or most other websites in the mugshots industry remove arrestees for free with proof of exoneration.

141.     Sarid hires writers for the editorial content on mugshots.com.


### *The Defendants Monetize Photographs and Arrest Records of Unwilling Participants*

### **Method 1: through mugshots.com**

142.     On information and belief, Sarid and/or his staff deliberately fail to update or correct out of date or wrong information on mugshots.com so as to (a) coerce arrestees to pay for the removal or correction of that information, (b) and incentivize the raising of revenue from arrestees' payments.

143.     Sarid has organized the mugshots.com enterprise entirely or largely towards the generation of profit via the takedown service.

144.     The mugshots.com enterprise does not request written permission of any arrestees before posting their mugshots and arrest records to mugshots.com.

145.     No Defendant named herein requests written permission of any arrestees before posting their mugshots and arrest records to mugshots.com.

146.     Sarid's sole purpose in operating the websites is to generate a profit or sales, and the operations of the websites are geared solely or largely towards those purposes.

147.     Sarid's primary business model is to monetize the arrest records and photographs posted on mugshots.com using the takedown service.

148.     This primarily includes visitors and arrestees who wish to correct or remove information from mugshots.com.

149.     So as to incentivize web visitors and arrestees to pay for removal of arrest records, Sarid instructs or causes his employees or agents not to correct out-of-date or inaccurate records and information about arrestees.

150.     So as to incentivize web visitors and arrestees to pay for removal of arrest records, Sarid instructs or causes his employees or agents not to take any procedural or recognized steps to revise false or out-of-date information about arrestees.

151.     The original content on mugshots.com is deliberately designed by Sarid to imply to visitors that arrestees posted on the site are dangerous, irrespective of whether they are actually rehabilitated.

152.     For example, mugshots.com posted an arrest record for Jonathan Barr stating that he was convicted of murder, even years after he was publicly exonerated.

153.    The original content on mugshots.com is deliberately designed by Sarid to imply to visitors that arrestees posted on the site are dangerous and/or guilty of the charged crime, irrespective of whether they are actually dangerous or convicted of a violent offense.

154.    Sarid posts this original content so as to incentivize, encourage, or increase the likelihood that visitors and arrestees to pay for the takedown service.

155.    The takedown service is owned or controlled by Sarid.

156.    The takedown service is operated or managed by Keesee and Hammermill.

157.    At some or all times herein relevant, Sarid posted, or caused to be posted, the following on some or all pages of mugshots.com (boldface, capitalization, and emphasis original):

**DISCLAIMER NOTICE:  ALL ARE PRESUMED INNOCENT UNTIL PROVEN GUILTY IN A COURT OF LAW. PUBLISHED MUGSHOTS AND/OR ARREST RECORDS ARE PREVIOUSLY PUBLISHED PUBLIC RECORDS OF: AN ARREST, A REGISTRATION, THE DEPRIVATION OF LIBERTY OR A DETENTION. THE MUGSHOTS AND/OR ARREST RECORDS PUBLISHED ON MUGSHOTS. COM ARE IN NO WAY AN INDICATION OF GUILT AND THEY ARE NOT EVIDENCE THAT AN ACTUAL CRIME HAS BEEN COMMITTED. EVERY EFFORT IS MADE TO ENSURE THE ACCURACY OF INFORMATION POSTED ON THIS WEBSITE. HOWEVER, MUGSHOTS. COM DOES NOT GUARANTEE THE ACCURACY OR TIMELINESS OF THE CONTENT OF THIS WEBSITE. IN ADDITION NAMES MAY BE SIMILAR OR IDENTICAL TO OTHER INDIVIDUALS. FOR LATEST CASE STATUS, CONTACT THE OFFICIAL LAW ENFORCEMENT AGENCY WHICH ORIGINALLY RELEASED THE INFORMATION.**

**UNPUBLISHING NOTICE:  IF YOU WERE FOUND GUILTY; YOU STILL MAY QUALIFY TO BE UNPUBLISHED.**

158.     Hammermill and Keesee post links on each records page offering to correct inaccurate records or remove a photograph or record.

159.    A visitor or arrestee who clicks on the link is taken to a checkout page.

160.    The checkout page lists various tiers of pricing for the number of corrections to be made or photographs and records to be removed.

161.    These tiers range from $398 for one photograph to $2,000 or more for multiple photographs.

162.    In small typeface below the checkout page, Keesee and Hammermill state that the payment does not guarantee removal of the photograph or record.

163.    That statement includes the following: LICENSOR RESERVES THE RIGHT TO APPROVE OR DECLINE ANY APPLICATION IN ITS SOLE DISCRETION.

164.    Keesee and Hammermill further state that they will not refund a payor's money if they choose to not remove the photograph or record.

165.    At most or all times herein relevant, Keesee and Hammermill also included, or caused to be included, purported terms of "sale" for each payment on the websites, as follows:

> In consideration for receipt of a completed application acceptable to Licensor and stated appropriate fee for the amount of content being licensed, the Licensor ("The Mugshots. com Database") grants the Licensee ("Payee", "Publisher") a non-transferable license to Permanently Publish(1), Edit(2), or Halt Publication (Unpublish)(3) of one arrest record(s) per one paid application within Licensor's publicly-available database. The Limited License described herein must be used within 24 hours from issuance of the license. Once License is issued, Licensee may instruct Licensor and/or its agents to permanently publish or alternatively; halt publication (unpublish) of the chosen licensed content. Failure to use the limited license within the 24 hour term of the limited license shall be considered a waiver of rights and under no circumstance give rise to a claim for a refund of the license fee paid by licensee or its agents, assigns or successors. Licensor may revoke any license at any given time by issuing a full refund to Licensee. An application may be declined, or reversed, for any reason, by Licensor in its sole discretion. If a license is declined or reversed by Licensor, the Licensor shall issue a full refund of the fee charged. In the event of

any dispute regarding the limited license described herein, the Licensee agrees that same shall be solely and exclusively resolved by mediation which shall be venued in Nevis, West Indies. In any event the limitation of liability arising from the transaction described herein shall be limited to the amount paid by Licensee, its agents, successors, or assigns for the limited license purchased by licensee.

The Publishing License herein may be used by victims (or other individuals) who may wish to ensure that a specific arrest record be accessible permanently within The Mugshots. com Database, arrestees (or other individuals) who may wish to halt publication (unpublish) of a record for personal and/or professional reasons, or arrestees (or other individuals) who may wish to update a record to reflect latest case status.

166.    Keesee and Hammermill state on one or more of the websites that a payor must also independently request, in writing, that a photograph be taken down from the site within 24 hours of payment in addition to the checkout and payment.

167.    Keesee and Hammermill state on one or more of the websites that the actual payment itself is insufficient for a record to be removed, and that they will not refund any monies if a photograph is not removed.

168.    Keesee and Hammermill post terms of service requiring a payor to agree that musgots.com is granting a payor a limited license to use the payor's own likeness.

169.    Payors who do not agree cannot have their images removed from the website.

170.    Sarid also offers, or causes to be offered, arrest records to mugshots.com visitors in the form of background checks.

171.    Sarid offers, or causes to be offered, these background checks for housing, employment, or insurance application renewal.

172.    These offers are made in conjunction with a third party.

173.     Until the filing of this lawsuit, on each arrestee's webpage, Sarid posted, or causes the posting of, the following link:



174.     Clicking on the link allowed the visitor to purchase records for an arrestee in the form of a background check.

175.     Beginning in or around June of 2016, Sarid replaced, or caused to be replaced, the above link with these links:



176.      Clicking on the links allowed the visitor to purchase records for an arrestee in the form of a criminal background check.

177.     On mugshots.com, Sarid recommends, or causes to be recommended, to visitors that they use mugshots.com for background checks and/or credit check purposes.

178.     The mugshots.com FAQ page states that "Mugshots.com is a search engine for Official Law Enforcement records, specifically arrest records and booking photographs, mugshots."

179.     The mugshots.com FAQ page states that people visit the website to answer, *inter alia*, these questions:

      i.   Is this new tenant a fraudster?

      ii.   Is the guy I'm dating accused of violent crimes?

      iii.   Is my neighbor a child molester?

iv.   Is my child's teacher a DUI offender?

180.      Some or all of the information offered on mugshots.com regarding arrestees is inaccurate and/or false.

181.      For example, as of the date of this filing, Defendants state on mugshots.com that Plaintiff Gabiola is currently on parole.

182.      As of the date of this filing, Gabiola has exited parole.

183.      As a result, some or all of the information being offered to consumers by Defendants on mugshots.com as a purported "background check" to answer those questions is incorrect and/or inaccurate.

**Takedown Service Method 2: Fake Reputation Management Firms**

184.      Hammermill and Keesee also operate a fake reputation management service through the website "unpublisharrest.com."

185.      Hammermill and Keesee represent that unpublisharrest.com is a separate reputation management firm.

186.      In reality, Sarid owns or controls unpublisharrest.com.

187.      Sarid, Hammermill, and/or Keesee incentivize or encourage people to use unpublisharrest.com by stating that they will not unpublish the mugshots or arrest records themselves.

188.      At some or all relevant times herein, on mugshots.com, Defendants stated the following:

"I WAS FOUND GUILTY" ; "MY CASE IS PENDING" ; WILL YOU REMOVE MY MUGSHOT?

No.

"MY RECORD WAS EXPUNGED" ; "I WAS PARDONED" ; "MY CASE WAS DISMISSED" ; WILL YOU REMOVE MY MUGSHOT?

As you may be aware Expungement and pardon only apply to certain government agencies' databases, and not all of them. Certainly not to the private sector.

189.    The service offered by Hammernill and Keesee on unpublisharrest.com is the removal, for a fee, of the mugshot and/or arrest record from mugshots.com.

190.    Sarid, Hammermill, and/or Keesee post advertisements for unpublisharrest.com on each arrest record page of mugshots.com.

191.    Hammermill and Keesee post to the top of every page and screen of mugshots.com a large weblink in boldface type which reads "**UNPUBLISH MUGSHOT**."

192.    Hammermill and Keesee also post to every page and screen of mugshots.com a large boldfaced link in red typeface with a telephone number highlighted in yellow on the right side of the screen, such s the following:

**CLICK HERE for Unpublishing or Call 1-800-810-3965**

193.    Keesee and Hammermill operate the call centers which receive telephone calls at that number.

194.    Each page on mugshots.com has no fewer than two weblinks in large, boldface and/or colorful typeface which lead to a "checkout" landing page, either via Method 1 or Method 2.

195.    Those weblinks are maintained by Hammermill and Keesee.

196.    Several pages on mugshots.com have more than these two weblinks leading to unpublishing and/or takedown services.

197.    For example, Hammermill and/or Keesee post to each arrestee's page a third link in bright red, boldface type above the mugshot, which reads:

### UNPUBLISH MUGSHOT

198.    Sarid, Hammermill, and/or Keesee make these large links colorful and/or boldfaced so as to attract attention to the links and solicit purchases of these purported services by visitors, including in Illinois.

199.    Sarid, Hammermill, and/or Keesee falsely represent on the subject matter websites that the unpublishing services are provided by an independent reputation management firm unaffiliated with mugshots.com.

200.    These representations include statements stating, for example, that "the terms of service agreement for the unpublishing services "may be modified from time to time as customary for an Internet reputation management business."

201.    At some or all relevant times herein, each website stated, as follows:

> UnpublishArrest. com [sic] is comprised of experienced agents who are specialists in submitting licensing applications on behalf of it's [sic] clients to "The Mugshots. com Database" for permanent unpublishing, permanent publishing or editing of arrest records/mugshots contained within "The Mugshots. com Database. " We have learned through experience what it takes to successfully submit applications to "The Mugshots. com Database". We are the billing and customer service agent for The Mugshots. com Database. In most instances our submissions are successful for permanently unpublishing, permanently publishing or editing a public arrest record(s)/mugshot(s). The work is typically completed by the licensor within 24 hours.

202.      In reality, both unpublisharrest.com and mugshots.com are owned or controlled by Sarid.

203.      In reality, Sarid causes or directs Hammermill and Keesee on the operations of unpublisharrest.com.

204.      As with mugshots.com, the checkout page on unpublisharrest.com lists various tiers of pricing for the number of corrections to be made or photographs and records to be removed.

205.      These tiers range from $398 for one photograph to $2,000 or more for multiple photographs.

206.      These takedown service prices are the same or substantially similar as on mugshots.com.

207.      At some or all times herein relevant, people who submitted an "application" to unpublisharrest.com for removal of a record were required by Defendants to also pay a separate "representation fee" in addition to the fees demanded by mugshots.com.

208.      Hammermill and Keesee operate unpublisharrest.com deliberately so as to deceive or confuse people into believing that they are independent reputation management firms.

209.      Hammermill and Keesee operate unpublisharrest.com deliberately, intentionally, or with reckless disregard, with the intent that people rely on their representations and pay additional monies.

210.      As of the date of this filing, "unpublisharrest.com" remained an active website, soliciting and collecting monies.

211.     On information and belief, Sarid routinely fails and/or refuses, or instructs his agents or employees to fail or refuse, to remove pictures and/or records of arrestees even after Keesee and/or Hammermill receives those arrestees' payments.

212.     Hammermill and Keesee further state both on unpublisharrest.com and to callers that the complete removal of the information, records, or pictures is not guaranteed, even with full payment.

213.     Hammermill and Keesee state on unpublisharrest.com that they "offer a full 100% money back guarantee if your licensing application for permanent unpublishing, permanent publishing or editing is not accepted by The Mugshots. com [sic] Database."

214.     Starting on or about January 1, 2016, Hammermill and Keesee posted a refund policy to unpublisharrest.com.

215.     On information and belief, prior to January 1, 2016, Sarid did not actually provide refunds, or otherwise caused no refunds to be provided.

216.     On or about January 1, 2016, Sarid added to unpublisharrest.com the following:

## *Document Verification*

In the event you have had your case sealed or expunged; we may submit you for a courtesy removal. **(see bold paragraph below)** You must provide verifiable documentation electronically via email  to **docverify1@gmail.com**.

**The documentation you provide electronically may be reviewed by Mugshots.com in-house counsel and/or an authorized agent to verify its authenticity. This documentation verification process carries a one time Administrative Fee of $299.00 per incident of arrest. No exceptions will be granted to this policy.**

Should the presented documentation be determined to be unverifiable; the $299.00 Administrative Fee is non-refundable, however it can be applied towards a normal licensing fee for permanent unpublishing of $399.00 per incident of arrest. To apply the funds to standard services, you must submit the balance within a time period not to exceed 10 calender days from your electronic notice of non-acceptance for courtesy removal.

217.     Sarid causes or instructs Hammermill and Keesee to allow any person to permanently publish the arrest record of any arrestee upon payment of a fee, even if the payor is not the arrestee to be permanently published.

218.     At some or all times herein relevant, above or below all or most mugshots on mugshots.com, Sarid posted or caused to be posted, this message:

> The following Official Record of [arrestee's name] is being redistributed by Mugshots.com and is protected by constitutional, publishing, and other legal rights. This Official Record was collected from a Law Enforcement agency on [insert date].

219.     Sarid posts this message, or causes that message to be posted, so as to falsely imply to visitors to the subject matter websites that mugshots.com is legally entitled to post the mugshots and arrest information, even if inaccurate or incorrect.

220.     Sarid posted, or caused to be posted, the following to mugshots.com:

The mere questions and/or reports presented on this website about a possible arrest of a person are not an implication of an actual arrest.

221.     In or around January 2016, after Plaintiffs filed this action, Hemmermill and/or Keesee added and/or caused to be added the following additional language to the terms of unpublisharrest.com:

## Publishing License Agreement

In consideration for receipt of a completed application acceptable to Licensor and stated appropriate fee for the amount of content being licensed, the Licensor ("The Mugshots.com Database") grants the Licensee ("Payee", "Publisher") a non-transferable license to *Permanently Publish*[1], or *Edit*[2], or *Halt Publication (Unpublish)*[3] of one arrest record(s) per one paid application within Licensor's publicly-available database. The Limited License described herein must be used within 24 hours from issuance of the license. Once License is issued, Licensee may instruct Licensor and/or its agents to permanently publish or alternatively; halt publication (unpublish) of the chosen licensed content. Failure to use the limited license within the 24 hour term of the limited license shall be considered a waiver of rights and under no circumstance give rise to a claim for a refund of the license fee paid by licensee or its agents, assigns or successors. Licensor may revoke any license at any given time by issuing a full refund to Licensee. An application may be declined, or reversed, for any reason, by Licensor in its sole discretion. If a license is declined or reversed by Licensor, the Licensor shall issue a full refund of the fee charged. In the event of any dispute regarding the limited license described herein, the Licensee agrees that same shall be solely and exclusively resolved by mediation which shall be venued in Nevis, West Indies. In any event the limitation of liability arising from the transaction described herein shall be limited to the amount paid by Licensee, its agents, successors, or assigns for the limited license purchased by licensee.

The Publishing License herein may be used by victims (or other individuals) who may wish to ensure that a specific arrest record be accessible permanently within The Mugshots.com Database, arrestees (or other individuals) who may wish to halt publication (unpublish) of a record for personal and/or professional reasons, or arrestees (or other individuals) who may wish to update a record to reflect latest case status.

*Definitions:*

*(1) Permanently Publish: Disable any ability for others to Unpublish.*

*(2) Edit: Ability to add information to current entry in order to reflect better accuracy or latest case status*

*(3) Halt Publication (Unpublish): Make an entry publicly unavailable to view by others.*

*(Last updated: 9/02/2013)*

## Additional Notes:

Courtesy service: Once an unpublishing order is approved and processed, Licensor and/or its agents will submit a "link removal" request to Google. The time frame that each Search Engine utilizes to perform the task of removal of inactive links ("Dead links") will vary according to their own schedule. Major Search Engines such as Google, Yahoo, and Bing update their entire index regularly. Each of the major search engines tend to crawl the web and automatically find new pages, remove inactive links, and reflect updates to existing pages and websites, keeping the Search Engine indices fresh and as up-to-date as possible. Licensor and its agents have no control of the speed of which Search Engines may act on link removal requests.

### DISCLAIMER NOTICES

ALL APPLICATIONS ARE SERVICED BY LICENSOR'S PRE-SCREENED VENDORS AND ARE THOROUGHLY REVIEWED BY LICENSED U.S ATTORNEYS AND/OR LICENSOR'S AUTHORIZED PERSONNEL.

LICENSOR RESERVES THE RIGHT TO APPROVE OR DECLINE ANY APPLICATION IN ITS SOLE DISCRETION. IN MOST INSTANCES LICENSOR'S EXERCISE OF DISCRETION WILL BE INFLUENCED BY CIRCUMSTANCES WHERE THE PUBLIC INTEREST OR OTHER FACTORS ASSOCIATED WITH PUBLISHING OUTWEIGH AN APPLICANT'S PERSONAL INTEREST IN PUBLISHING.

THE EXISTENCE OF UNPUBLISHING SERVICES IS POSTED DUE TO REPEAT REQUESTS OF SUCH A SERVICE AND DOES NOT CONSTITUTE AN OFFER TO SELL. BY HEREBY SUBMITTING A REQUEST FOR INFORMATION AND/OR SUBSEQUENT UNPUBLISHING APPLICATION THROUGH ONE OF THE LICENSOR'S AUTHORIZED AGENTS YOU ARE ACTING AS THE SOLE INITIATOR OF A POSSIBLE TRANSACTION BETWEEN YOU AND THE LICENSOR AND/OR ITS AGENTS.

MUGSHOTS.COM ("PUBLISHER") IS NOT PART OF ANY UNPUBLISHING TRANSACTIONS THAT MAY OCCUR BETWEEN LICENSOR ("THE MUGSHOTS.COM DATABASE") OR THEIR AUTHORIZED AGENTS AND CONSUMERS WHO REQUEST SUCH SERVICE/S. THE MUGSHOTS.COM WEBSITE IS OWNED AND OPERATED BY: JULKISUUDESSA LLC, NEVIS, WEST INDIES.

ALL TERMS ON THIS PAGE ARE SUBJECT TO CHANGE WITHOUT NOTICE

Reproduced with permission from The Mugshots.com Database

222.     Hammermill and Keesee are responsible only for operating the takedown service on Sarid's behalf, and do not themselves post mugshots or arrest records.

### The Takedown Service is the Primary Revenue Source

223.     Sarid obtains only a limited or fractional amount of revenue from advertising space on mugshots.com.

224.     In 2012, takedown service revenue for the mugshots.com enterprise was $940,000, while advertising revenue was only $130,000.

225.     In or around the first five months of 2013, takedown service revenue for the mugshots.com enterprise was approximately $2,070,362, while advertising revenue was only $112,703.

226.     Keesee and Sarid deposited the money from the takedown service revenue into Florida bank accounts, then transferred or deposited it into offshore bank accounts maintained by the Nevis entities.

227.     On information and belief, takedown service revenue has continued to grow steadily since 2013, while advertising revenue has remained relatively flat.

228.     Sarid designed the entire mugshots.com enterprise to profit from the takedown service.

229.     The takedown service, and the profit generated thereby, is the primary or most significant reason Sarid operates mugshots.com.

### *How the Websites Obtain Visitors*

230.     According to ALEXA, an internet analytics firm, mugshots.com was among the top 10,000 websites in the world as of 2013.

231.    On information and belief, Sarid uses IP tracing and cookies to tailor advertising to individual page viewers.

232.    According to the Chicago Tribune, Mugshots.com averaged 2 million visitors each month as of October 2013.

233.    Additionally, Sarid falsely inflates the popularity of mugshots.com in order to gain more advertisers.

234.    For example, on Sarid's fake "Michael Robertson" LinkedIn profile, he states that mugshots.com is among "the top 1,000 website destinations" on the internet.  That statement is false.

235.    Sarid also uses "comments" sections on musghots.com to encourage return visitors.

236.    Below all or most mugshots and/or arrestee records on mugshots.com, Defendants place a "comments" section for visitors.

237.    Visitors log into the "comments" section using their facebook or other social media account.

238.    On information and belief, Sarid uses these comments sections to improve site traffic on mugshots.com.

239.    Sarid also tracks the number of visits, or "hits," are made to each page.

240.    Rolling a mouse over the mugshot on each page reveals the number of discrete visitors to that page since the page was posted.

241.    In order to obtain more visitors to mugshots.com and arrestee pages, Sarid posts videos of arrestees on the home, landing, and splash pages of mugshots.com, without obtaining arrestees' permission to do so.

242.     These videos include videos prepared by mugshots.com, as well as embedded videos from Youtube and news channels.

243.     Those videos depict sensationalized stories of arrestees, so as to drive up the number of hits to that arrestee's page.

244.     Above each video is a sensationalized headline prepared by mugshots.com to describe the content of the video.

245.     Sarid also employs a team of writers to produce purported "news stories" about arrestees on mugshots.com.

246.     Sarid posts, or causes to be posted, those "news stories" to the mugshots.com homepage to drive up hits to the home page and to those arrestees' individual pages.

247.     These "news stories" are credited to the "Mugshots.com writing staff."

248.     Some or all of these stories include a picture of the arrestee on the mugshots.com home page.

249.     For example, on Mugshots.com's home page on November 4, 2015, no fewer than twelve "news stories" accused the arrestee of a sexual crime or offense.

250.     According to the "About" page on mugshots.com, the mugshots.com writing staff "publish[es] over 1,000 crime stories every month."

251.     Sarid also attracts visitors to the mugshots.com website using a twitter account with the handle "@mugshotsdotcom."

252.     On the mugshots.com twitter account, Sarid posts pictures of arrestees from mugshots.com so as to attract visitors to mugshots.com.

253.     Sarid posts, or causes to be posted, those pictures, often of arrestees of color, without descriptions of their arrests or dispositions.

254.    For example, on November 4, 2015, the top of the mugshots.com twitter account appeared as solely this collection of pictures:



255.    Visitors to mugshots.com also arrive via a web engine search for the arrestee, such as through Google or Yahoo!.

256.    Sarid uses, or caused to be used, search engine analytics and search optimization to ensure that mugshots.com pages are near the top of the search results for most or all arrestees searched.

257.    In this method, a person searching a particular name will receive a link to mugshots.com among the top search results.

258.    Clicking on that link will take the searcher to a web page containing the arrestee's complete arrest history, including photographs taken upon booking.

259.    That web page will also contain a list of what purports to be legal definitions.

260.     Generally, before being able to view the page, the visitor will also have to view, or click out of, a pop-up web advertisement.

261.     The second method is to visit the mugshots.com home page, then search the mugshots.com database for an arrestee.

262.     Mugshots.com posts to its home page a list of photographs of various arrestees, including without limitation celebrities and/or exonerated arrestees who requsted their records be removed.

263.     At some or all times herein relevant, Sarid has posted or caused to be posted, the following on the mugshots.com contact page:

Threats and other hostile communications: We reserve the right to publish any and all threats and all other communications submitted to us by you, your agent, or your attorney.

264.     Sarid recently removed, or caused to be removed, from the "FAQ" page of mugshots.com a statement that people who state they cannot get a job as a result of their photograph being posted on mugshots.com "probably do not interview well."

### *Contacts and Connections with Illinois*

265.     Transacting business in Illinois is central to Sarid's business model for mugshots.com.

266.     According to mugshots.com, as of January 2016, Defendants had more arrestee pages from Illinois than from nine other states combined.

267.     As of January 2016, Mugshots.com has over seven times as many arrestee pages for Illinois as it does for New York.

### **Weblogs**

268.     Sarid maintains and updates weblogs, also called "blogs," on mugshots.com.

269.     These blogs routinely include purported statements of law and legal advice to citizens and residents of Illinois.

270.     On October 6, 2012, a blog entry on unpublisharrest.com purported to explain the requirements for expungement of a conviction to residents of the States of Arizona, California, Colorado, Florida, Illinois, Missouri, New Hampshire, New Jersey, New York, Ohio, Oregon, Tennessee, Texas, Utah, and Washington.

271.     No other States were included in that October 6, 2012 blog entry.

272.     Sarid tailors the mugshots.com blog entries towards Illinois residents.

**Solicitation and Transaction of Business in Illinois**

273.     Sarid, Keesee, and Hammermill, in the ordinary course of the takedown service business, routinely solicits business from, and transact business in, Illinois.

274.     During the relevant time period, Keesee and Hammermill have routinely solicited payments from Illinois residents and arrestees for the removal of records and/or pictures from mugshots.com.

275.     Sarid also use social media, including facebook and twitter, to solicit visitors from Illinois to visit mugshots.com and unpublisharrest.com.

276.     Neither mugshots.com nor unpublisharrest.com are passive websites. Both websites are fully interactive, with a variety of purchase options.

277.     Every page and screen on the sister site contains a section soliciting payment by visitors:



278.     In or around June of 2016, after Plaintiffs filed this action, Hammermill and/or Keesee posted, or caused to be posted, a purported arbitration agreement to unpublisharrest.com.

279.     That arbitration agreement purported to waive all potential involvement by arrestees in a class action against unpublisharrest.com, even for those causes of action accruing prior to the arbitration agreement.

280.     The arbitration agreement stated that arbitration demands should be sent to David Bray of Dickinson Wright, one of the attorneys representing Hammermill and Keesee in this action.

281.     The arbitration agreement stated, in part, as follows:

> Licensor and Licensee agree to arbitrate all disputes and claims between them.  This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

> - Claims arising out of or relating to any aspect of the relationship between Licensor and Licensee, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory;
> - Claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);
> - Claims that are currently the subject of purported class action litigation in which Licensee is not a member of a certified class; and
> - Claims that may arise after the termination of this Agreement.

> Notwithstanding the foregoing, either party may bring an individual action in small claims court.  **Licensor and Licensee agree that, by entering into this Agreement, Licensor and Licensee are each waiving the right to a trial by jury or to participate in a class action.**  Licensor and Licensee agree that each may bring arbitration claims against the other only in the Licensor's and Licensee's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding.

> This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this Agreement.

A party who intends to seek arbitration must first send to the other, by certified mail, a written Notice of Dispute ("Notice"). The Notice to Licensor should be addressed to: Dickinson Wright, PLLC, Attn: David G. Bray, 1850 N. Central Avenue, Phoenix, Arizona 85004 and must (a) describe the nature and basis of the claim or dispute; and (b) set forth the specific relief sought ("Demand"). If the parties do not reach an agreement to resolve the claim within thirty (30) days after the Notice is received, Licensor or Licensee may commence an arbitration proceeding.

\* \* \* If, however, the arbitrator finds that either the substance of your claim or the relief sought in the Demand is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse Licensor for all monies previously disbursed by it that are otherwise your obligation to pay under the AAA Rules. In addition, if you initiate an arbitration in which you seek more than $75,000 in damages, the payment of these fees will be governed by the AAA rules.

282.     This purported arbitration agreement is invalid, void, voidable, and/or legally ineffective.

283.     The arbitration agreement is contained on a separate webpage on unpublisharrest.com, accessible only by clicking a link in size 8 typeface at the bottom of the page.

284.     The link to the arbitration agreement is not visible unless the visitor scrolls beyond the "submit" button on the unpublisharrest.com application and to the bottom of the page.

285.       Hammermill and/or Keesee designed, or caused to be designed, the location of the arbitration agreement on unpublisharrest.com so as to prevent visitors from knowing it existed.

286.       As a result, some or most visitors to unpublisharrest.com will not know the arbitration agreement exists.

287.       Nothing in the takedown application form states that the transaction is governed by an arbitration clause.

288.       On information and belief, Hammermill and/or Keesee posted, or caused to be posted, the arbitration agreement so as to avoid class certification in this lawsuit.

289.       The arbitration agreement conatins a purported class action waiver.

290.       Hammermill and Keesee do not give arrestees a meaningful opportunity, or any opportunity at all, to reject the terms of the arbitration agreement, including that waiver.

291.       The arbitration agreement contains limits the ability of the arrestee to obtain a remedy for an asserted claim in a cost-effective manner.

292.       The arbitration agreement is procedurally and /or substantively unconscionable.

293.       Between 2011 and the present, Hammermill and Keesee routinely transacted business with Illinois residents through mugshots.com and its sister site by soliciting and accepting payment for the takedown service.

## Defendants' Targeting of Illinois

294.       Sarid, Hammermill, and Keesee directly target Illinois as part of their ordinary course of business.

295.       According to mugshots.com, no fewer than 499,000 Illinois residents have entries on mugshots.com.

296.     Mugshots.com has a separate webpage and/or landing page on mugshots.com dedicated solely to Illinois.

297.     The Illinois webpage on mugshots.com contains a web browser header which reads "Illinois mugshots."

298.     Sarid also posts, or causes to be posted, a list of Illinois counties to their Illinois page on mugshots.com, with the number of arrestees for each county contained in a parenthetical next to each county listing.

299.     Sarid and his employees or agents also uses analytics and search engine optimization to market mugshots.com and unpublisharrest.com to Illinois residents.

300.     At some or all times herein, the top search result on Google for "Illinois mugshots" is mugshots.com, which markets itself in the search results as "Illinois Mugshot."

301.     Sarid also creates, or causes to be created, "landing pages" for Illinois mugshots which connect to the primary page of mugshots.com, and which are designed to attract Illinois web surfers to mugshots.com.

302.     Sarid and his staff also directly transact, or cause to be transacted, business in Illinois in order to obtain the records posted to mugshots.com.

303.     This includes the use of "bot" and "spider" programs in Illinois to obtain data from government websites.

304.     On one or more occasions before January 6, 2014, Sarid's bot programs overloaded the servers of the IDOC website and Cook County Sheriff's website, causing them to repeatedly crash.

305.     Sarid and his staff have since repeatedly used FOIA requests and bot programs to obtain new records for posting on mugshots.com.

306.    On information and belief, Sarid and his staff use or have used their bot and spider programs in Illinois daily or weekly.

307.    On or about August 27, 2013, the State of Illinois passed Public Act 98-555, reported at 2013 ILL. ALS 555, 15 (the "Mugshots Act").

308.    The Mugshots Act made it unlawful in the State of Illinois "for any person engaged in publishing or otherwise disseminating criminal record information through a print or electronic medium to solicit or accept the payment of a fee or other consideration to remove, correct, or modify said criminal record information."  2013 ILL. ALS 555, 15 .

309.    Under the Mugshots Act, "criminal information" encompasses all information available on mugshots.com, including without limitation mugshots and arrest records.

310.    The Mugshots Act took effect on or about January 1, 2014.

311.    On information and belief, Defendants made few or no changes to their business or practices in response to the Mugshots Act, except as set forth herein.

312.    Keesee and Hammermill continue to solicit and accept payment for removal of arrest records and images from Illinois residents using mugshots.com and its sister site, in violation of the Mugshots Act.

313.    Sarid continues to instruct Keesee and Hammermill to solicit and accept payment for removal of arrest records and images from Illinois residents using mugshots.com and its sister site, in violation of the Mugshots Act.

314.    Since the filing of this action, all Defendants have continued their activities in Illinois, including without limitation the posting of mugshots and arrest records and the solicitation and collection of fees for their removal.

315.     On information and belief, Defendants are therefore likely to continue to solicit and accept payment for removal of images and arrest records from mugshots.com in violation of the Mugshots Act.

**Additional Allegations**

316.     Sarid has not disclosed, either on mugshots.com or elsewhere, the full list of sources they use to generate the profiles of arrestees on mugshots.com.

317.     Defendants exert total control over mugshots.com.

318.     Defendants exert total control over unpublisharrest.com.

319.     Sarid is in total control of the content on mugshots.com, and materially contribute to creating the content.

320.     Sarid does not only host a forum for third parties to add content, but instead created the websites (mugshots.com and unpublisharrest.com) to host their own content.

321.     Although Defendants argue that mugshots.com is analogous to a search engine, it is not.

322.     Sarid and his staff publish on mugshots.com original content designed and intended to cause visitors to the site to believe that the records posted to mugshots.com are true and factual.

323.     In that content, Sarid and his staff draw conclusions regarding arrestees which do not appear in the public or private data and/or records forming the basis for the arrestee profiles.

324.     For example, Sarid and his staff create, or cause to be created, original content throughout mugshots.com which implies that the arrest of an individual is, in and of itself, evidence of guilt of a crime.

325.     This is one example of that content:

For example, before Google's decision to actively assist individuals conceal the fact they were arrested from the world, a Google search of the name 'Curt Rehberg' would have produced a link to his mugshot and story on Mugshots.com on the first search results page. Anyone interested in Mr. Rehberg would then read the story of the Illinois attorney arrested earlier this month for allegedly stealing over $1.2 million from at least seven clients. Yes, at this point, he has only been arrested. But if you are thinking about engaging him as your attorney and granting him authority over your bank accounts, his arrest is without question relevant information about him that any reasonable person would want to know in making an informed decision on whether to proceed with the contemplated relationship. People all across the country are now deprived of this type of vital, and in some cases life-saving, information thanks to an apparently well-intended tweak to an algorithm. But regardless of the intent behind the change, depriving the public of relevant, if embarrassing, information has very serious real world consequences.

326.     Sarid also states in original content throughout their website that the information on mugshots.com is "factual."

327.     Examples of such statements include, without limitation, the following:

But there are a great many situations in which reasonable people would want to know about a person's arrest even if he or she were never convicted. We direct your attention to Ms. Heather Koon. She was arrested last week on charges of raping an infant in her care at an Ohio daycare center. She has not been convicted of any crime yet. To all Google officials, would you consider that relevant information about her when making your decision to allow her to babysit your children? Remember, she has "only" been arrested after authorities reportedly viewed video of her having sex with an infant. Why should her mere arrest preclude her from watching your children or those of your friends and family members? And for all those arrestees like her but who have not had news stories written about them, now their arrest will not pose any barrier to them watching other people's children thanks to Google's algorithm modification that effectively conceals that piece of factual and highly relevant, but potentially embarrassing, information from the public. Whose interests are being served by Google's new policy?

### WHAT IS MUGSHOTS.COM?

Mugshots.com is a "Google for Mugshots". The website is a search engine for Official Law Enforcement records, specifically booking photographs, mugshots. Originally collected and distributed by Law Enforcement agencies, Booking records are considered and legally recognized as public records, in the public domain. Mugshots.com republishes these Official Records in their original form ("as is") under the First Amendment to the United States Constitution, the freedom to publish true and factual information. Our intent is to provide a legitimate and useful service for both the private and public sectors.

328.     Sarid, Hammermill, and Keesee market mugshots.com to law enforcement agencies and the public as a method of performing background checks for, *inter alia*, employment and housing purposes.

329.     Sarid markets mugshots.com as a public service to the general public to provide information to be used for, *inter alia*, employment, housing, and marriage decisions.

330.     Sarid market mugshots.com as "the leading authority of mugshots worldwide" which "publish[es] over 1,000 crime stories every month."

331.     When a visitor to mugshots.com requests information regarding a particular arrestee, mugshots.com immediately displays numerous pieces of information about that arrestee, including without limitation the following:

> (a) Some or all arrests for that arrestee;
> (b) The charges for that arrestee;
> (c) Identifying markings, such as scars, tattoos, or birthmarks;
> (d) The arrestee's age and date of birth;
> (e) The arrestee's eye color, gender, hair color, race, weight, and height;
> (f) The arrestee's Department of Corrections identification number; and
> (g) Other personal identifying information.

332.     Sarid attaches to each arrestee page a "mugshots.com ID" number.

333.     Defendants have failed to develop an effective system to allow individuals to remove inaccurate or incorrect information from mugshots.com.

334.     In fact, Defendants represent to callers that they will not remove or cause to be removed any content from mugshots.com, whether accurate or inaccurate, unless the requestor pays a fee, as set forth previously.

335.     This First Amended Class Action Complaint shall serve as continuing notice and a demand to all Defendants to retain and preserve, and not to destroy, all relevant documents and evidence in this matter, and that Plaintiffs shall pursue a spoliation of evidence claim for any noncompliance with this demand.

336.     This is a re-filed action.

337.     Plaintiff Gabiola initially filed this action as case no. 14 cv 9351 on November 24, 2014.

338.     That case was nonsuited on or about January 8, 2016.

### The Plaintiffs

### *Plaintiff Gabiola*

339.     Gabiola exited parole on July 27, 2012.  When he did so, IDOC removed his records from their website.

340.     After Gabiola's records were posted on the IDOC website, mugshots.com posted a record for Plaintiff, with photograph, on its website.

341.     Mugshots.com currently contains a web page for Gabiola, which includes a photograph.

342.     Mugshots.com states that the information on its webpage for Gabiola was last updated on October 11, 2013, after Plaintiff exited parole.

343.     As of the date of this filing, the arrestee page on mugshots.com for Peter Gabiola falsely states that he remains on parole.

344.     That page also contains a photograph purporting to establish or prove Gabiola's status as a parolee.

345.     Late in 2013, Gabiola was offered a position at Multimedia Sales and Marketing ("Multimedia") in Buffalo Grove, Illinois.

346.     Within an hour of beginning work at that position, one or more employees of Multimedia conducted a Google search on Gabiola and saw the mugshots.com posting.

347.     As a result of seeing the mugshots.com posting, Multimedia immediately terminated Gabiola's employment.

348.     Gabiola has on no fewer than two other occasions had offers of employment rescinded as a result of prospective employers seeing his inaccurate profile on mugshots.com.

349.     As a result, on or about October 10, 2014, Plaintiff Gabiola called the phone number provided for unpublisharrest.com on its website.

350.     Gabiola called unpublisharrest.com because he actually relied on its representation that it was an independent reputation management firm.

351.     During that telephone call, Gabiola informed the answering operator or agent that his arrest record on mugshots.com is false and/or incorrect.

352.     That operator/agent was employed by, or an agent of, Hammermill and/or Keesee.

353.     That operator at unpublisharrest.com informed Plaintiff that removing two images from the website would cost $2,000 to mugshots.com, plus an additional representation fee to unpublisharrest.com.

354.     The operator also stated that removing all of the arrest information and photographs from mugshots.com would cost $15,000 to mugshots.com, plus an additional representation fee to unpublisharrest.com.

355.     The operator also stated to Gabiola that the payment came with no guarantees from mugshots.com or unpublisharrest.com that the photographs and records would actually be removed.

356.     The operator also stated to Gabiola that unless Gabiola paid the fees in full, the incorrect arrest record would remain posted to mugshots.com.

357.     Gabiola was unable to pay for the removal of the arrest records from mugshots.com because he lacked the money or financial means to do so.

358.     Gabiola stated to the operator that Defendants' actions in charging large sums of money without guarantees of actual removal were illegal.

359.     The operator responded to Gabiola that "we operate in a gray area."

360.    Sarid or his staff published, or failed to correct, Gabiola's erroneous arrest record deliberately so as to incentivize Gabiola to pay the takedown fee.

361.    Sarid or his staff acted towards Gabiola in the same or a substantially similar manner as some or all other arrestees on mugshots.com.

362.    Hammermill and Keesee acted towards Gabiola in the same or a substantially similar manner as some or all other arrestees who contact Gabiola and/or unpublisharrest.com.

363.    Defendants use the stigma and negative economic results, such as loss of housing, employment, or employment prospects, experienced by individuals on mugshots.com, to coerce, push, pressure, or incentivize those individuals into using unpublisharrest.com and paying large fees to Defendants.

364.    As a result of his lost employment and housing opportunities, Gabiola has lost and continues to lose money.

365.    Gabiola is unable to obtain full or meaningful employment so long as Defendants continue to attempt to profit from his arrest record by demanding payment for the removal of his inaccurate published arrest record.

366.    Defendants' actions have caused actual and ongoing harm to Gabiola's employment prospects.

367.    Gabiola has signed a written attorney-client agreement with Berton N. Ring, P.C., and has expressly assigned all claims for attorney fees to Berton N. Ring, P.C.

368.    Plaintiff Gabiola visited his page on mugshots.com within one year prior to when the previous action was filed.

### *Plaintiff Hammond*

369.     Plaintiff Hammond has no fewer than five arrest pages on mugshots.com.

370.     According to mugshots.com, there have been no fewer than 200 hits to each of the five pages since their initial posting.

371.     One page has received at least 480 hits.

372.     Plaintiff Hammond is currently unemployed and disabled.

373.     Plaintiff Hammond's sole source of income is disability benefits, which are not enough to pay the $1,000-per-page unpublishing fee charged by Defendants.

374.     Plaintiff Hammond is unable to obtainsubstantial  long-term employment because of the mugshots.com web pages which appear in his web search results.

375.     Some or all of the information on Hammond's pages is inaccurate, including his current status, past charges, and past convictions or lack thereof.

376.     On or about October 14, 2015, Hammond wrote to Defendants via undersigned counsel demanding the removal of his arrest records and mugshots from mugshots.com.

377.     Defendants did not respond to that letter.

378.     Hammond's experience is typical of individuals with pages on mugshots.com.

379.     Defendants use the stigma and negative economic results, such as loss of employment or employment prospects, experienced by individuals on mugshots.com, to coerce those individuals into using unpublisharrest.com and paying large fees to Defendants.

380.     When Hammond visited mugshots.com, he was solicited by Hammermill and Keesee or their agent to pay for the removal of his mugshot as set forth herein.

381.     Hammond was unable to pay for the removal of the arrest records from mugshots.com because he lacked the money or financial means to do so.

382.     Because Hammond is unemployed or underemployed, he has lost and continues to lose money.

383.     Hammond is unable to obtain full-time, long-term employment so long as Defendants continue to attempt to profit from his arrest record by demanding payment for the removal of his published arrest record.

384.     Defendants' actions have caused actual and ongoing harm to Hammond's housing and employment prospects.

385.     Hammond has signed a written attorney-client agreement with Berton N. Ring, P.C., and has expressly assigned all claims for attorney fees to Berton N. Ring, P.C.

386.     Plaintiff Hammond visited his page on mugshots.com within one year prior to when his claims were added to the previous action.


### *Plaintiff Thompson*

387.     In or around September 2012, Thompson learned via a Google search that a record for his erroneous arrest for check fraud was posted to mugshots.com.

388.     However, that arrest record contained no mention of the fact that Thompson's arrest had been in error.

389.     At the time Thompson's erroneous arrest record was posted, Sarid knew or should have known that the arrest record was erroneous.

390.     Thompson's erroneous arrest record was posted to mugshots.com after Thompson's arrest had already been publicly acknowledged as inaccurate by Florida law enforcement agencies.

391.     Sarid or his staff published Thompson's erroneous arrest record deliberately so as to incentivize Thompson to pay the takedown fee.

392.     Sarid or his staff acted towards Thompson in the same or a substantially similar manner as some or all other arrestees on mugshots.com.

393.     That same day, Thompson twice called unpublisharrest.com, requesting that his incorrect arrest record be removed.

394.     Each time, the operator demanded that Thompson pay $399 for the removal or correction of the incorrect record.

395.     Thompson thereafter called unpublisharrest.com numerous times over the next three and a half years to request the removal of the erroneous record.

396.     Each time Thompson called unpublisharrest.com, the same operator answered.

397.     Each time Thompson called unpublisharrest.com, Thompson informed the operator that the arrest record attributed to him on mugshots.com was inaccurate.

398.     Each time Thompson called unpublisharrest.com, the same operator demanded that Thompson pay $399 for the removal or correction of the incorrect record.

399.     Each time Thompson called unpublisharrest.com, the same operator informed Thompson that mugshots.com would leave Thompson's inaccurate arrest record posted unless Thompson paid the fee.

400.     The operator who spoke with Thompson was an employee or agent of Hammermill and/or Keesee.

401.     Hammermill and Keesee acted towards Thompson in the same or a substantially similar manner as some or all other arrestees who contact Hammermill and/or unpublisharrest.com.

402.     Between September 2012 and the beginning of 2016, Thompson applied for approximately forty jobs, and was rejected for each one.

403.     On information and belief, Thompson was rejected for these jobs because the incorrect mugshots.com profile was among the top Google search results for his name.

404.     In or around the Spring of 2016, Thompson was prominently featured in a documentary regarding the subject matter websites by Fusion reporters Natasha del Toro and Dan Lieberman.

405.     Shortly after the documentary was published online, Thompson's profile was removed from mugshots.com.

406.     Thompson has signed a written attorney-client agreement with Berton N. Ring, P.C., and has expressly assigned all claims for attorney fees to Berton N. Ring, P.C.

407.     Plaintiff Thompson visited his page on mugshots.com within one year prior to when this action, and the previous action, was filed.

<u>**CLASS ACTION ALLEGATIONS**</u>

408.     Plaintiffs bring this action on behalf of themselves and three classes of similarly situated individuals, pursuant to Federal Rule of Civil Procedure 23.

409.     **CLASS A** consists of all persons in the State of Illinois whose arrest records, mugshots, likeness, or other personal identifying information was compiled and displayed on mugshots.com by Defendants between November 21, 2011 and the date of trial in this action.  This claim is brought on behalf of Plaintiffs Gabiola and Hammond only.

410.  **CLASS B** consists of all persons in the State of Illinois, between August 27, 2013 and the date of trial in this action, who (a) requested by telephone or using the form available on the subject matter websites that Defendants, or an agent of Defendants, remove or "unpublish" an arrest record or mugshot from mugshots.com, or (b) viewed an advertisement or offer for the removal of their arrest record from mugshots.com.

411.  **CLASS C** consists of all persons in the State of Illinois, between August 27, 2013 and the date of trial in this action, who were told by Defendants or an agent of Defendants that they were required to pay a fee to remove or "unpublish" one or more arrest records or mugshots.

412.  **CLASS D** consists of all persons in the United States whose arrest records, mugshots, or other information relating to character, general reputation, personal characteristics, mode of living or other personal identifying information, was compiled and displayed on mugshots.com by Defendants between November 21, 2012 and the date of trial in this action.

413.  Excluded from each Class are all Defendants, their heirs, successors, and assigns, and all employees and agents of all Defendants.  Excluded also are the Court and the Court's immediate family.

414.  The membership of each Class potentially numbers in the hundreds of thousands.

415.  Defendants state on mugshots.com as of the date of this filing that they have posted records and photographs for not less than 457,000 people in Illinois, and 24 million nationwide.

416.  In 2012, 49,154 inmates were housed in Illinois correctional facilities.  In 2014, there were 17,645 arrests in Lake County, Illinois alone.

417.      In the first five months of 2013, Hammermill & Masterson received payments from over 5,000 separate arrestees seeking removal of their profiles.

418.      Defendants have acted in the same or substantially similar manner as to most or all class members.

419.      Defendants have engaged in the same conduct described in this action as to all, or substantially all, persons and arrestees whose mugshots and arrest records appear on mugshots.com.

420.      There are questions and issues common to each class, which predominate over any individual issues.  Those include, without limitation, the following:

(a) Whether Defendants post the likeness and/or personal identifying information of arrestees to mugshots.com for commercial gain;

(b) Defendants' practices and policies for removal and/or correction of incorrect or inaccurate information from mugshots.com;

(c) Whether Defendants charge for the removal of mugshots and/or arrest records from mugshots.com;

(d) Whether Defendants provide the notice to users of mugshots.com required by the Fair Credit Reporting Act;

(e) Whether Defendants' conduct as described herein constitutes a violation of the Illinois Right of Publicity Act, codified at 765 ILCS 1075/1 *et seq*.;

(f)  Whether Defendants' conduct as described herein constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, codified at 815 ILCS 505/1 *et seq*.;

(g) Whether Defendants' conduct constitutes a violation of the Florida Right of Publicity Act, codified at Fla. Stat. § 540.08 *et seq*.;

(h) Whether Defendants unjustly received and/or continue to receive money as a result of their conduct described herein, and whether under principles of equity and good conscience, Defendants should not be permitted to retain those monies.

421.    These questions of law and fact predominate over all questions and issues affecting only individual class members.

422.    A class action is superior to all other methods for resolving this controversy.

423.    The Plaintiffs will fairly and adequately protect the interests of each class.

424.    The Plaintiffs' counsel is experienced in class action matters, and a class action is the most appropriate means for the fair and efficient adjudication of the claims herein.

425.    Defendants used the same forms and policies as to all class members. Plaintiffs have no unique defenses or interests adverse to those of the class.

426.    The identities of all members of each class can be easily determined from the records and subject matter websites of each Defendant herein.

427.    Hammermill and Keesee record on excel spreadsheets all payments they receive and the payors, either by phone or via the subject websites.

428.    On information and belief, Hammermill and Keesee keep a record of some or all calls made for purposes of unpublishing an arrestee's record.

429.    Plaintiffs reserve the right to amend their class definitions and allegations based on facts learned in discovery.

## COUNT I – CLASS A
## <u>VIOLATIONS OF THE ILLINOIS RIGHT OF PUBLICITY ACT</u>
### *On behalf of Gabiola only*
### *Against All Defendants*

430.     Plaintiffs restate and re-allege paragraphs 1-429 of this First Amended Class Action

Complaint as if fully set forth herein.

431.     The people of the State of Illinois, by and through their popularly elected

legislature, enacted a statute entitled the Illinois Right of Publicity Act, codified at 765

ILCS 1075/1 *et seq.* ("ROPA").  That statute was in force and effective at all times herein

relevant.

432.     Defendants transacted business in the State of Illinois as set forth herein, including

without limitation by soliciting and accepting payments made in this State, and in so doing

availed themselves of Illinois law, including ROPA.

433.     Pursuant to the ROPA, "[t]he right to control and to choose whether and how to use

an individual's identity for commercial purposes is recognized as each individual's right of

publicity."  765 ILCS 1075/10.

434.     Pursuant to the ROPA, "[a] person may not use an individual's identity for

commercial purposes during the individual's lifetime without having obtained previous

written consent from the appropriate person or persons specified in Section 20 of this Act

[765 ILCS 1075/20] or their authorized representative."  765 ILCS 1075/30.

435.     Pursuant to the ROPA,

"Commercial purpose" means the public use or holding out of an
individual's identity (i) on or in connection with the offering for sale
or sale of a product, merchandise, goods, or services; (ii) for
purposes of advertising or promoting products, merchandise, goods,
or services; or (iii) for the purpose of fundraising.

"Identity" means any attribute of an individual that serves to identify

> that individual to an ordinary, reasonable viewer or listener, including but not limited to (i) name, (ii) signature, (iii) *photograph*, (iv) *image*, (v) likeness, or (vi) voice.

765 ILCS 1075/5 (emphasis supplied).

436. Defendants did not obtain written permission from the Plaintiffs to post their photographs and arrest records to mugshots.com.

437. Defendants did not obtain written permission from most or all persons whose images appear on mugshots.com.

438. Defendants used the Plaintiffs' photographs, images, names, and likenesses for commercial purposes through one or more of the following:

- Requiring payment in order to remove said photograph;
- Displaying the photographs and records in connection with offering the "service" of removing said photographs and records;
- Displaying the photographs and records in connection with offering the "service" of background checks;
- Offering permanent display of his photograph for a fee paid by any person;
- Other acts and/or omissions as specified in this Second Amended Complaint.

439. Defendants acted in the same or substantially similar ways towards all members of Class A.

440. Defendants' sole use for the photographs posted or available on mugshots.com was and is a commercial purpose, namely, the takedown service.

441. Defendants' refusal to remove Gabiola's likeness, photograph, and records from mugshots.com without the payment of a fee for that "service" constituted the use of his likeness for commercial gain in violation of the ROPA.

442. Defendants market unpublisharrest.com as an Unpublishing Service offered in exchange for a fee.

443.      Defendants' actions were willful and intentional.

444.      Pursuant to the ROPA,

A person who violates Section 30 of this Act [765 ILCS 1075/30] may be liable for either of the following, whichever is greater:

(1) actual damages, profits derived from the unauthorized use, or both; or

(2) $ 1,000.

(b) Punitive damages may be awarded against a person found to have willfully violated Section 30 of this Act [765 ILCS 1075/30].

765 ILCS 1075/40.

445.      Pursuant to the ROPA, "the court may issue such temporary restraining orders, preliminary injunctions, and permanent injunctions as may be appropriate under this Act." 765 ILCS 1075/50.

446.      Pursuant to the ROPA, "The court may award to the prevailing party reasonable attorney's fees, costs, and expenses relating to an action under this Act." 765 ILCS 1075/55.

447.      Plaintiff Gabiola brought this action within one year of his October 10, 2014 telephone call to unpublisharrest.com, or such other time of the accrual of his cause of action.

WHEREFORE, the Plaintiff, on behalf of himself and the Class, respectfully requests this Honorable Court grant and award the following relief:

(a) Certify this cause as a class action pursuant to Rule 23(b)(3), and award to Plaintiff and each class member $1,000, plus punitive damages in an amount to be determined at trial;

(b) Certify this cause as a class action, and issue a permanent injunction against further violations of ROPA by Defendants as to any members of the Class, including any further posting or

use of the images or photographs of Plaintiff and the members of the Class;

(c) Alternatively, certify this cause as an issue class action as to liability only pursuant to Rule 23(c)(4), with a finding that Defendants are liable as to all class members;

(d) Award to the Plaintiff and the Class punitive damages, costs of suit, and reasonable attorney fees; and

(e) Grant whatever additional relief this Court deems appropriate and just under the circumstances.

**COUNT II – CLASSES A, B, AND C**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD ACT**
*On behalf of Plaintiffs Gabiola and Hammond*
*Against All Defendants*

448. Plaintiffs restates and re-alleges paragraphs 1-447 of this First Amended Class Action Complaint, inclusive of all factual allegations in Count I, as if fully set forth herein.

449. The people of the State of Illinois, by and through their popularly elected legislature, enacted a statute known as the Illinois Consumer Fraud and Deceptive Business Practices Act, codified at 815 ILCS 505/1 *et seq.* (the "ICFA"). The ICFA was in force and effective at all times herein relevant.

450. Pursuant to the ICFA,

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" [815 ILCS 510/2], approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal

courts relating to Section 5 (a) of the Federal Trade Commission Act
[15 U.S.C. § 45].

815 ILCS 505/2.

451.     Pursuant to the ICFA, both unfair and deceptive conduct is unlawful.

452.     Defendants violated the ICFA by one or more of the following deceptive acts:

> (a) Operating the sister site, unpublisharrest.com, purportedly as a separate entity, with the intention that people actually rely on that representation and pay additional monies;
> (b) Representing that payment by an arrestee would result in removal of the arrestee's photograph, when in reality Defendants routinely failed to do so after payment;
> (c) Other deceptive acts as alleged and set forth herein.

453.     Defendants violated ICFA by one or more of the following unfair acts or omissions:

> (a) Acting as though they were a government entity by purporting to offer a "public service," when in reality they are monetizing arrest records for profit, thereby confusing the public;
> (b) Requiring the payment of fees for removal of images and/or arrest records;
> (c) Operating the sister site, unpublisharrest.com, purportedly as a separate entity, with the intention that people actually rely on that representation and pay additional monies;
> (d) Representing that payment by an arrestee would result in removal of the arrestee's photograph, when in reality Defendants routinely failed to do so after payment;
> (e) Deliberately failing to correct incorrect and/or inaccurate information solely so as to incentivize payment by arrestees;
> (f) Using the likenesses of arrestees for commercial purposes without written consent, and refusing to remove those likenesses without payment;
> (g) Other unfair acts as alleged and set forth herein.

454.     Pursuant to ICFA, "[a]ny person who suffers actual damage as a result of a violation

of this Act committed by any other person may bring an action against such person. The

court, in its discretion may award actual economic damages or any other relief which the

court deems proper . . . [and] the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party." 815 ILCS 505/10a.

455.     Defendants acted in the same or substantially similar ways towards all members of Classes A, B, and C.

WHEREFORE, the Plaintiffs, on behalf of themselves and the Class, respectfully request this Honorable Court grant and award the following relief:

(a) Certify this cause as a Rule 23(b)(3) class action, and enter judgment in favor of Plaintiff and the Class and against Defendants in an amount to be proven at trial;

(b) Certify this cause as a Rule 23(b)(2) class action, and issue a permanent injunction against further violations of ICFA by Defendants as to any members of the Class, including any further posting or use of the images or photographs of Plaintiff and the members of the Class;

(c) Alternatively, certify this cause as an issue class action as to liability only pursuant to Rule 23(c)(4), with a finding that Defendants are liable as to all class members;

(d) Award to the Plaintiff and the Class costs of suit and reasonable attorney fees; and

(e) Grant whatever additional relief this Court deems appropriate and just under the circumstances.


### COUNT III – CLASSES A, B, AND C
### VIOLATIONS OF THE ILLINOIS MUGSHOTS ACT (815 ILCS 505/2QQQ)
*On behalf of Plaintiffs Gabiola and Hammond*
*Against All Defendants*

456.     Plaintiffs restate and re-allege paragraphs 1-455 of this First Amended Class Action Complaint, inclusive of all factual allegations in Counts I and II, as if fully set forth herein.

457.    Section 505/2QQQ of the ICFA states as follows:

Criminal record information. (a) It is an unlawful practice for any person engaged in publishing or otherwise disseminating criminal record information through a print or electronic medium to solicit or accept the payment of a fee or other consideration to remove, correct, or modify said criminal record information.

(b) For the purposes of this Section, "criminal record information" includes any and all of the following:

(1) descriptions or notations of any arrests, any formal criminal charges, and the disposition of those criminal charges, including, but not limited to, any information made available under Section 4a of the State Records Act or Section 3b of the Local Records Act [5 ILCS 160/4a or 50 ILCS 205/3b];

(2) photographs of the person taken pursuant to an arrest or other involvement in the criminal justice system; or

(3) personal identifying information, including a person's name, address, date of birth, photograph, and social security number or other government-issued identification number.

815 ILCS 505/2QQQ.

458.    Defendants posted Plaintiffs' criminal record information to mugshots.com as set forth herein.

459.    Defendants violated §505/2QQQ by one or more of the following acts or omissions:

- Posting Plaintiffs' criminal record information to mugshots.com for commercial purposes, namely, the takedown service;
- Requiring payment in order to remove said criminal record information;
- Soliciting payment in order to remove said criminal record information;
- Offering permanent display of Plaintiffs' photograph for a fee paid by any person;
- Other acts and/or omissions as specified in this Second Amended Complaint.

460.    Defendants acted in the same or substantially similar ways towards all members of Classes A, B, and C.

461.    Pursuant to ICFA, "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . . [and] the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party."  815 ILCS 505/10a.

WHEREFORE, the Plaintiffs, on behalf of themselves and the Classes, respectfully requests this Honorable Court grant and award the following relief:

(a) Certify this cause as a Rule 23(b)(3) class action, and enter judgment in favor of Plaintiff and the Class and against Defendants in an amount to be proven at trial;

(b) Certify this cause as a Rule 23(b)(2) class action, and issue a permanent injunction against further violations of ICFA by Defendants as to any members of the Class, including any further posting or use of the images or photographs of Plaintiff and the members of the Class, or solicitation and/or collection of monies for removal thereof;

(c) Alternatively, certify this cause as an issue class action as to liability only pursuant to Rule 23(c)(4), with a finding that Defendants are liable as to all class members;

(d) Award to the Plaintiff and the Class costs of suit and reasonable attorney fees; and

(e) Grant whatever additional relief this Court deems appropriate and just under the circumstances.

**COUNT V – ALL CLASSES**
**VIOLATIONS OF**
**THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**
***On behalf of Plaintiffs Gabiola and Thompson***

462.    Plaintiffs restate and re-allege paragraphs 1-461 of this First Amended Class Action

Complaint as if fully set forth herein.

463.     The people of the United States, by and through their popularly elected Congress,

enacted a statute entitled the Racketeer Influenced and Corrupt Organizations Act

("RICO"), codified at 18 U.S.C. §1961 *et seq*.

464.     RICO was in force and effective at all times herein relevant.

465.     Pursuant to RICO,

a)  It shall be unlawful for any person who has received any income
    derived, directly or indirectly, from a pattern of racketeering activity or
    through collection of an unlawful debt in which such person has
    participated as a principal within the meaning of section 2, title 18,
    United States Code [18 USCS § 2], to use or invest, directly or
    indirectly, any part of such income, or the proceeds of such income, in
    acquisition of any interest in, or the establishment or operation of, any
    enterprise which is engaged in, or the activities of which affect,
    interstate or foreign commerce.
    * * *
b)  It shall be unlawful for any person through a pattern of racketeering
    activity or through collection of an unlawful debt to acquire or maintain,
    directly or indirectly, any interest in or control of any enterprise which
    is engaged in, or the activities of which affect, interstate or foreign
    commerce.

c)  It shall be unlawful for any person employed by or associated with any
    enterprise engaged in, or the activities of which affect, interstate or
    foreign commerce, to conduct or participate, directly or indirectly, in the
    conduct of such enterprise's affairs through a pattern of racketeering
    activity or collection of unlawful debt.

d)  It shall be unlawful for any person to conspire to violate any of the
    provisions of subsection (a), (b), or (c) of this section.

18 U.S.C.S. § 1962.

466.     Pursuant to RICO, "racketeering activity" includes extortion under state law.

467.     Illinois law defines "extortion" as a threatening demand for payment made without

justification.

468.     Illinois law defines the statutory offense of "intimidation," which includes extortion, as, *inter alia*, threatening to "[e]xpose any person to hatred, contempt or ridicule." 720 ILCS 5/12-6.

469.     Florida law defines "extortion" as "either verbally or by a written or printed communication, maliciously threaten[ing] to . . . to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever . . . ." Fla. Stat. Ann. § 836.05.

470.     The Illinois and Florida statutes are substantially similar to extortion statutes across the United States.

471.     Defendants violated RICO by one or more of the following acts and/or omissions:

> (a) Posting arrest records of the Plaintiffs for the purpose of demanding money for their removal;
>
> (b) Demanding money for the removal of the arrest records and threatening to leave the arrest records posted to mugshots.com if Plaintiffs did not pay, thereby threatening to expose Plaintiffs to disgrace, ridicule, hatred, and contempt;
>
> (c) Refusing to remove the arrest records of Plaintiffs unless they paid money, thereby actually exposing Plaintiffs to disgrace, ridicule, and contempt;
>
> (d) Using the false name of "Michael Robertson" on FOIA requests;
>
> (e) Issuing FOIA requests for commercial purposes under false pretenses;
>
> (f) Other unlawful acts and/or omissions.

472.    By threatening to post, or continue the posting of, inaccurate or false arrest records unless they received the payment of a fee, Defendants threatened to expose Plaintiffs to ridicule, hatred, contempt, and/or disgrace for the purpose of obtaining a pecuniary advantage.

473.    Pursuant to RICO, "racketeering activity" includes violations of 18 U.S.C. §1952.

474.    Section 1952 of RICO prohibits any person from "travel[ing] in interstate or foreign commerce or us[ing] the mail or any facility in interstate or foreign commerce, with intent to . . . distribute the proceeds of any unlawful activity . . . ," or attempting to do so. 18 U.S.C. § 1952.

475.    Defendants violated §1952 of RICO by one or more of the following acts and/or omissions:

(a) Attempting to obtain monies by the solicitation and/or acceptance of monies for the removal of arrest records in violation of the Illinois mugshots act;

(b) Actually obtaining monies by the solicitation and/or acceptance of monies for the removal of arrest records in violation of the Illinois mugshots act;

(c) Attempting to obtain monies by the solicitation and/or acceptance of monies for the removal of arrest records in violation of statutes prohibiting said activity in California, Colorado, Missouri, Utah, and Virginia;

(d) Actually obtaining monies by the solicitation and/or acceptance of monies for the removal of arrest records in violation of statutes prohibiting said activity in California, Colorado, Missouri, Utah, and Virginia;

(e) Attempting to obtain monies by unlawful intimidation and/or extortion, as set forth herein;

(f) Actually obtaining monies by unlawful intimidation and/or extortion, as set forth herein;

(g) Transferring the monies obtained via their activities in (a) – (f) to bank accounts in Florida on multiple occasions;

(h) Transferring the monies obtained via their activities in (a) – (f) to offshore bank accounts on multiple occasions;

(i) Other unlawful acts and/or omissions.

476.     Pursuant to RICO,

Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 USCS § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

18 U.S.C.S. § 1964.

WHEREFORE, the Plaintiffs, on behalf of themselves and the Classes, respectfully requests this

Honorable Court grant and award the following relief:

(a) Certify this cause as a Rule 23(b)(3) class action, and enter judgment in favor of Plaintiff and the Class and against Defendants in an amount to be proven at trial but not less than treble the amount of actual damages of the Class;

(b) Certify this cause as a Rule 23(b)(2) class action, and issue a permanent injunction against further violations of RICO by Defendants as to any members of the Class, including any further posting or use of the images or photographs of Plaintiff and the members of the Class, or solicitation and/or collection of monies for removal thereof;

(c) Alternatively, certify this cause as an issue class action as to liability only pursuant to Rule 23(c)(4), with a finding that Defendants are liable as to all class members;

    (d) Award to the Plaintiff and the Class costs of suit and reasonable attorney fees; and

    (e) Grant whatever additional relief this Court deems appropriate and just under the circumstances.

## **COUNT VI – CLASS D**
## **VIOLATION OF THE FEDERAL FAIR CREDIT REPORTING ACT**
### *On behalf of all Plaintiffs*

477.    Plaintiffs restate and re-allege paragraphs 1-476 of this First Amended Class Action Complaint, inclusive of all factual allegations in Counts I – V, as if fully set forth herein.

478.    The people of the United States, by and through their popularly elected Congress, enacted a statute entitled the Fair Credit Reporting Act, codified at 15 U.S.C. § 1681 *et seq.* ("FCRA").

479.    The FCRA was in force and effective at all times herein relevant.

480.    At all times herein relevant, the websites herein were "credit reporting agencies" within the definition provided by 15 U.S.C. § 1681a of the FCRA.

481.    Mugshots.com is a "credit reporting agency" as defined by the FCRA because, through the various Defendants as set forth herein, it solicits and accepts "monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and . . . uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

482.    Mugshots.com is a "[c]onsumer reporting agency that compiles and maintains files on consumers on a nationwide basis" as defined by FCRA because, through the various

Defendants as set forth herein, it "regularly engages in the practice of assembling or evaluating, and maintaining, for the purpose of furnishing consumer reports to third parties bearing on a consumer's credit worthiness [creditworthiness], credit standing, or credit capacity," public record information regarding consumers nationwide. 15 U.S.C. § 1681a.

483. FCRA defines "consumer" as an individual. 15 U.S.C. § 1681a.

484. As such, all arrestees posted on mugshots.com are "consumers" within the definition of the FCRA.

485. Additionally, all visitors to mugshots.com are "consumers" within the definition of the FCRA.

486. Section 1681a of the FCRA defines "consumer report" as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness [creditworthiness], credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for--

(A) credit or insurance to be used primarily for personal, family, or household purposes;

(B) employment purposes; or

(C) any other purpose authorized under section 604 [15 USCS § 1681b]."

487. By providing certain information to visitors, including without limitation information related to arrestees' dates of birth, height, weight, race, personal characteristics, likenesses, arrest records, incarceration status, and/or arrests, Defendants

are disseminating information bearing on a consumer's creditworthiness, general reputation, personal characteristics, reputation, and mode of living.

488.     Defendants have intentionally marketed mugshots.com to landlords and employers as a means to investigate the backgrounds of potential tenants and employees.

489.     Therefore, some or all arrestee pages on mugshots.com are "consumer reports" within the meaning of the FCRA.

490.     According to mugshots.com, Defendants offer background checks to visitors for a fee.

491.     On information and belief, those background checks contain, *inter alia*, the information offered on the mugshots.com website.

492.     Pursuant to §1681(e)(d)(2) of the FCRA requires that a credit reporting agency must provide "to any to whom a consumer report is provided by the agency a notice of such person's responsibilities under [FCRA]."

493.     At all times herein relevant, until on or about January 18, 2016, Defendants have failed to provide the notice required by the FCRA to most or all users of the subject matter websites, including mugshots.com.

494.     On or about January 18, 2016, one or more Defendants posted the following notice to mugshots.com:

**<u>FCRA DISCLAIMER:</u> MUGSHOTS.COM DOES NOT PROVIDE CONSUMER REPORTS AND IS NOT A CONSUMER REPORTING AGENCY. OUR DATABASE CANNOT BE USED TO MAKE DECISIONS ABOUT CONSUMER CREDIT, EMPLOYERS, INSURANCE, TENANT SCREENING, OR ANY OTHER PURPOSES THAT WOULD REQUIRE FCRA COMPLIANCE.**

495.     Prior to on or about January 18, 2016, Defendants did not provide the notice required by the FCRA anywhere on any of the subject matter websites.

496.     Pursuant to §1681n of the FCRA,

Any person who willfully fails to comply with any requirement imposed under this title [15 USCS §§ 1681 et seq.] with respect to any consumer is liable to that consumer in an amount equal to the sum of--

(1)     (A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $ 100 and not more than $ 1,000; [and]

(2)  such amount of punitive damages as the court may allow; and

(3)  in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n.

497.     Pursuant to Section 1681o of the FCRA,

Any person who is negligent in failing to comply with any requirement imposed under this title [15 USCS §§ 1681 et seq.] with respect to any consumer is liable to that consumer in an amount equal to the sum of--

(1)  any actual damages sustained by the consumer as a result of the failure; and

(2)  in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681o.

WHEREFORE, the Plaintiff respectfully requests this Honorable Court grant and award the following relief:

(a) Certify this cause as a Rule 23(b)(3) class action, and enter judgment in favor of Plaintiff and the Class and against

Defendants as to liability and the maximum statutory damages provided by the FCRA for each class member;

(b) Certify this cause as a Rule 23(b)(2) class action, and issue a permanent injunction against further violations of FCRA by Defendants as to any members of the Class;

(c) Alternatively, certify this cause as an issue class action as to liability only pursuant to Rule 23(c)(4), with a finding that Defendants are liable as to all class members;

(d) Award to the Plaintiff and the Class costs of suit and reasonable attorney fees; and

(e) Grant whatever additional relief this Court deems appropriate and just under the circumstances.

**COUNT VI – CLASS D**
**<u>VIOLATION OF THE FEDERAL FAIR CREDIT REPORTING ACT</u>**
***On behalf of all Plaintiffs***

498.    Plaintiffs restate and re-allege paragraphs 1-497 of this First Amended Class Action Complaint, inclusive of all factual allegations in Counts I –V, as if fully set forth herein.

499.    Section 1681b(b)(1) states that a consumer reporting agency may only provide a consumer report if it ensures that the recipient complies with certain disclosure provisions (the "FCRA disclosures").

500.    The FCRA disclosures inform consumers that the consumer report may be used for employment purposes and inform employers that they must provide consumers with certain disclosures if any adverse action is taken based in whole or in part upon the report.

501.    Defendants promote mugshots.com for use in making employment, housing, marriage, and/or insurance decisions.

502.    Defendants have provided background checks and consumer reports for purposes in employment decisions at all times herein relevant.

503.     Defendants have failed to make the FCRA disclosures as required by Section 1681b(b)(1) of the FCRA at all times herein relevant.

WHEREFORE, the Plaintiffs respectfully request this Honorable Court grant and award the following relief:

> (a) Certify this cause as a class action pursuant to Rule 23(b)(3), and enter judgment in favor of Plaintiff and the Class and against Defendants as to liability and the maximum statutory damages provided by the FCRA for each class member;

> (b) Certify this cause as a class action pursuant to Rule 23(b)(2), and issue a permanent injunction against further violations of FCRA by Defendants as to any members of the Class;

> (c) Alternatively, certify this cause as an issue class action as to liability only pursuant to Rule 23(c)(4), with a finding that Defendants are liable as to all class members;

> (d) Award to the Plaintiff and the Class costs of suit and reasonable attorney fees; and

> (e) Grant whatever additional relief this Court deems appropriate and just under the circumstances.

## COUNT VII – CLASSES B, C, AND D
### VIOLATION OF THE FEDERAL FAIR CREDIT REPORTING ACT
#### *On behalf of Plaintiffs Thompson and Gabiola*

504.     Plaintiff restates and re-alleges paragraphs 1-503 of this First Amended Class Action Complaint, inclusive of Counts I -VI, as if fully set forth herein.

505.     Section 1681(e) of the FCRA states, in relevant part, as follows:

> (b)     Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 USCS § 1681e.

506.    At all times herein relevant, Defendants instituted little or no procedures to ensure that the information posted on mugshots.com was assured of the maximum possible accuracy.

507.    On information and belief, the only procedure instituted by Defendants for the removal of inaccurate information from mugshots.com was the payment of a fee as set forth in previously.

WHEREFORE, the Plaintiffs respectfully request this Honorable Court grant and award the following relief:

(a) Certify this cause as a class action pursuant to Rule 23(b)(3), and enter judgment in favor of Plaintiff and the Class and against Defendants as to liability and the maximum statutory damages provided by the FCRA for each class member;

(b) Certify this cause as a class action pursuant to Rule 23(b)(2), and issue a permanent injunction against further violations of FCRA by Defendants as to any members of the Class;

(c) Alternatively, certify this cause as an issue class action as to liability only pursuant to Rule 23(c)(4), with a finding that Defendants are liable as to all class members;

(d) Award to the Plaintiff and the Class costs of suit and reasonable attorney fees; and

(e) Grant whatever additional relief this Court deems appropriate and just under the circumstances.

## COUNT VIII – CLASS D
## <u>VIOLATIONS OF THE FLORIDA RIGHT OF PUBLICITY ACT</u>
### *On behalf of Plaintiff Thompson*

508.    Plaintiff restates and re-alleges paragraphs 1-507 of this First Amended Class Action Complaint as if fully set forth herein.

509.     Keesee, Epstein, and Sarid, and some or all of the other Defendants, live and work in Florida, including ownership and operation of the subject matter websites.

510.     Upon information and belief, one or more of the subject matter websites are hosted on servers located in Florida.

511.     On information and belief, callers to the subject matter websites reach a call center located in Florida.

512.     On information and belief, requests and "applications" for correction or removal of information are reviewed by Keesee and Hammermill in Florida.

513.     All transactions and operations of the Defendants are subject to Florida law.

514.     The people of the State of Florida, by and through their popularly elected legislature, enacted a statute entitled the Florida Right of Publicity Act, codified at Fla. Stat. § 540.08 ("FROPA").  FROPA was in force and effective at all times herein relevant.

515.     Pursuant to FROPA:

(1) No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by:

(a) Such person; or

(b) Any other person, firm or corporation authorized in writing by such person to license the commercial use of her or his name or likeness; or

(c) If such person is deceased, any person, firm or corporation authorized in writing to license the commercial use of her or his name or likeness, or if no person, firm or corporation is so authorized, then by any one from among a class composed of her or his surviving spouse and surviving children.

(2) In the event the consent required in subsection (1) is not obtained, the person whose name, portrait, photograph, or other

likeness is so used, or any person, firm, or corporation authorized by such person in writing to license the commercial use of her or his name or likeness, or, if the person whose likeness is used is deceased, any person, firm, or corporation having the right to give such consent, as provided hereinabove, may bring an action to enjoin such unauthorized publication, printing, display or other public use, and to recover damages for any loss or injury sustained by reason thereof, including an amount which would have been a reasonable royalty, and punitive or exemplary damages.

(3) If a person uses the name, portrait, photograph, or other likeness of a member of the armed forces without obtaining the consent required in subsection (1) and such use is not subject to any exception listed in this section, a court may impose a civil penalty of up to $ 1,000 per violation in addition to the civil remedies contained in subsection (2). Each commercial transaction constitutes a violation under this section.

Fla. Stat. § 540.08.

516.    Defendants did not obtain written permission from the Plaintiff to post Plaintiff's photograph to the subject matter websites.

517.    Defendants did not obtain written permission from any person whose mugshot photograph appears on the subject matter websites.

518.    Defendants use the Plaintiff's photograph for commercial purposes through one or more of the following:

- Requiring payment in order to remove said photograph;
- Displaying the photographs in connection with the "service" of public record access;
- Offering permanent display of his photograph for a fee;
- Other acts specified herein.

519.    Defendants acted in the same or substantially similar ways towards all members of Class D.

520.    Defendants' sole use for the photographs posted or available on the subject matter websites is a commercial purpose.

521.    Defendants' actions were willful and intentional.

WHEREFORE, the Plaintiff respectfully requests this Honorable Court grant and award the

following relief:

> (a) Certify this cause as a class action pursuant to Rule 23(b)(3), and enter judgment in favor of Plaintiff and the Class and against Defendants in an amount to be proven at trial;

> (b) Certify this cause as a class action pursuant to Rule 23(b)(2), and issue a permanent injunction against further violations of FROPA by Defendants as to any members of the Class;

> (c) Alternatively, certify this cause as an issue class action as to liability only pursuant to Rule 23(c)(4), with a finding that Defendants are liable as to all class members;

> (d) Award to the Plaintiff and the Class costs of suit and reasonable attorney fees; and

> (e) Grant whatever additional relief this Court deems appropriate and just under the circumstances.

## COUNT IX – CLASS D
## <u>VIOLATIONS OF THE FLORIDA CONSUMER FRAUD ACT</u>
### *On behalf of Plaintiff Thompson*

522.    Plaintiff restates and re-alleges paragraphs 1-492 of this First Amended Class Action Complaint, inclusive of all allegations in all previous counts, as if fully set forth herein.

523.    The people of the State of Florida, by and through their popularly elected legislature, enacted a statute entitled the Florida Consumer Protection Act, codified at Fla. Stat. § 501.204 *et seq.* ("FCPA"). The FCPA was in force and effective at all times herein relevant.

524.     Pursuant to the FCPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. § 501.204. .

525.     Pursuant to the FCPA,

Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

(2) In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in [FCPA].

Fla. Stat. § 501.211.

526.     Defendants violated the FCPA by one or more of the following deceptive acts:

(d) Operating unpublisharrest.com, purportedly as a separate entity, with the intention that people actually rely on that representation and pay additional monies;
(e) Representing that payment by an arrestee would result in removal of the arrestee's photograph, when in reality Defendants routinely failed to do so after payment;
(f) Other deceptive acts as alleged and set forth herein.

527.     Defendants violated FCPA by one or more of the following unfair acts or omissions:

(h) Operating unpublisharrest.com, purportedly as a separate entity, with the intention that people actually rely on that representation and pay additional monies;
(i) Soliciting and demanding payment for removal of arrest records, and refusing to remove those records for years without payment;
(j) Deliberately failing to correct incorrect and/or inaccurate information solely so as to incentivize payment by arrestees;
(k) Using the likenesses of arrestees for commercial purposes without written consent, and refusing to remove those likenesses without payment;

(l) Other unfair acts as alleged and set forth herein.

WHEREFORE, the Plaintiff respectfully requests this Honorable Court grant and award the

following relief:

(a) Certify this cause as a class action pursuant to Rule 23(b)(3), and enter judgment in favor of Plaintiff and the Class and against Defendants in an amount to be proven at trial;

(b) Certify this cause as a class action pursuant to Rule 23(b)(2), and issue a permanent injunction against further violations of FCPA by Defendants as to any members of the Class;

(c) Alternatively, certify this cause as an issue class action as to liability only pursuant to Rule 23(c)(4), with a finding that Defendants are liable as to all class members;

(d) Award to the Plaintiff and the Class costs of suit and reasonable attorney fees; and

(e) Grant whatever additional relief this Court deems appropriate and just under the circumstances.

**ALL CLASS COUNTS HEREIN ARE REPLEADED AND RE-ALLEGED AS INDIVIDUAL CAUSES OF ACTION**

Respectfully submitted,
PETER GABIOLA, ANTONIO
HAMMOND, and JIMMY THOMPSON,
on behalf of themselves and all others
similarly situated,

/s/ Berton N. Ring
By the Plaintiff's Attorneys
Berton N. Ring, P.C.

Berton N. Ring #6183351
Stuart M. Clarke #6311043
BERTON N. RING, P.C.
123 West Madison Street, 15th Floor
Chicago, IL 60602
(312) 781-0290

## <u>NOTICE OF ATTORNEY LIEN</u>

Please take notice that the Plaintiffs have retained Berton N. Ring, P.C. on this matter. Berton N. Ring, P.C. shall have a claim and an interest under the Illinois Attorneys Lien Act 770 ILCS 5/1 and for attorney fees under all applicable statutes referenced herein, as well as 72 ILCS 5/12-7.1, all statutes previously mentioned here in the complaint, and all retaining liens and common law rights.


<u>/s/ Berton N. Ring</u>
Berton N. Ring