**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PETER GABIOLA and ANTONIO HAMMOND, on behalf of themselves and all other similarly situated individuals, | ) ) ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 16 cv 02076 |
| | ) | |
| MUGSHOTS.COM, LLC, a Delaware Limited Liability Company; *et al.*, | ) ) | |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT[1]**

---

[1] After Defendants Hammermill & Masterson, LLC, Thomas Keesee, and Marc Gary Epstein filed their Motion to Dismiss, their co-Defendant Sahar Sarid waived service and retained their attorneys as his counsel as well. Plaintiffs' counsel offered Defendants' counsel the opportunity to brief all issues on the same briefing schedule, or for Sarid to simply adopt these Defendants' Motion to Dismiss, and both offers were rejected.

## TABLE OF CONTENTS

I.   DEFENDANTS IMPERMISSIBLY ARGUE WITH THE
     FIRST AMENDED COMPLAINT......................................................................1

II.  REACHING THE CONSTITUTIONAL ISSUE RAISED BY
     DEFENDANTS IS UNNECESSARY.................................................................2

     A. These Defendants Have No Standing to Raise
        Constitutional Arguments.......................................................................2

     B. Alternatively, Defendants Have No First Amendment Protection
        in Information Unlawfully Obtained.......................................................3

III. DEFENDANTS HAVE NO CONSITUTIONAL PRIVILEGE TO
     ENGAGE IN UNTRUTHFUL COMMERCIAL SPEECH.............................4

IV.  PLAINTIFFS HAVE A RIGHT TO PRIVACY IN
     ARREST RECORDS.......................................................................................8

V.   DEFENDANTS ARE NOT SPEAKING ON MATTERS OF
     PUBLIC CONCERN......................................................................................11

VI.  DEFENDANTS MAKE NO ARGUMENTS FOR DISMISSAL
     OF PLAINTIFFS' FCRA CLAIMS...............................................................13

VII. PLAINTIFFS STATE VALID CAUSES OF ACTION UNDER THE
     ILLINOIS AND FLORIDA CONSUMER RIGHTS ACTS..........................13

     A. Plaintiffs State a Valid Cause of Action Under the
        Illinois Mugshots Act............................................................................13

     B. Plaintiff Thompson States a Valid Cause of Action Under the
        Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").............16

VIII. PLAINTIFFS' RIGHT OF PUBLICITY ACT CLAIMS
      ARE VALID..................................................................................................18

     A. The Defendants' Commercial Speech Is Not A Matter
        of Public Concern..................................................................................18

     B. Defendants Use Plaintiffs' Mugshots to Sell the
        Takedown Service..................................................................................20

     C. Defendants' Arguments Regarding the Florida Right of
        Publicity Are Meritless..........................................................................20

**IX.   PLAINTIFF STATES VALID CAUSES OF ACTION UNDER THE
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
ACT ("RICO")**..............................................................................................22

**A.  Defendants Obtained An Intangible Right from Plaintiffs
Actionable Under RICO**..................................................................22

**B.  Defendants' Arguments Regarding Consent and Refusal
Are Meritless**......................................................................................24

**CONCLUSION**..........................................................................................................25

# TABLE OF AUTHORITIES

## Supreme Court Opinions

*L.A. Police Dep't v. United Reporting Publ'g*, 528 U.S. 32 (1999) ............................................... 4

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980) ........................... 4

*Edenfield v. Fane*, 507 U.S. 761 (1993) ......................................................................................... 7

*Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626 (1985) .................. 9

*U.S. DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989) ........................... 9, 10

*Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977) ................................................... 12

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ......................................................... 12

*Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749 (1985) ............................................... 15

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991) ..................................................................... 15

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................................... 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................. 17

*Snyder v. Phelps*, 562 U.S. 443 (2011) ....................................................................................... 19

*Joseph Burstyn v. Wilson*, 343 U.S. 495 (1952) ........................................................................ 22

*Scheidler v. NOW, Inc.*, 537 U.S. 393 (2003) ............................................................................ 23

## Seventh Circuit Opinions

*CSFM Corp. v. Elbert & McKee Co.*, No. 87 C 8495, 1988 U.S. Dist. LEXIS 9993 (N.D. Ill. Sept. 7, 1988) ................................................................................................................................ 1

*Macaluso v. City of Chi.*, No. 15 CV 1739, 2015 U.S. Dist. LEXIS 152870 (N.D. Ill. Nov. 12, 2015) ............................................................................................................................................... 2

*Serpas v. Schmidt*, 827 F.2d 23 (7th Cir. 1987) ........................................................................... 2

*Tribune Co. v. Swiss Reinsurance Am. Corp.*, No. 02 C 4772, 2003 U.S. Dist. LEXIS 17441 (N.D. Ill. Sept. 30, 2003) ............................................................................................................... 2

*Genusa v. Peoria*, 619 F.2d 1203 (7th Cir. 1980) ........................................................................ 3

*Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600 (7th Cir. 2002) ........... 5

*United States v. Benson*, 561 F.3d 718 (7th Cir. 2009) ................................................................ 7

*Vrdolyak v. Avvo, Inc.*, No. 16 C 2833, 2016 U.S. Dist. LEXIS 123578 (N.D. Ill. Sept. 12, 2016) .............................................................................................................................................. 11

*Cicilline v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d 842 (N.D. Ill. 2008) ................................ 13

*Underground Solutions, Inc. v. Palermo*, No. 13 C 8407, 2016 U.S. Dist. LEXIS 64962 (N.D. Ill. May 17, 2016) ............................................................................................................................ 15

*In re FACTOR VIII OR IX CONCENTRATE BLOOD PRODS. LITIG.*, 25 F. Supp. 2d 837 (N.D. Ill. 1998) ................................................................................................................................ 15

*Medline Indus. v. Strategic Commer. Solutions, Inc.*, 553 F. Supp. 2d 979 (N.D. Ill. 2008) ...... 16

*Best v. Berard*, 837 F. Supp. 2d 933 (N.D. Ill. 2011) ................................................. 19

*KingVision Pay per View, Ltd. v. Boom Town Saloon, Inc.*, 98 F. Supp. 2d 958 (N.D. Ill. 2000) ...................................................................................................................................... 20

*Hartford Cas. Ins. Co. v. Borg-Warner Corp.*, 913 F.2d 419 (7th Cir. 1990) ........................... 20

*Vazquez v. Cent. States Joint B*d., 547 F. Supp. 2d 833 (N.D. Ill. 2008) ................................... 24

*United States v. Lisinski*, 728 F.2d 887 (7th Cir. 1984) ................................................. 25

**Federal Court Opinions**

*Pitrolo v. County of Buncombe*, No. 1:06cv199, 2007 U.S. Dist. LEXIS 103422 (W.D.N.C. July 16, 2007) ........................................................................................................................ 2

*In re IBP Confidential Bus. Documents Litig.*, 797 F.2d 632 (8th Cir. 1986) ........................... 2

*Spottsville v. Barnes*, 135 F. Supp. 2d 1316 (N.D. Ga. 2001) ................................................. 4

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914 (3d Cir. 1990) ................... 4

*Bosley v. WildWetT.com*, 310 F. Supp. 2d 914 (N.D. Ohio 2004) ........................................ 7, 8, 19

*Midler v. Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988) ................................................. 8

*King v. Gen. Info. Servs.*, 903 F. Supp. 2d 303 (E.D. Pa. 2012) ........................................ 9, 10, 13

*Det. Free Press, Inc. v. U.S. DOJ*, 829 F.3d 478 (6th Cir. 2016) ........................................ 9, 10

*Stephenson v. United States*, 139 F. Supp. 3d 566 (E.D.N.Y. 2015) ........................................ 11

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126 (N.D. Cal. 2014) ........................................................................................................................ 11

*Hart v. Elec. Arts, Inc.*, 717 F.3d 141 (3d Cir. 2013) ................................................. 12, 15

*Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222 (N.D. Cal. 2014) ........................................ 12

*Martin v. Hearst Corp.*, 777 F.3d 546 (2d Cir. 2015) ................................................. 12

*Millstone v. O'Hanlon Reports, Inc.*, 383 F. Supp. 269 (E.D. Mo. 1974) ................................... 13

*McFarland v. Miller*, 14 F.3d 912 (3d Cir. 1994) ................................................. 15

*Cepeda v. Swift & Co.*, 415 F.2d 1205 (8th Cir. 1969) ................................................. 15

*Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332 (D.N.J. 2001) ........................ 16

*Gastaldi v. Sunvest Cmtys. USA, L.L.C.*, 637 F. Supp. 2d 1045 (S.D. Fla. 2009) ...................... 17

*James D. Hinson Elec. Contr. Co. v. Bellsouth Telcoms., Inc.*, No. 3:07-cv-598-J-32MCR, 2008 U.S. Dist. LEXIS 9464 (M.D. Fla. Feb. 8, 2008) ........................................................ 17

*Democratic Republic of the Congo v. Air Capital Group, L.L.C.*, 614 F. App'x 460 (11th Cir. 2015) ........................................................................................................................ 17

*Army Aviation Heritage Found. & Museum, Inc. v. Buis*, 504 F. Supp. 2d 1254 (N.D. Fla. 2007) ...................................................................................................................................... 18

*Bilotta v. Citizens Info. Assocs.*, No. 8:13-cv-2811-T-30TGW, 2014 U.S. Dist. LEXIS 3229 (M.D. Fla. Jan. 10, 2014) ........................................................................................ 18, 21

*Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006) ................................. 18

*E-Ventures Worldwide, L.L.C. v. Google, Inc.*, No. 2:14-cv-646-FtM-29CM, 2016 U.S. Dist. LEXIS 62855 (M.D. Fla. May 12, 2016) .................................................................... 18

*Stalley v. Orlando Reg'l Healthcare Sys.*, 524 F.3d 1229 (11th Cir. 2008) ................................ 18

*Tyne v. Time Warner Entm't Co., L.P.*, 204 F. Supp. 2d 1338 (M.D. Fla. 2002) ........................ 21

*United States v. Local 560 of Int'l Bhd. of Teamsters*, 780 F.2d 267 (3d Cir. 1985) .................. 23

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) .................................................... 23

*United States v. Cain*, 671 F.3d 271 (2d Cir. 2012) ..................................................... 23

*United States v. Tropiano*, 418 F.2d 1069 (2d Cir. 1969) ............................................... 23

*In Suk Chang v. United States*, 305 F. Supp. 2d 198 (E.D.N.Y. 2004) ................................. 23

*Lewis v. Lhu*, 696 F. Supp. 723 (D.D.C. 1988) ......................................................... 23

**State Cases**

*Marin Indep. Journal v. Mun. Court*, 12 Cal. App. 4th 1712 (1993) ........................................ 3, 4

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 119 Cal. Rptr. 2d 296, 45 P.3d 243 (2002) ........................ 6

*Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 776 N.E.2d 151 (2002) ...................................... 14

*Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 775 N.E.2d 951 (2002) ...................... 14

*City of Chi. v. Mich. Beach Hous. Coop.*, 297 Ill. App. 3d 317, 696 N.E.2d 804 (1998) ........... 15

*Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill. 2d 379, 432 N.E.2d 849 (1982) .................. 16

*Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 625 N.E.2d 990 (1993) .............................. 16

*Ahearn v. Mayo Clinic*, 40 Fla. L. Weekly 2502 (Dist. Ct. App. 2015) ..................................... 16

*Davis v. Powertel, Inc.*, 26 Fla. L. Weekly 146 (Dist. Ct. App. 2000) ....................................... 16

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164 (Fla. Dist. Ct. App. 2015) ................................................................................. 18

*Trannel v. Prairie Ridge Media, Inc.*, 2013 IL App (2d) 120725, 987 N.E.2d 923 .................. 20

**State Statutes**

730 Ill. Comp. Stat. 5/1-1-2 ......................................................................... 10

765 Ill. Comp. Stat. 1075/5 .......................................................................... 20

Fla. Stat. § 501.211………………………………………………..…………………………16-17

Fla. Stat. § 540.08 ................................................................................. 21

**Other**

Felcher and Rubin, "Privacy, Publicity and the Portrayal of Real People by the Media," 88 Yale L.J. 1577, 1596 (1979)

## I.    DEFENDANTS IMPERMISSIBLY ARGUE WITH THE FIRST AMENDED COMPLAINT

"On a motion to dismiss, the allegations of the complaint are taken as true." *CSFM Corp. v. Elbert & McKee Co., No. 87 C 8495,* 1988 U.S. Dist. LEXIS 9993, at *5-6 (N.D. Ill. Sept. 7, 1988). Defendants Hammermill & Masterson, LLC, Thomas Keesee, and Marc Gary Epstein ("Defendants"), on the other hand, spend their motion arguing both with the well-pleaded allegations of the First Amended Complaint and with themselves.[2] "The information provided on and obtained from this site does not constitute an official record," begins Mugshots.com's terms of service agreement. Yet in Defendants' Motion to Dismiss, they argue mugshots is nothing more than a depository for *official* public records.

The reality here is what the First Amended Complaint alleges: what is on mugshots.com is usually false or inaccurate arrest information, *not* public records, combined with a mugshot to make it look official and posted intentionally as nothing more than *advertisements* for a takedown service operated by a fake company. It is *not* a failure to update public records. Defendants are part of a scheme that (a) use arrest records as the basis to post false and/or inaccurate information – *not the records themselves* – to mugshots.com, (b) misrepresents that its fake reputation management service is independent of mugshots.com; and (c) sells that fake reputation management service as to consumers desperate to remove the information from mugshots.com (First Am. Compl't at ¶¶180-191). And in many instances, such as in Illinois, the arrest records are posted even after they are required by law to be removed from state department of corrections websites, and which have designated those records as confidential after removal. First Am. Compl't at ¶¶114-118.

---

[2] Defendants also say they do not know what a "fake" reputation management firm is. For Defendants' reference, the word "fake," according to Merriam-Webster's Dictionary, means "not true or real**:** meant to look real or genuine but not real or genuine."

Here, all of the named Plaintiffs have had false or inaccurate information posted about them to the website. Plaintiff Thompson was erroneously arrested on a check fraud warrant meant for someone else, then mugshots.com posted that he was arrested for check fraud without posting that the arrest was erroneous. Plaintiff Gabiola's page *still* states he is currently on parole as his "inmate status." And Plaintiff Hammond's page states he is still incarcerated when he is not.[3]

## II. REACHING THE CONSTITUTIONAL ISSUE RAISED BY DEFENDANTS IS UNNECESSARY

This Court "[has] a duty to avoid unnecessary constitutional adjudication[, including] a case where the challenged statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a constitutional question." *Serpas v. Schmidt*, 827 F.2d 23, 31 (7th Cir. 1987). Here, there is no need to address Defendants' constitutional arguments.

### A. These Defendants Have No Standing to Raise Constitutional Arguments

As the First Amended Complaint makes clear, these Defendants – Keesee, Hammermill & Masterson, and Marc Epstein – are not responsible for posting the arrest information.[4] Instead, they are responsible for the *takedown* service: advertising the fake reputation management service, and charging the arrestees for removal of the often false or inaccurate information. As a result, they do not have standing to assert a First Amendment defense for the <u>posting</u> of the arrest information.

As was explained in *Pitrolo v. County of Buncombe*, No. 1:06cv199, 2007 U.S. Dist.

---

[3] "A plaintiff may allege facts in a brief in opposition to a motion to dismiss that are consistent with, and expand on, the factual allegations in the complaint." *Macaluso v. City of Chicago*, No. 15 CV 1739, 2015 U.S. Dist. LEXIS 152870, at *10 (N.D. Ill. Nov. 12, 2015).

[4] That is done by Defendant Sahar Sarid, the owner of both mugshots.com and unpublisharrest.com, and who is not a party to this Motion. Sarid is the only person with standing to make these First Amendment arguments. These Defendants are independently liable as the operators of the takedown service and jointly liable with Sarid as agents of an undisclosed principal. *See, e.g., Tribune Co. v. Swiss Reinsurance Am. Corp.*, No. 02 C 4772, 2003 U.S. Dist. LEXIS 17441, at *14 (N.D. Ill. Sep. 30, 2003).

LEXIS 103422 (W.D.N.C. July 16, 2007) and *In re IBP Confidential Business Documents Litigation*, 797 F.2d 632 (8th Cir. 1986), the First Amendment is a *personal* right, not a vicarious one, and thus cannot be asserted by a non-speaker. As a result, these Defendants do not have rights to assert a First Amendment defense for the speech of another. Vicarious standing is not permitted where, as here, the statutory provision in question "is readily subject to a narrowing construction by the state courts and is not so vague or overbroad that there exists a real and substantial possibility that its very existence . . . may cause persons not before the Court to refrain from engaging in constitutionally protected speech or expression." *Genusa v. Peoria*, 619 F.2d 1203, 1210 (7th Cir. 1980) (internal citations and quotation marks omitted).

Because here each statute in question can be easily narrowed to apply only to the *takedown service*, and <u>not</u> the posting of the information in question, therefore the statutes will not chill the posting of truthful arrest records in compliance with applicable law, and these Defendants lack standing to raise the constitutional issue.[5]

### B. Alternatively, Defendants Have No First Amendment Protection in Information Unlawfully Obtained

Defendants also have no First Amendment defense available because the information posted on mugshots.com was illegally obtained. The First Amended Complaint alleges that Defendants obtain their information from using bot programs to scrape from department of corrections websites records which are required by law to be removed and kept confidential, or through FOIA requests, in which Defendants falsely indicate that they are not using the records for a commercial purpose. Both are unlawful. First Am. Compl't ¶¶ 113-125.

In *Marin Independent Journal v. Municipal Court*, 12 Cal. App. 4th 1712, 1721-22, 16 Cal.

---

[5] For instance, the Illinois Mugshots Act does not prohibit the posting of arrest records; it only prohibits charging for their removal; it is thus readily subject to a narrowing construction (in other words, its plain language) which does not prohibit the posting of records in the first instance, or make others less likely to post truthful arrest records.

Rptr. 2d 550, 555 (1993), a newspaper sought the return on First Amendment grounds of photographs taken during courtroom proceedings in violation of a California statute. The California Appellate Court ruled against the paper, finding "that news reporters may not violate the law and then hide behind the protective cloak of the First Amendment where the press [has] no right to information . . . superior to that of the general public." *Id.* at 1721-22.

Moreover, "there is no First Amendment right of access to public information." *Spottsville v. Barnes*, 135 F. Supp. 2d 1316, 1323 (N.D. Ga. 2001). *See also L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32 (1999) ("The California statute in question merely requires that if respondent wishes to obtain the addresses of arrestees it must qualify under the statute to do so. . . . California could decide not to give out arrestee information at all without violating the First Amendment.") This is important here, because Defendants used false names and unlawful means to obtain the records in question. First Am. Compl't ¶¶ 113-125.

### III. DEFENDANTS HAVE NO CONSTITUTIONAL PRIVILEGE TO ENGAGE IN UNTRUTHFUL COMMERCIAL SPEECH

The primary First Amendment issue is whether the arrest information on mugshots.com and unpublisharrest.com is commercial speech, which can be regulated or banned consistent with the First Amendment, or whether it is news reporting subject to greater First Amendment protection. Defendants compare themselves to the *Chicago Tribune*. Defendants are wrong, because the arrest information *is* itself an advertisement for the takedown service.

Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 561 (1980). "The Supreme Court has cited three factors to consider in deciding whether speech is commercial: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *United States*

*Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990). Applying that

test here, the first factor is clearly satisfied; Defendants advertise on *every* arrestee page:



The arrestees have been turned into advertisements for the takedown service, for without their

photographs, there is no takedown service.[6] And the second factor, too, is satisfied; the links and

statements clearly refer to a specific product or service; namely, Defendants' takedown service.

The links lead to unpublisharrest.com. Each link or statement describes the removal of a mugshot

or arrest information, and is clearly intended to attract website visitors to purchase the service in

hopes of removing the page. In short, the people are both the product being sold and the

advertisements, and the removal is the service being sold. Defendants' own terms of service

agreement even specifies that payment purportedly buys a license in the person's likeness.

Third, Defendants have a clear economic motivation for this speech; a website visitor to

mugshots.com who clicks on an "unpublish" link is taken to unpublisharrest.com, and is greeted

with this:



Based on U.S. Supreme Court precedents, the California Supreme Court has also adopted

a useful test in determining whether speech is commercial and thus subject to regulation:

"categorizing a particular statement as commercial or noncommercial speech requires

---

[6] These advertisements are alleged to exist in the First Amended Complaint, *and* this Court may also take judicial notice of their existence. *See Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600 (7th Cir. 2002).

consideration of three elements: the speaker, the intended audience, and the content of the message." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 960, 119 Cal. Rptr. 2d 296, 311, 45 P.3d 243, 256 (2002). Applying the first two factors of the *Kasky* test here, we find that the speaker – largely these Defendants and Sarid – are indeed engaged in commerce based on the takedown service. The First Amended Complaint alleges that the websites receive twenty times more revenue from the takedown service than ordinary advertising, and that the takedown service constitutes the *raison d'etre*, primary revenue stream, and primary business model for the websites. First Am. Compl't at ¶¶223-229. The First Amended Complaint also alleges that the target audience is the arrestees themselves, with the takedown service being marketed to arrestees through their own profiles and advertisements on those profiles, and incorrect, false, or inaccurate statements in the profiles being used together with search engine optimization to incentivize the use of the takedown service. First Am. Compl't at ¶128, 143-148. It is, in short, the takedown *service* which is being sold. Both of the first two *Kasky* elements are satisfied.

The third element is the content of the message, or specifically whether it contains both *Kasky* and the U.S. Supreme Court referred to as "product references." In that vein, "references to services would include not only statements about the price, availability, and quality of the services themselves, but also, for example, statements about the education, experience, and qualifications of the persons providing or endorsing the services." *Id.* at 961. Given each advertisement on mugshots.com refers to the availability of the takedown service, followed by pricing and links to testimonials, this element of the *Kasky* test is also satisfied.

In sum, "commercial speech generally or typically is directed to an audience of persons who may be influenced by that speech to engage in a commercial transaction with the speaker or the person on whose behalf the speaker is acting." *Id.* at 960. That is precisely what Plaintiff

alleges here.  The purpose of the speech is exactly the point.  If Defendants want to prove the when all of the allegations in the First Amended Complaint must be taken as true.

Furthermore, commercial speech is **not** entitled to the same protections as other speech; it may be regulated or banned entirely consistent with the First Amendment.  On this point, *United States v. Benson*, 561 F.3d 718 (7th Cir. 2009), is controlling.  In *Benson*, the defendant argued that his website, which offered false methods for visitors to avoid paying income taxes, was protected First Amendment speech on a matter of public concern.  The Seventh Circuit Court of Appeals rejected that argument, holding that because Benson was falsely advertising as a means to increase his own sales, his website was commercial speech.  Simply put, "the First Amendment . . . does not prohibit the State from insuring that the stream of commercial information flow[s] cleanly as well as freely, and our cases make clear that the State may ban commercial expression that is fraudulent or deceptive without further justification." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993).

In *Bosley v. WildWetT.com*, 310 F. Supp. 2d 914, 925 (N.D. Ohio 2004), the defendants disseminated images of the plaintiff without her shirt as examples of material to be found on their website.  Though the plaintiff had removed her shirt in public, the images were captured by defendants without plaintiff's consent.  The plaintiff filed an action seeking a restraining order against further use of her images, and the defendants interposed a First Amendment defense, arguing that the images were matters of public concern or expressive works.  The court disagreed, holding that because the defendants were using Bosley's image to sell Bosley's image, the images were unprotected commercial speech.  Most critically, *Bosley* noted that the topless images were advertisements for the site, and "[a]dvertisements are not protected under this public affairs exception." *Bosley v. WildWetT.com*, 310 F. Supp. 2d 914, 924 (N.D. Ohio 2004).  *Id.*  Here, as

in *Bosley*, the arrest information and mugshots are *themselves* advertisements, and thus, like the images in *Bosley*, unprotected commercial speech irrespective of what they depict. At best, they are "advertisements in disguise."

"The purpose of the media's use of a person's identity is central. If the purpose is informative or cultural the use is immune; if it serves no such function but merely exploits the individual portrayed, immunity will not be granted." *Midler v. Ford Motor Co.*, 849 F.2d 460, 462 (9th Cir. 1988) (citing Felcher and Rubin, "Privacy, Publicity and the Portrayal of Real People by the Media," 88 Yale L.J. 1577, 1596 (1979)). If the websites here were *truly* a database of arrest records in the public interest, as Defendants claim, there would be no takedown service, or at the very least that service would be limited to incorrect or outdated information for no charge or a nominal fee. Instead, what Defendants are doing is offering to remove the arrest information for *anyone who pays* an exorbitant fee <u>per conviction</u>. This requires necessarily that violent crimes are removed for the sake of profiteering while *de minimus* violations such as drug arrests or traffic violations remain. It means that those with the means to pay can save their reputations while those of minimal means cannot. Often, those *de minimus* arrests are falsified upwards into felonies, as with Plaintiff Thompson, so as to incentivize payment for still more takedowns. Selling the removal of false information is not in the public interest.

## IV. PLAINTIFFS HAVE A RIGHT TO PRIVACY IN ARREST RECORDS

"Defendants seem to align themselves with Justice Black's absolute position that the First Amendment meant only what it literally said: There shall be no law restricting freedom of speech-ever--with no ifs, buts, or whereases. However, the Supreme Court never adopted this position." *Bosley*, *supra*. Furthermore, not one of the cases cited by Defendants addresses a fake reputation management "service" which purports (falsely) to be a separate entity. It is this fake "service"

that Defendants are selling.  "The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading, *or that proposes an illegal transaction*."  *Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626, 638 (1985) (emphasis supplied).  The takedown service is an illegal transaction, and Defendants have *never argued* that the <u>takedown service</u> is protected by the First Amendment in any way.

Beginning in *United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989), where the U.S. Supreme Court found a right to privacy in so-called rap sheets, courts have noted the "vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information."  *Id*. at 764 (emphasis supplied).  In *Reporters Comm.*, the "computerized summary in a single clearinghouse" was the FBI central database, which the U.S. Supreme Court ruled inaccessible to the press on grounds that the arrestees' rights to privacy trumped the reporters' First Amendment rights to access.

Defendants here are attempting to reconstruct that same database, only this time via unlawfully obtaining, falsifying, and then unlawfully selling that information.  Given these factors, the right to privacy should not be less here.  The Fair Credit Reporting Act has long been held constitutional on similar grounds, as "a cramped notion of personal privacy ignores an individual's interest in maintaining the practical obscurity of cumulative, indexed, computerized data."  *King v. General Info. Servs.*, 903 F. Supp. 2d 303, 311-12 (E.D. Pa. 2012).

Most recently, the Sixth Circuit Court of Appeals explained the right to privacy in mugshots and arrest records in *Detroit Free Press, Inc. v. United States DOJ*, 829 F.3d 478 (6th Cir. 2016).  In *Detroit Free Press*, the Sixth Circuit Court of Appeals cited *Reporters Comm.* And referenced sites such as mugshots.com in concluding that people had a right to privacy in booking

photos. 829 F.3d 478 (6th Cir. 2016). "[That] the public has long wanted to look at these photos . . . says nothing about the individual's privacy interest." *Id*.[7] State laws are trending in this manner as well. "[M]any states have placed limits on how employers may use criminal background checks. In Pennsylvania, employers are allowed to consider an applicant's felony and misdemeanor convictions, but not mere arrests, in connection with hiring decisions. Additionally, the growing trend of "ban the box" legislation that has been enacted in states, as well as local municipalities, also exemplifies this national effort towards restricting both the dissemination and consideration of adverse information that is potentially harmful to an individual's economic opportunities." *King*, 903 F. Supp. 2d at 312-13. In short, "the fact that most States deny the general public access to their criminal-history summaries should not be surprising. As we have pointed out . . . in 47 States nonconviction data from criminal-history summaries are not available at all, and even conviction data are generally unavailable to the public." *Reporters Comm*, 489 U.S. at 767 (1989).

This privacy goes hand in hand with rehabilitation. The goal of the Illinois Code of Corrections is, *inter alia*, "rehabilitation" and to "restore offenders to useful citizenship." 730 ILCS 5/1-1-2. Consistently Congress has found "offender rehabilitation" to be "one of the primary objectives of U.S. penal policy[.]" H. Rep. No. 95-720, 95th Cong., 1st Sess., reprinted in 1977 U.S. Code Cong. & Admin. News 3146, 3149. What Defendants are doing is tantamount to continuing sentences through stigma (Hammond and Gabiola), imposing sentences on those never convicted (Thompson), and doing so for crimes which sometimes never occurred (Thompson). The result is lost jobs and homelessness. As one Court put it, "A now-countless number of studies

---

[7]"A disclosed booking photo casts a long, damaging shadow over the depicted individual. . . .Today, an idle internet search reveals the same booking photo that once would have required a trip to the local library's microfiche collection. In fact, mug-shot websites collect and display booking photos from decades-old arrests: BustedMugshots and JustMugshots, to name a couple. Potential employers and other acquaintances may easily access booking photos on these websites, hampering the depicted individual's professional and personal prospects. Desperate to scrub evidence of past arrests from their online footprint, individuals pay such sites to remove their pictures." 829 F.3d 478 (6th Cir. 2016).

have concluded that a conviction—even a very old conviction—is a substantial barrier to employment. . . . [T]here is also an impressive body of proof that unemployment is strongly linked with recidivism. . . . In light of all of these findings, I question the wisdom of the often-repeated "consensus" that economic hardship or negative employment consequences do not constitute "extreme circumstances" . . . If an ex-offender's inability to find employment puts in jeopardy his or her reentry into society, I am hard pressed to imagine a circumstance more extreme." *Stephenson v. United States*, 139 F. Supp. 3d 566, 569 (E.D.N.Y. 2015).

## V.  DEFENDANTS ARE NOT SPEAKING ON MATTERS OF PUBLIC CONCERN

As a result, the fundamental question is whether or not the Defendants' limited commercial speech rights outweigh Plaintiffs' right to privacy.  The answer is no.

Defendants analogize themselves to the website Avvo in *Vrdolyak v. Avvo, Inc.*, No. 16 C 2833, 2016 U.S. Dist. LEXIS 123578 (N.D. Ill. Sep. 12, 2016).  But Avvo does not offer the services of a fake reputation management firm to remove attorneys from Avvo, nor does Avvo use false or inaccurate information to incentivize attorneys to pay for their removal.  In *Vrdolyak*, all of the advertisements on Avvo were either third party advertisements or "sponsored listings" paid for by attorneys; here, the advertisements are for removal of the arrestee content itself, and every arrestee page *is* such an advertisement.  In *Vrdolyak*, the information at issue was truthful; here, the information is often false, with the added wrinkle of a fake reputation management firm offering to remove it.  But the most important factor in *Vrdolyak* was that Avvo does not falsely (or otherwise) list attorneys as suspended, disbarred, or disciplined *and then offer to remove that negative information for a fee.*

Defendants cite to *In re NCAA Student Athlete Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126 (N.D. Cal. 2014), for the proposition that a televised sports event is not

commercial speech merely because of the commercial breaks. But Defendants are not selling the mugshots search engine service; they are selling the *arrestees*, analogous to selling the *players'* own likenesses. But more than that – they are attempting to license the arrestees' own likenesses *to the arrestees themselves* after wrongfully appropriating them.[8] That is commercial speech, not protected by the First Amendment. *See Hart v. Elec. Arts, Inc.*, 717 F.3d 141 (3d Cir. 2013); *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977).

Further, the public concern doctrine "does not apply where a defendant uses a plaintiff's name and likeness in a knowingly false manner to increase sales of the publication." *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222, 1250 (N.D. Cal. 2014) (internal brackets omitted). This is what was alleged in the instant case: Defendants use knowingly false information about arrestees to incentivize them to pay a fake reputation management service, thereby increasing sales. "Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68-69 (1983). *Perkins*, referring to LinkedIn emails, is particularly relevant here, where the court held that referral emails sent by LinkedIn which used photographs of other users constituted commercial speech because they were used to advertise the LinkedIn service.

Finally, *Martin v. Hearst Corp.*, 777 F.3d 546 (2d Cir. 2015), is distinguishable; there was no takedown service (or anything similar) at issue there. Whereas, in *Martin,* the media outlet in question published a *news story* about the plaintiff as a matter of public concern, here Defendants are deliberately commercializing arrest information and pictures solely for *profit*, and making those records inaccurate so as to incentivize payment. Notably, unlike *Hearst*, Plaintiffs here are

---

[8] And this is where the Defendants' *Chicago Tribune* parade of horribles fails. The *Tribune* is not attempting to sell a takedown service, nor are they using false or inaccurate information to do so.

not suing about the *editorial* content – the "news stories" – on the site.

## VI. DEFENDANTS MAKE NO ARGUMENTS FOR DISMISSAL OF PLAINTIFFS' FCRA CLAIMS

Defendants do not make any arguments for dismissal of Plaintiffs' claims under the Fair Credit Reporting Act ("FCRA"), aside from their general constitutional argument under the First Amendment.   The FCRA has been repeatedly found constitutional over innumerable First Amendment challenges.  *See Millstone v. O'Hanlon Reports, Inc.*, 383 F. Supp. 269, 274 (E.D. Mo. 1974).  Notably, once again, Defendants do not contest the allegations in the Complaint that the websites are a Consumer Credit Agency furnishing consumer credit information and reports for purposes of the FCRA.  *See also Individual Reference Servs. Group, Inc. v. FTC*, 145 F. Supp. 2d 6, 42 (D.D.C. 2001); *King*, 903 F. Supp. 2d at 303; *Cicilline v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d 842 (N.D. Ill. 2008).  As a result, Plaintiffs' FCRA claims should proceed irrespective of the disposition of the remainder of Defendants' Motion and Defendants should be ordered to Answer.

## VII. PLAINTIFFS STATE VALID CAUSES OF ACTION UNDER THE ILLINOIS AND FLORIDA CONSUMER RIGHTS ACTS

### A.  Plaintiffs State A Valid Cause of Action Under the Illinois Mugshots Act

Defendants' misquoting[9] of the language of §2QQQ (the "Mugshots Act") of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") should not be allowed.  The statute does not merely prohibit *accepting* fees for the removal of arrest information, it states that "[i]t is an unlawful practice . . . to ***solicit or*** accept the payment of a fee or other consideration to remove, correct, or modify said criminal record information."  815 ILCS 505/2QQQ (emphasis

---

[9] At the conclusion of a memorandum in which Defendants cite unpublished opinions in violation of local and circuit rules, misrepresent statutory language, and cite to overruled cases, they ask this Court to award to *them* attorney fees. It is the type of litigation tactic Courts frown upon.

supplied).  As a result, that Defendants never *accepted* fees is irrelevant; they *solicited* every Plaintiff.

Defendants also do not cite any authority for their *ipse dixit* proposition that the cause of §2QQQ has the same elements or actual damages requirement as §505/2, and the statute says nothing of the sort.  In reality, the same elements are *not* required, by the plain language of the statute.  This makes logical sense; §505/2 concerns deceptive and unfair practices generally, whereas §2QQQ concerns mugshot extortion websites specifically.  "The fundamental rule of statutory interpretation is to ascertain and give effect to the intent of the legislature. . . . If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory interpretation.  A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent." *Copes v. Northeast Ill. Reg'l Commuter R.R. Corp.*, 2015 IL App (1st) 150432, ¶ 12, 45 N.E.3d 1123.  Notably, *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149, 776 N.E.2d 151 (2002), cited by Defendants, does not concern the Mugshots Act, and predates the Mugshots Act by over a decade.

Yet even assuming *arguendo* that the same elements *were* required for both statutory sections, they are clearly met here.  Plaintiffs have alleged clearly an unfair act as determined by the Illinois Supreme Court in *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 775 N.E.2d 951 (2002), as delineated by the so-called "*Sperry* factors."  Plaintiffs have also sufficiently alleged the existence of damages. [10]  For purposes of ICFA, "damages are measured by the plaintiff's loss,

---

[10] Defendants ignore two important facts: (1) in the case of all three Plaintiffs here, the Defendants willfully posted incorrect information, and (2) Defendants posted the information as commercial speech *for the purpose of advertising the takedown service*.

not the defendant's gain." *City of Chicago v. Michigan Beach Hous. Coop.*, 297 Ill. App. 3d 317, 326, 696 N.E.2d 804, 811 (1998). Therefore, it is irrelevant whether or not Plaintiffs actually paid the takedown fee. Instead, Plaintiffs suffered measurable reputational harm, employment loss, and damage to their property rights of publicity.

The right of publicity, as a property right, is different than defamation, which is a personal right. *See, e.g.,* M*cFarland v. Miller,* 14 F.3d 912 (3d Cir. 1994). *See Hart v. Elec. Arts, Inc.*, 717 F.3d 141 (3d Cir. 2013) (comparing the right of publicity to copyright and trademark law, and noting that "the right of publicity is broader and, by extension, protects a greater swath of property interests."). "[P]laintiffs' names and likenesses belong to them. As such they are property. They are things of value." *Id*. at 151 (emphasis supplied). "Nor is it a matter of dispute that plaintiff has a valuable property right in his name, photograph and image and that he may sell these property rights." *Cepeda v. Swift & Co., 415 F.*2d 1205, 1206 (8th Cir. 1969).

Courts have also long held that actual damages are available for reputational injuries stemming from commercial speech. *See Underground Solutions, Inc. v. Palermo*, No. 13 C 8407, 2016 U.S. Dist. LEXIS 64962 (N.D. Ill. May 17, 2016). And in *In re FACTOR VIII OR IX CONCENTRATE BLOOD PRODS. LITIG.*, 25 F. Supp. 2d 837 (N.D. Ill. 1998), the court found that actual damages were available for persons harmed by *negligent* false statements or omissions. Also on point is *Dun & Bradstreet v. Greenmoss Builders, 472 U.*S. 749, 762-63 (1985), which concerned whether credit reports are entitled to First Amendment protections. After finding that credit reports are commercial speech afforded lesser protection, the court concluded that reputational damages could be properly awarded for inaccuracies in those reports without a showing of actual malice. And in *Cohen*, the Court found damages proper for a person "los[ing] his job and lower[ing] his earning capacity." 501 U.S. at 669-72. Reputational damages *are*

actual damages, even in statutory actions. *See, e.g.,* M*edline Indus. v. Strategic Commer. Solutions, Inc.,* 553 F. Supp. 2d 979 (N.D. Ill. 2008).[11] Plaintiffs are also entitled to nominal damages for violations of the ICFA. *Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 758, 625 N.E.2d 990, 997 (1993) ("If a party proves the right to damages but fails to provide a proper basis for computing those damages, only nominal damages can be recovered. However, liability for nominal damages is sufficient to sustain a cause of action.")

As such, reputational damages are recoverable because Defendants' conduct relates to false commercial speech not protected by the First Amendment. Given the fake reputation management service, Defendants cannot argue they are entitled to protections afforded to the press. "Commercial speech is protected only in so far as it serves an informational function and it loses its protection if it deceives, misleads or constitutes fraudulent activity." *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332, 339 (D.N.J. 2001).

### B. Plaintiff Thompson States A Valid Cause of Action Under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

The Defendants argue that Plaintiff Thompson cannot receive actual damages because he never paid the takedown fee. However, Defendants fail to recognize that "aggrieved [is] broader than suffered a loss." *Ahearn v. Mayo Clinic*, 40 Fla. L. Weekly 2502 (Dist. Ct. App. 2015). *Citing Davis v. Powertel, Inc.*, 26 Fla. L. Weekly 146 (Dist. Ct. App. 2000), the *Ahearn* court noted "regardless of whether an aggrieved party can recover 'actual damages' under section 501.211(2) [of the Act], it may obtain injunctive relief under section 501.211(1). . . . [A] party is aggrieved

---

[11] Plaintiffs also do not have to prove damages under the Mugshots Act because it is a remedial statute. "[W]hen a statute is enacted to protect a particular class of individuals, courts may imply a private cause of action for a violation of that statute although no express remedy had been provided. The public policy underlying certain statutes demands implication of a private remedy to compensate an aggrieved individual belonging to that class of persons whom the statute was designed to protect." *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill. 2d 379, 386-87, 432 N.E.2d 849, 852 (1982).

for purposes of section 501.211(1) even though the offending conduct was voluntarily ceased." *Id*. *Ahearn* "[that] section 501.211(1) offers declaratory and injunctive relief against a party who has violated, is violating, or is otherwise likely to violate this part." (emphasis omitted). As the Florida First District Court of Appeal has explained, "[t]here is no requirement that a plaintiff show an ongoing practice or irreparable harm, and declaratory relief is available regardless of whether an adequate remedy at law also exists." *Gastaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp. 2d 1045, 1057-58 (S.D. Fla. 2009).

Defendants argue that Plaintiff lacks Article III standing to bring this action. However, Defendants ignore that the more restrictive standard under the FDUTPA has been supplanted by a more permissive view, which expands significantly the meaning of "injury"; courts now hold that a party may be injured without having purchased a product or service. *James D. Hinson Elec. Contr. Co. v. Bellsouth Telcoms., Inc.*, No. 3:07-cv-598-J-32MCR, 2008 U.S. Dist. LEXIS 9464 (M.D. Fla. Feb. 8, 2008). *See also Democratic Republic of the Congo v. Air Capital Group, LLC*, 614 F. App'x 460 (11th Cir. 2015). And as *Democratic Republic of the Congo* makes clear, this more permissive standard also is sufficient for an injury conferring Article III standing. "At bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). By that standard here, Plaintiff Thompson does have standing because he has already suffered a "concrete and particularized injury" which is "fairly traceable" to these Defendants. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Plaintiff Thompson's injury accrued over seven years and was caused by the Defendants' business practices.

Plaintiff Thompson *did* suffer actual damages compensable under the FDUTPA. *See Army*

*Aviation Heritage Found. & Museum, Inc. v. Buis*, 504 F. Supp. 2d 1254 (N.D. Fla. 2007) (awarding damages under the FDUTPA for defamatory statements). *Bilotta v. Citizens Info. Assocs., LLC*, No. 8:13-cv-2811-T-30TGW, 2014 U.S. Dist. LEXIS 3229 (M.D. Fla. Jan. 10, 2014), is instructive, where a federal district court, on nearly identical facts, denied the defendants' motion to dismiss. Also instructive is *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006), where the plaintiff alleged that his likeness was used to generate fake profiles on a Yahoo! dating site. Further, Defendants ignore that Plaintiff suffered a personal property injury – namely his right of publicity.

Further, after the 2001 amendments to the statute, the scope of permissible actual damages has been expanded because it is no longer necessary that a plaintiff be a consumer in order to bring an action for actual damages or for injunctive relief. *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164 (Fla. Dist. Ct. App. 2015). In *Caribbean Cruise Line*, defendant's motion to dismiss was denied where the plaintiff sued defendant over reputational injuries resulting from the defendant giving plaintiff an "F" rating on its website. And in *E-Ventures Worldwide, LLC v. Google, Inc.*, No. 2:14-cv-646-FtM-29CM, 2016 U.S. Dist. LEXIS 62855, at *24 (M.D. Fla. May 12, 2016), the court denied the defendant's motion to dismiss where "plaintiff . . . alleged the Google removed its websites from its search results for anticompetitive and punitive reasons[,]" thus damaging plaintiff's reputation and harming its sales.

However, should this Court conclude that Plaintiff Thompson lacks standing to bring this claim, no judgment should be entered and any dismissal must be without prejudice. *Stalley v. Orlando Reg'l Healthcare Sys.*, 524 F.3d 1229, 21 Fla. L. Weekly Fed. C 588 (11th Cir. 2008).

## VIII. PLAINTIFFS' RIGHT OF PUBLICITY ACT CLAIMS ARE VALID

### A. The Defendants' Commercial Speech Is Not A Matter of Public Concern

Citing *Snyder v. Phelps*, 562 U.S. 443 (2011), the Defendants argue that their conduct is akin to that of Westboro Baptist Church protesting homosexuality at military funerals through horrific signs and slogans, and thus protected by the First Amendment. Defendants are worse: the members of Westboro Baptist Church have never demanded money in exchange for leaving. The existence of the takedown service transforms the publication of mugshots and inaccurate arrest information into a commercial scheme unconnected to the public concern.

*Bosley* is far more on point. Unlike in *Snyder*, where there was no profit-seeking motive, the court in *Bosley* noted that "when there is a mixed message of advertising combined with news and/or commentary on public issues, the entire message is labeled commercial speech and given the lowest level of constitutional solicitude. . . . For example, if a commercial firm reprints a news story from the media and uses it in an advertisement, then this is an advertising use not immunized by the First Amendment from either invasion of appropriation privacy or infringement of the right of publicity." 310 F. Supp. 2d at 924 (citing J. Thomas McCarthy, *The Right of Publicity and Privacy: News or Comment on Public Issues in an Advertising Context*, § 7:4 (2d ed.)). This is quite similar to the instant case, where the Defendants, a commercial firm by their own account, reprint information unlawfully obtained from others for advertising purposes.

As for *Best v. Berard*, 837 F. Supp. 2d 933 (N.D. Ill. 2011), cited by Defendants, once again Defendants ignore that the key piece here is the takedown service. The television show in *Best* was not proposing a commercial transaction as its sole focus, unlike the websites at issue here. The key distinction between an actionable right of publicity claim and one that is not is whether, as here, the speech proposes a commercial transaction. *Michaels v. Internet Entm't Grp., Inc.*, 5 F. Supp. 2d 823 (C.D. Cal. 1998).

## B. Defendants Use Plaintiffs' Mugshots to Sell the Takedown Service

Defendants' use of a line of *dicta* in Toney v. L'Oreal USA, Inc., 406 F.3d 905 (7th Cir. 2005), to argue that Plaintiffs' claims fail because their images are purportedly not being used to *endorse* a product or service, is misplaced.  *Toney* merely mirrors the statute, which does not require that the image or likeness of the individual be used to "endorse" a product or service, but rather that it be used "in connection with" that product or service or for advertising it.  That is clearly the case here.  As the Illinois Appellate Court held in *Trannel v. Prairie Ridge Media, Inc.*, 2013 IL App (2d) 120725, 987 N.E.2d 923, the absence of an endorsement does not defeat an IRPA claim; it merely precludes punitive damages. [12]

### C.  Defendants' Arguments Regarding the Florida Right of Publicity Are Meritless

For the second time, and despite having been alerted to their error by Plaintiffs in the last round of briefing, Defendants blatantly violate *United States v. Irey*, 22 Fla. L. Weekly Fed. C 1231 (U.S. 11th Cir. 2010) by citing to *Wakefield v. Citizens Information Associates, LLC*, 13-cv-23754 (August 26, 2014 S.D.F.L), an <u>unpublished</u> order.  Under Eleventh Circuit precedent, unpublished orders may be used only "where they are specifically relevant to determine whether the predicates for *res judicata*, collateral estoppel, or double jeopardy exist in the case, to ascertain the law of the case, or to establish the procedural history or facts of the case."  *Borden v. Allen*, 23 Fla. L. Weekly Fed. C 110 n.27 (U.S. 11th Cir. 2011).  None of those situations apply here.  The Seventh Circuit complies with the rules of other circuits concerning the precedential value of decisions there.  *KingVision Pay per View, Ltd. v. Boom Town Saloon, Inc.*, 98 F. Supp. 2d 958 (N.D. Ill. 2000).  The Seventh Circuit also prohibits citations to unpublished cases under Circuit Rule 53.  *See Hartford Casualty Ins. Co. v. Borg-Warner Corp.*, 913 F.2d 419 (7th Cir. 1990).

---

[12] Commercial purpose means the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising."  765 ILCS 1075/5.

Simply put, *Wakefield* is on *no* precedential value whatsoever, and it is sanctionable for Defendants to suggest otherwise. *Wakefield* should be disregarded.

Exactly on point – and *not* unpublished – is *Bilotta*, which both post-dated *Wakefield*, and, as here, concerned a mugshots-posting website with a takedown service. Defendants call the reasoning of *Bilotta* "flawed," but present no reasons why this on-point, *published* decision should not be followed. In *Bilotta*, the defendant websites "publish[ed] the booking photos or mug shots of individuals who have been arrested. The websites also contain[ed] a link for unpublishing services to have the mug shot removed for a fee, and advertisements for other products and services." 2014 U.S. Dist. LEXIS 3229, at *2. The defendants moved to dismiss on the same grounds that Defendants raised here. The court denied defendants' motion to dismiss, holding that "Bilotta alleges that [defendant] published Bilotta's name and image for a commercial purpose without her consent to advertise and promote "unpublishing services" that would remove an individual's mug shot from a particular site in exchange for payment. Further it alleges that [defendant] advertises and promotes distinct goods and services on its websites. Taken as true, these allegations are sufficient to state a cause of action for violation of Fla. Stat. § 540.08 [the Right of Publicity Act]." *Id*. at *3-4. The Plaintiffs and proposed Plaintiff here made exactly the same allegations as in *Bilotta* regarding the actions of Defendants. The holding of *Bilotta* – a *published* opinion – is clear that this states a cause of action under the Florida Right of Publicity Act.

*Tyne v. Time Warner Entm't Co., L.P.*, 204 F. Supp. 2d 1338 (M.D. Fla. 2002), is distinguishable because it concerned the motion picture *The Perfect Storm*, and motion pictures have been expressly held to be expressive creative works under the transformative use doctrine by *Joseph Burstyn v. Wilson*, 343 U.S. 495 (1952) ("we conclude that expression by means of motion

pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments."). Because mugshots.com is not a motion picture and Defendants are not using the websites for transformative or expressive purposes (i.e., works of art), *Tyne* is inapposite.

## IX. PLAINTIFF STATES VALID CAUSES OF ACTION UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

### A. Defendants Obtained An Intangible Right from Plaintiffs Actionable Under RICO

Defendants' first argument for dismissal of the Plaintiffs' RICO claims is that Plaintiffs have suffered no injury because their photographs are public records. This argument is meritless, because Plaintiffs are not suing over the pictures being posted. It is the *takedown service*, not the pictures, that is the problem. As explained above, even to the extent the arrest information is newsworthy, Defendants are using it as nothing more than advertisements. The examples Defendants give, such as court transcripts and court files, are not advertisements. This Court would not be selling Plaintiffs' Complaint to the highest bidder, nor would it offer Defendants the opportunity to remove it from the PACER system for a fee. Further, there are more than mugshots on mugshots.com. Plaintiff Thompson's picture was indeed on mugshots.com. But so was a fake record saying he had been arrested for check fraud, when in reality Defendants knew it was a simple traffic stop; they kept the false information up to coerce Thompson into paying. Plaintiff Gabiola's picture is *still* in mugshots.com, but so is a "status update" falsely listing his *current* status as "parole," as has been the case for several years. Plaintiff Hammond is still falsely listed on several records as being <u>presently</u> incarcerated.

And Defendants are simply wrong that intangible property rights are not actionable under RICO. In fact, "the language of the Hobbs Act makes no such distinction between tangible and intangible property. . . . Moreover, other circuits which have considered this question are

unanimous in extending the Hobbs Act to protect intangible, as well as tangible, property." *United States v. Local 560 of Int'l Bhd. of Teamsters*, 780 F.2d 267, 281 (3d Cir. 1985). "We agree with the majority of district courts that have concluded that intangible property can qualify as extortable property under the Hobbs Act regardless of whether its exercise, transfer, or sale would be legal." *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006). In *United States v. Cain*, 671 F.3d 271 (2d Cir. 2012), a portion of a local tree-service market, though intangible and unquantifiable, was found to be a sufficient property interest for a RICO violation. In *United States v. Tropiano*, 418 F.2d 1069 (2d Cir. 1969), the right to solicit potential future business was sufficient. In *In Suk Chang v. United States*, 305 F. Supp. 2d 198 (E.D.N.Y. 2004), potential use of a car service was found sufficient. In *Local 560*, the right to join a union was sufficient.

The common thread after *Scheidler v. NOW, Inc.*, 537 U.S. 393 (2003), is not that a property interest must be tangible, but rather that it must be capable of being acquired. Here, that is most assuredly the case; Defendants have essentially obtained from Plaintiffs and others the right to monetize their own names and likenesses through advertising. Reputational injuries are also sufficient under RICO. "All that is required to sustain standing under RICO is an allegation that plaintiffs' injuries flowed, directly or indirectly, from defendants' fraudulent acts. . . . Plaintiffs' allegations of reputational and other damage stemming from defendants' actions are sufficient to meet this standing requirement." *Lewis v. Lhu*, 696 F. Supp. 723, 727 (D.D.C. 1988). "The concept of property under the Hobbs Act, as devolved from its legislative history and numerous decisions, is not limited to physical or tangible property or things, but includes, in a broad sense, *any valuable right considered as a source or element of wealth*, and does not depend upon a direct benefit being conferred on the person who obtains the property." *Tropiano*, 418 F.2d at 1075-76 (internal quotation marks and citations omitted; emphasis

supplied)). This would include, for instance, loss of the right to seek employment.

### B. Defendants' Arguments Regarding Consent and Refusal Are Meritless

Defendants argue that Plaintiffs' claims are barred because they did not consent to the use of their mugshots and refused to be extorted because they did not pay the demanded fee. However, the Defendants' own terms of service agreement states that website visitors automatically give consent for the use of the arrest information *just by visiting the website*. For example, the terms of service on mugshots.com states that "Visitors to this site agree that Mugshots.com is not liable for errors or omissions or any of the information provided." On unpublisharrest.com, the terms of service includes that "You do not claim intellectual property right or exclusive ownership to any of our products or services, whether modified or unmodified. All products and services are the property of UnpublishArrest.com. Our products and services are provided 'as is' without warranty of any kind, either expressed or implied." The website also states that "the information published on this website supersedes all other forms of information[,]" including policies stated on phone calls. There is significantly more in the same vein. In other words, the only way to *not* consent is to not visit the site. Plaintiffs visited the website as a result of Defendants' scheme, and, therefore, by the terms of the terms of service agreement, consented automatically.[13] There was thus no refusal or lack of consent, unless Defendants wish to argue that their own terms of service agreement does not mean what it says.

As such, *Vazquez v. Cent. States Joint Bd.*, 547 F. Supp. 2d 833 (N.D. Ill. 2008), does not help Defendants here; there was no terms of service agreement in *Vazquez*. Further, in *Vazquez*, the plaintiffs' injuries were caused by being terminated from union positions because they refused

---

[13] This consent was obtained only via the extortion scheme, and therefore not valid for any purpose other than this RICO claim.

to comply with an illegal scheme, at which time the extortion was over.  Here, Defendants simply kept extorting Plaintiffs the same way both before and after website visits and phone calls.  In other words, the extortion *never stopped*.[14]  Defendants' argument is tantamount to saying that an extortion scheme is inactionable so long as it continues unabated.[15]

## CONCLUSION

"'When I use a word,'" Humpty Dumpty said, in rather a scornful tone, "'it means just what I choose it to mean -- neither more nor less.'"  Through the Looking Glass, in The Complete Works of Lewis Carroll 196 (1939).  Defendants evidently agree with Humpty Dumpty, believing they can avoid liability by ignoring the First Amended Complaint and making up facts to suit their motion to dismiss.  To Defendants, their websites, and the law, mean just they *choose* them to mean.[16] Defendants' motion and requests for fees should be denied.

> Respectfully submitted,
> PETER GABIOLA, JIMMY THOMPSON,
> and ANTONIO HAMMOND, on behalf of
> themselves and all others similarly situated,
>
> /s/ Berton N. Ring
> By the Plaintiffs' Attorneys
> Berton N. Ring, P.C.

Berton N. Ring #6183351
Stuart M. Clarke #6311043
BERTON N. RING, P.C.
123 West Madison Street, 15th Floor
Chicago, IL 60602
(312) 781-0290

---

[14] It did for Thompson, but only after four years, and only after he appeared in the documentary.  First Am. Compl't at ¶¶387-406.

[15] It is also not necessary that Defendants issue an explicit threat.  It is not necessary that Defendants explicitly issue a threat.  "Exploitation of, or preying upon, the victim's fear constitutes wrongful use of fear and satisfies the statute." *United States v. Lisinski*, 728 F.2d 887, 891 (7th Cir. 1984).

[16] To the extent this Court intends to consider any prior motions to dismiss improperly incorporated into Defendants' currently pending motion, Plaintiffs incorporate their oppositions thereto by reference herein.