UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PETER GABIOLA, ANTONIO HAMMOND, and JIMMY THOMPSON, on behalf of themselves and all other similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> SAHAR SARID, individually and a/k/a "Michael Robertson," THOMAS KEESEE, MARC GARY EPSTEIN, MUGSHOTS.COM, LLC, a Delaware Limited Liability Company, UNPUBLISH, LLC, a Florida Limited Liability Company, UNPUBLISH, LLC, a Wyoming Limited Liability Company, HAMMERMILL & MASTERSON LLC d/b/a "Unpublisharrest.com," "Mugshots.com," and "unpublishingpartners.com," a Wyoming Limited Liability Company, HAMMERMILL & MASTERSON LLC d/b/a "Unpublisharrest.com," "Mugshots.com," and "unpublishingpartners.com," a Florida Limited Liability Company, <br><br> Defendants. | Case No. 16-cv-02076 <br><br> Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, Peter Gabiola, Antonio Hammond, and Jimmy Thompson, filed a nine count First Amended Complaint, alleging claims under federal, Illinois, and Florida law for violations of their right of publicity, consumer fraud, fair credit reporting, and extortion [60]. Defendants, Thomas Keesee, Marc Gary Epstein, and Hammermill & Masterson LLC, filed a motion to dismiss pursuant to Federal Rule of 12(b)(6) for failure to state a claim [67]. Defendant Sahar Sarid, joined in defendants' motion and separately filed a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim [84]. For the reasons stated herein, the Court grants in part and denies in part the

1

motions.

**Background**

Plaintiff Peter Gabiola was an Illinois resident[1] and a former inmate in the Illinois Department of Corrections. Plaintiff Antonio Hammond is an Illinois resident and a former inmate in the Illinois Department of Corrections. Plaintiff Jimmy Thompson is a resident of Florida. In October 2003, he was arrested by the Orange County Sheriff's Department during a traffic stop and detained for eight days on charges of check fraud. Once the Hillsborough County State's Attorney discovered that they had charged the wrong Jimmy Thompson, the charges were dismissed and Thompson was released from custody. Thompson learned that the record from that false arrest was posted on "Mugshots.com."

Defendant Sahar Sarid is a resident of Florida and the owner of the websites at issue, "Mugshots.com" and "Unpublisharrest.com." Defendant Mugshots.com LLC is a limited liability company in Delaware. As of June 23, 2016, Mugshots.com was no longer in good standing in the State of Delaware. Sarid is also the owner of Unpublish LLC, which purports to be a limited liability company organized under the laws of the island of Nevis in the West Indies. Unpublish LLC also purports to be a Florida limited liability company with its principal place of business in Florida. Unpublish LLC also purports to be a Wyoming limited liability company with its principal place of business in Minnesota. Both Florida and Wyoming revoked Unpublish's registration in 2015. Public records indicate that Unpublish LLC continues to operate in Florida. The Unpublish entities purport to be a licensee for an internet-based reputation management service.

Defendant Marc Gary Epstein is a Florida resident. Epstein was sole manager or member of the Unpublish LLC. Epstein is also the alleged owner of Unpublish LLC. Defendant Hammermill & Masterson LLC owned or controlled Unpublish LLC. Hammermill & Masterson LLC purports to

---

[1] Gabiola is currently a Nebraska resident.

be a Wyoming limited liability company with its principal place of business in Florida. It also purports to be a Florida limited liability company with its principal place of business in Florida. Defendant Thomas Keesee is the sole member and manager of Hammermill & Masterson LLC. Keesee is a resident of Florida. Hammermill & Masterson allegedly operates the Mugshots.com website. Several non-party companies formed by Sarid are listed as owners of Mugshots.com on the website.

The websites Unpublisharrest.com and Unpublishingpartners.com are hosted and or registered to an address in Fort Lauderdale, Florida. The complaint alleges on information and belief that one or more of the LLC defendants are alter egos of the individual defendants with no independent assets, offices, or employees. Sarid and Keesee operate Mugshots.com, Unpublisharrest.com, and Unpublishingpartners.com from Florida. The complaint alleges that the websites are a single enterprise. The complaint alleges that Sarid orchestrated a fake sale of the website to a fabricated individual named "Michael Robertson" to conceal his ownership of the website.

*I. Mugshots.com*

In 2008, Sarid created Mugshots.com, a searchable online database of arrest record information complete with photographs ("mugshots") when they are available. Mugshots.com obtains its content from two sources. First, it uses software to copy the information publicly available on the websites for departments of corrections. In Illinois, for example, the Illinois Department of Corrections "IDOC" posts public records of inmates to the IDOC website while the individual is incarcerated or on supervised release. The second source of records for the website is the filing of Freedom of Information Action ("FOIA") requests for inmate and arrest records from public databases maintained by the government. The complaint alleges on information and belief that Sarid or his employees do not indicate that they are requesting the records for a commercial

3

purpose. Sarid does not update the information, photos, or records posted on Mugshots.com. Sarid makes little or no effort to confirm the accuracy of the information. Mugshots.com represents that it may remove the records and pictures of persons who are exonerated. Mugshots.com also allegedly contains links stating "Get Full Criminal Profile," and "Get Criminal Background Checks".

Mugshots.com contains the following disclaimer:

> **DISCLAIMER NOTICE: ALL ARE PRESUMED INNOCENT UNTIL PROVEN GUILTY IN A COURT OF LAW. PUBLISHED MUGSHOTS AND/OR ARREST RECORDS ARE PREVIOUSLY PUBLISHED PUBLIC RECORDS OF: AN ARREST, A REGISTRATION, THE DEPRIVATION OF LIBERTY OR A DETENTION. THE MUGSHOTS AND/OR ARREST RECORDS PUBLISHED ON MUGSHOTS.COM ARE IN NO WAY AN INDICATION OF GUILT AND THEY ARE NOT EVIDENCE THAT AN ACTUAL CRIME HAS BEEN COMMITTED. EVERY EFFORT IS MADE TO ENSURE THE ACCURACY OF INFORMATION POSTED ON THIS WEBSITE. HOWEVER, MUGSHOTS.COM DOES NOT GUARANTEE THE ACCURACY OR TIMELINESS OF THE CONTENT OF THIS WEBSITE. IN ADDITION NAMES MAY BE SIMILAR OR IDENTICAL TO OTHER INDIVIDUALS. FOR LATEST CASE STATUS, CONTACT THE OFFICIAL LAW ENFORCEMENT AGENCY WHICH ORIGINALLY RELEASED THE INFORMATION.**
>
> **UNPUBLISHING NOTICE: IF YOU WERE FOUND GUILTY; YOU STILL MAY QUALIFY TO BE UNPUBLISHED.**

*II. Unpublisharrest.com*

In 2011, Sarid created a service to monetize the removal of arrest records from Mugshots.com – a "takedown service." Several reputation management entities pre-dated the defendant website Unpublisharrest.com, which was created in 2012. Plaintiffs allege that they are not separate entities because Sarid owns both websites and they work together to generate revenue. Unpublisharrest.com offers a service to remove the records only from Mugshots.com for a fee. The sole purpose of Unpublisharrest.com is to operate as a portal for payments to the removal service.

There are advertisements on Mugshots.com record pages promoting Unpublisharrest.com and links to a checkout page enumerating the tiers of pricing for the removal service. In some instances, a record page on Mugshots.com has as many as three advertisements for or links to

4

Unpublisharrest.com. The Unpublisharrest.com website has a disclaimer that payment does not guarantee removal of a record or photograph. It further states: "LICENSOR RESERVES THE RIGHT TO APPROVE OR DECLINE ANY APPLICATION IN ITS SOLE DISCRETION." The removal service on Unpublisharrest.com earns substantially more revenue than Mugshots.com does from advertising. The complaint alleges that defendants deliberately fail to update or correct inaccurate or out of date records to incentivize the use of the removal service.

*III. Individual Plaintiffs*

When Gabiola completed his sentence, IDOC removed Gabiola from its public website. Gabiola alleges that the Mugshots.com profile was last updated on October 11, 2013, but it does not state that he had completed his sentence prior to that date. Gabiola alleges that he lost his job after co-workers found the Mugshots.com profile. He further alleges that he has had other offers of employment rescinded based on prospective employers seeing the Mugshots.com profile. On October 10, 2014, Gabiola called the Unpublisharrest.com toll-free number. The telephone representative informed Gabiola that removing the two images from the Mugshots.com website would cost $2,000 plus a representation fee. Removal of the entire profile would be $15,000 and a representation fee. The representative further stated that payment did not guarantee removal of the profile.

Plaintiff Hammond has five arrest pages on Mugshots.com. Some or all the information posted on Mugshots.com about Hammond's criminal history is inaccurate. Hammond is currently unemployed and his sole source of income is disability benefit payments. Hammond claims that he is unable to obtain long-term employment due to the profiles on Mugshots.com. Hammond's financial situation prevents him from paying for the removal service offered by Unpublisharrest.com.

Plaintiff Thompson learned in September 2012 that a record from his false arrest for check

5

fraud appears on Mugshots.com. Thompson's arrest record was posted after the charges were dismissed. The posting does not state that he was erroneously arrested. Thompson called Unpublisharrest.com to request removal of the arrest report. He was informed that it would cost $399 for removal or correction of the report. Thompson continued to call Unpublisharrest.com and was repeatedly told that the cost of removal is $399. He further alleges that he has applied for, and been rejected from, approximately forty jobs between September 2012 and the beginning of 2016.

The nine-count First Amended Complaint alleges: (1) Count I on behalf of Gabiola for violation of the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 *et seq.*; (2) Count II on behalf of Gabiola and Hammond for violations of the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/1 *et seq.*; (3) Count III on behalf of Gabiola and Hammond for violations of the Illinois Mugshots Act, 815 ILCS 505/2QQQ; (4) Count [IV][2] on behalf of Gabiola and Thompson for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C §1961 *et seq.*; (5) Count [V] on behalf of all plaintiffs for violations of the Federal Fair Credit Reporting Act ("FCRA"); (6) Count VI on behalf of all plaintiffs for violations of the disclosure provisions of the FCRA; (7) Count VII on behalf of Thompson and Gabiola for violations of the accuracy requirements of the FCRA; (8) Count VIII on behalf of Thompson for violations of the Florida Right of Publicity Act ("FRPA"), Fla. Stat. §540.08; (9) Count IX on behalf of Thompson for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §501.204 *et seq.*

**Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering the motion, the Court accepts as true all well pleaded facts in the plaintiff's complaint

---

[2] The First Amended Complaint does not contain a Count IV, but includes two Count VIs. For clarity, this Court has renumbered the Counts consecutively.

and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive dismissal, the complaint must not only provide the defendant with fair notice of a claim's basis, but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007).

**Discussion**

Defendants Thomas Keesee, Marc Gary Epstein, and Hammermill & Masterson, filed a motion to dismiss the First Amended Complaint in its entirety, arguing that the alleged conduct is protected by the First Amendment to the United States Constitution. They also move to dismiss the right of publicity claims because neither Illinois nor Florida requires permission or authorization to speak on matters of public concern, arrest photos are exempt from liability, and the photos are not directly being used to promote a product or service. The consumer fraud claims fail, according to defendants, because the plaintiffs have not alleged actual damages from an unlawful act. Lastly, the defendants contend that the RICO claims fail as a matter of law because plaintiffs have not suffered an injury under RICO.

Defendant Sarid joined in his co-defendants motion, and separately moves to dismiss, arguing that plaintiffs have not alleged facts demonstrating that any of the defendants are a "consumer reporting agency" within the meaning of the Fair Credit Reporting Act.[3] Additionally, Sarid argues that Thompson's claims under the Florida Deceptive and Unfair Trade Practices Act and the Florida Right of Publicity Act are barred by the statute of limitations.

*1. Statute of Limitations: Thompson*

---

[3] The United States initially intervened in this action to defend the constitutionality of the Fair Credit Reporting Act, during briefing it became clear that defendants were not arguing that the FCRA violates the First Amendment. Instead, defendants are asserting that the FCRA does not apply to defendants. The United States is not weighing in on whether the FCRA governs defendants conduct on these facts. However, the United States requests the Court find that the factual record needs to be developed prior to decided that it simply does not apply.

Defendant Sarid argues that Thompson's claims under Florida law are time-barred. The statute of limitations for claims under both the FRPA and the FDUTPA is four years. *See* Fla. Stat. § 95.11(3)(f) and *Putnam Berkeley Group, Inc. v. Dinin,* 734 So.2d 532, 536 (Fla. 4th DCA 1999). The discovery rule does not delay the accrual of either cause of action. *Id.* Plaintiffs allege in the First Amended Complaint that Thompson discovered his arrest record on Mugshots.com in September 2012, Dkt. 60 at ¶387. However, in briefing the motions at issue, plaintiffs admit in that "Thompson's injury accrued over seven years ago[.]" Dkt. 73, Pls' Resp. to Defs' Motion to Dismiss, at 17. Plaintiffs argue that this Court should overlook the admission and find that because Sarid allegedly concealed the identity of the website's owner to avoid suit that he is equitably estopped from raising this defense now. These allegations arguably allow for equitable tolling. *See Fla. Dep't of Health & Rehabilitation Servs. v. S.A.P.,* 835 So.2d 1091, 1097-98, 27 Fla. L. Weekly 980 (2002) (holding that equitable estoppel "presupposes an act of wrongdoing – such as fraud and concealment – that prejudices a party's case[.]"). Sarid's motion is denied without prejudice on this point. Plaintiff is cautioned to plead and argue carefully.

*2. First Amendment*

Defendants contend that the First Amendment provides a complete defense to all claims in this suit. Plaintiffs assert that the defendants' use of their mugshots and arrest records is commercial speech that does warrant First Amendment protection. The United States Supreme Court has provided this basic definition: Commercial speech is "speech that proposes a commercial transaction." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). This definition is only an analytical starting point. "[C]ommunications also may 'constitute commercial speech notwithstanding the fact that they contain discussions of important public issues'." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014) (quoting *Fox,* 492 U.S. at 475). Courts consider several factors when determining whether speech is commercial,

including: (1) if it is an advertisement; (2) if the speech refers to a specific product or service; and (3) the speaker has an economic motivation for the speech. *U.S. v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009) (interpreting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-7, 105 S.Ct. 2875, 77 L.Ed.2d 469 (1983).

Here, taking the well-pleaded facts as true and resolving all reasonable inferences in favor of plaintiff, this Court cannot say that the websites at issue are non-commercial speech as a matter of law. As pleaded, the use of the arrest photos and records in conjunction with what appear in the complaint as buttons linking to a removal service are reasonably construed as proposing a commercial transaction. The First Amended Complaint alleges that the profiles on Mugshots.com contained links stating "Unpublish Mugshot," in bold typeface at the top of every page and additional links also in large bold red typeface stating "Click Here for Unpublishing or Call 1-800-810-3965". Visitors that click on the links are taken directly to a checkout page, offering removal services for a fee. On these facts, the arrest photos and records coupled with clear invitation to removal create the appearance that they operate in concert to sell the removal service and generate revenue. Defendants' assertion that Mugshots.com and the removal service at Unpublisharrest.com are completely separate is belied by the structure of the Mugshots.com site and the corporate structure alleged in the complaint. As described in the complaint, the arrest profiles are designed to coerce plaintiffs to pay for removal. In other words, the mugshots themselves are advertisements for the removal service, which is the far more lucrative enterprise.

Defendants argue that this Court should follow *Nieman v. Versuslaw,* 512 Fed.Appx. 635 (7th Cir. 2013). In that non-precedential order, the plaintiff sued a legal-search website that provides public access to records of judicial decisions for a fee. The Seventh Circuit Court of Appeals affirmed dismissal of the case, finding that "[t]he First Amendment privileges the publication of facts contained in lawfully obtained judicial records, even if reasonable people would want them

9

concealed." *Id.* at 637. In *Nieman,* however, the plaintiff did not argue that the records themselves were used in such a way as to render them commercial speech. The profiteering in that case came from the fee to access the records rather than using the records to generate revenue for a service as is the case here. Thus, the court in *Nieman* had no opportunity to consider the question before this Court.

*Vrdolyak v. Avvo, Inc.*, 206 F.Supp.3d 1384 (N.D. Ill. 2016) (Gettleman, J.), is instructive though distinguishable from the case at bar. There, as here, the plaintiff brought a putative class action alleging that the defendant violates the Illinois Right of Publicity Act by using the plaintiff's identity for commercial purposes without his consent. *Id.* at 1385. The defendant website Avvo.com promotes certain legal services and publishes a directory of attorneys at no charge to the attorney but without their consent. There is also no fee for consumers to view attorney profiles and search listings. According to the plaintiff, Avvo.com generates revenue primarily by selling advertising to lawyers. "Avvo Advertising" allows an attorney to purchase advertising and define the audience for their ads. *Id.* at 1386. Lawyers who pay for this type of advertising have a link to their profile displayed as a "Sponsored Listing" on the profile pages of attorneys who have not paid for any advertising service from Avvo.com, but practice in the same geographic and field as the "Sponsored Listing." For an additional fee, attorneys can join "Avvo Pro" which guarantees them that no "Sponsored Listings" or other advertising will appear on their profile page. *Id.* While the court concluded that the "Sponsored Listings" did not convert the entire directory into commercial speech and thus the defendant's publications were fully protected by the First Amendment, there are important distinctions.

Avvo.com argued that its attorney directory is simply a digital version of the yellow pages – it posts truthful information from public records with advertising appearing with the attorney profiles. The court agreed with Avvo.com because not every attorney profile contains an

advertisement and none of the advertisements include the profiled attorney's name. Thus, the court concluded that the publication was fully protected by the First Amendment because "to hold otherwise would lead to the unintended result that any entity that publishes truthful newsworthy information about individuals such as teachers, directors and other professionals, such as a newspaper or yellow page directory, would risk civil liability simply because it generated revenue from advertisements placed by others in the same field." *Id.* at 1388.

Here, unlike in *Vrdolyak,* plaintiffs are arguing that their arrest photos and reports – their profiles – work together with links directly to the checkout page for the removal service as advertisements. *Vrdolyak* is also distinguishable in that the advertisements there were for other services separate from Avvo.com and the plaintiff was complaining that competitors could post on his profile unless he paid Avvo.com for an exclusive page with no advertising. That scenario is more akin to a yellow pages directory, than here where the profile itself is used to promote the removal service, which generates revenue for defendants. Accordingly, as noted above this Court is unpersuaded that the websites at issue are entitled to complete protection of the First Amendment as a matter of law.

*3. Right of Publicity*

The Court now turns to the legal sufficiency of the claims in the First Amended Complaint. Defendants argue that plaintiffs' claims under Illinois and Florida Right to Publicity statutes fail as a matter of law because defendants do not need permission or authorization to republish matters contained in a public record. In Illinois to state a claim under the IRPA, the plaintiffs must allege: (1) the use of their identities; (2) for commercial purposes; and (3) without consent. 765 ILCS 1075/30; *Vrdolyak v. Avvo, Inc.,* 206 F.Supp.3d 1384, 1386 (N.D. Ill. 2016); *Best v. Berard,* 776 F.Supp.2d 752, 756 (N.D. Ill. 2011). IRPA defines a commercial purpose as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product,

11

merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." 765 ILCS 1075/5. IPRA exempts from liability the "use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign." 765 ILCS 1075/35(b)(2).

Florida law is essentially the same. Pursuant to Florida Statute §540.08: "No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent…". Fla. Stat. §540.08(1). Like its Illinois counterpart, the Florida statute contains a public interest exception, which states:

> The provisions of this section shall not apply to: (a) The publication, printing, display, or use of the name or likeness of any person in any newspaper, magazine, book, news broadcast or telecast, or other news medium or publication as part of any bona fide news report or presentation having a current and legitimate public interest and where such name or likeness is not used for advertising purposes[.]

Fla. Stat. §540.08(3)(a).

It is not advertising use in the traditional sense, but Mugshots.com promotes itself with plaintiffs' likenesses (and others), by using the embarrassing nature of an arrest to promote the website, draw consumers, and if it is their photo or likeness, provide an easy link to removal for a fee. There are no allegations in the complaint to suggest that any of these plaintiffs provided consent. Plaintiffs here clearly allege that defendants are using their likenesses, in the form of arrest photographs, without their consent to solicit enrollment in the subscription removal service.

Defendants argue that these claims fall under the public interest exception. As discussed above, however, this Court is not inclined to find on the facts presented that the plaintiffs likenesses are not used for advertising purposes as a matter of law. Defendants' argument is unavailing at this stage. Mugshots.com is not a traditional news outlet and, based on the complaint, generates very

little revenue, but its alleged companion website generates substantial revenue through the profile removal service. As pleaded, the factual allegations support an inference that everything, including the articles on the Mugshots.com are click-bait to increase consumers and to embarrass the profiled arrestees and in turn to drive revenue to the removal service.

The instant case is distinguishable from *Best v. Berard*, 776 F.Supp.2d 752 (2011). In that case, Judge Kennelly was presented with a plaintiff who was featured on a "reality" television show that followed female police officers on duty and recorded their encounters with individuals for broadcast. The plaintiff refused to sign a consent waiver but her encounter with police was aired anyway. The defendants argued that it was a matter of public concern and therefore came under the exception to the Right of Publicity statute. The court, citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), began with the proposition that "[t]he commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecution are without question events of legitimate concern to the public." *Best*, 776 F.Supp.2d at 757. The court further concluded that arrests are included in that same category.

After consideration, the court found that the reality program's status as entertainment, and not pure news, did not alter the First Amendment analysis. The court ultimately found that the claim at issue was properly within the exception to the right of publicity. The court held that the non-commercial news exception "reasonably may be interpreted to cover the use of Best's identity in an entertainment program that conveys truthful footage of an arrest and thus implicates matters of public concern." *Id.* at 759. The significant difference between that case and the one at bar is that in this case there is a much greater integration of the commercial elements and a reduced proportion of newsworthiness. Here, the purpose is of presenting the arrest profiles appears to be to embarrass, shame, and coerce payment to remove them from the public sphere. In *Best,* the use of the plaintiff's likeness was as part of a whole production, that while profit earning through the sale of

13

advertisement, could not itself be interpreted to be the advertisement. Thus, this Court finds *Best* inapposite.

In *Bilotta v. Citizens Information Associates, LLC,* 2014 WL 105177 (M.D. Fla. Jan. 10, 2014)[4], the district court for the Middle District of Florida considered a nearly identical case, where the plaintiff complained that the website justMugshots.com and mugshots.mobi that linked to fee-based unpublishing services violated Florida's right of publicity statute. In that case, the court rejected the defendant's claim that publication of the mug shot was protected under the First Amendment. The court further found that dismissal was not warranted under Federal Rule 12(b)(6) because the plaintiff had sufficiently alleged the use of her likeness (a mugshot) for commercial purposes (the removal of the arrest photo for a fee) to state a claim under the Florida right of publicity statute. This Court also finds that plaintiffs have stated a claim under the state right of publicity statutes.

*4. Consumer Fraud*

Defendants argue that plaintiffs fail to state consumer fraud claims under the Illinois Consumer Fraud Act and the Florida Deceptive and Unfair Trade Practices Act because plaintiffs fail to allege actual damages. Under Illinois law, plaintiffs' claims are two-fold; first, plaintiffs Gabiola and Hammond allege violations of the ICFA in Count II and, second they allege violations of the Mugshots Act in Count III. Plaintiffs appear to abandon Count II in their responses in opposition to defendants' motions to dismiss they do not argue that they have stated a claim under the ICFA. Plaintiffs only argue that they have stated a viable claim under provisions of the Mugshots Act. Dkt. 73 at 13.

The Mugshots Act specifically excludes the publication and dissemination of criminal record information from prohibition and thus it avoids the First Amendment. The Mugshots Act provides in relevant part: "It is an unlawful practice for any person engaged in publishing or otherwise

---

[4] Despite plaintiff's assertion that *Bilotta* is "published," it is not reported in the Federal Supplement reporter, but does appear on Westlaw.

disseminating criminal record information through a print or electronic medium to solicit or accept the payment of a fee or other consideration to remove, correct or modify said criminal record information." 815 ILCS 505/2QQQ(a). Photos taken pursuant to arrest are included in the definition of criminal record information. *Id.* at §505/2QQQ(b)(2).

Defendants argue that the Illinois plaintiffs' claim under the Mugshots Act fails as a matter of law because the plaintiffs have not alleged actual damages in the form of pecuniary loss. However, defendants have not demonstrated that the actual damages requirement for other portions of the ICFA applies to the Mugshots Act. The plain language of this provision suggests a violation occurs by the mere solicitation of payment. This Court agrees with the State of Illinois as intervenor that the defendants' use of plaintiffs' criminal record information places plaintiffs' in the position of choosing to pay removal fees or suffer ongoing reputational losses causing financial hardship by limiting employment opportunities. Thus, this Court finds that plaintiffs have adequately stated a claim under the Mugshots Act.

With respect to Thompson's claim under the FDUTPA, defendants also argue that he must have suffered "actual damages" to recover under the Act. It is clear that Thompson cannot recover actual damages to compensate for a pecuniary loss under Florida law because he did not pay for removal. *See, e.g., Kelly v. Palmer, Reiffer & Associates, P.A.,* 681 F.Supp.2d 1356, 1366-67 (S.D. Fla. 2010) (distinguishing requirements for a claim of damages and claims for injunctive relief under the FDUTPA). Defendants also assert that Thompson cannot seek injunctive relief because he is not an "aggrieved person" since his arrest record has been removed from Mugshots.com. However, "[v]oluntary cessation of allegedly offensive conduct moots a claim only 'if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." *Id.* at 1365 (quoting *Nat'l Advertising Co. v. City of Miami,* 402 F.3d 1329, 1333 (11th Cir. 2005)). The complaint here alleges that defendants removed Thompson's record and photo from their website after he appeared

15

in a documentary regarding the websites at issue. Thompson alleges the he applied for over forty jobs between 2012 and 2016 and was rejected from each. Thus, this Court finds that Thompson has sufficiently alleged that he is an aggrieved person. *Cf. Klinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S.D. Fla. 1990) ("A professional writer's loss of his ability to publish clearly constitutes an injury sufficient to permit him to resort to the injunctive remedies of the statute.")

*5. Federal Claims: FCRA and RICO*

Plaintiffs allege that defendants violate several requirements of the Federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681(a). Plaintiffs assert that the information published on Mugshots.com qualifies as a "consumer report" as it is defined in the FCRA. Further, plaintiffs argue that defendants are subject to the FCRA because Mugshots.com regularly assembles or evaluates consumers for the purpose of providing reports to third parties for fees, i.e. as criminal background checks. In addition to their blanket argument that their activity is protected by the First Amendment, defendants argue that plaintiffs' injuries are reputational and caused solely by the re-publication of public arrest reports.

The United States intervened to assert that the constitution is not implicated in the FCRA claims presented here. The United States notes that the FCRA provisions relied on by plaintiffs do not prohibit defendants from collecting and publishing arrest records or other information as a consumer report. The FCRA sections, 1681b(b), 1681e(b) and (d), merely require Mugshots.com to follow certain procedures, for notice and accuracy, to ensure that the information is not misused. This Court agrees with the United States that the First Amendment is not implicated here because the provisions on which plaintiffs rely do not prohibit or penalize the dissemination of truthful information.

Defendants' conduct may be construed as "consumer reports" because the arrest records that Mugshots.com distributes may be information "bearing on a consumer's… character, general

16

reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681a(d). However, the FCRA only applies to "consumer reporting agencies," defined in that Act as:

> [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f). Here, plaintiffs allege that defendants' promote the use of Mugshots.com to do background checks for purposes of employment or personal security. However, there are no allegations in the complaint that defendants compile the arrest reports to sell to third parties. Plaintiffs argue that the fee-based removal service marketed to individuals whose arrest records appear on the site satisfies the statutory definition. This Court disagrees. The plain language of the statutory definition set forth above does not contemplate charging a fee for the removal of a public record report provided for free online. The allegations in the complaint do not support a conclusion that defendants fit the definition of a "consumer reporting agency" in the manner in which plaintiffs allege defendants monetize their arrest records.

Lastly, defendants argue that plaintiffs' Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962 ("RICO") claims fail as a matter of law because RICO only covers pre-publication extortion and threats, and plaintiffs must have suffered a concrete financial loss proximately caused by defendants' actions. Plaintiffs contend that extortion under Illinois and Florida law constitutes the "racketeering activity" that is the predicate for their RICO claims. Illinois law defines "intimidation" as the threat to "[e]xpose any person to hatred, contempt, or ridicule." 720 ILCS 5/12-6(a)(5). "Implicit in the word 'threat' as it is used in the intimidation statute is the requirement that the expression in its context have a reasonable tendency to create apprehension that its originator will act according to its tenor." *People v. Maldonado*, 247 Ill. App. 3d 149, 153–54, 617 N.E.2d 236, 239 (1993). Similarly, Florida law defines "extortion" as "either verbally or by a written

or printed communication, maliciously threaten[ing] to… expose another to disgrace, or to expose any secret affecting another… with intent thereby to extort money or any pecuniary advantage whatsoever." Fla. Stat. Ann. § 836.05. The problem here is plaintiffs are not threatened with exposure because the arrest records are already published. While potentially embarrassing, they are public records protected by the First Amendment and plaintiffs do not meaningfully challenge the defendants' ability to re-publish truthful arrest records. The allegations claim that defendants are essentially threatening not to remove them unless plaintiffs pay a fee, which plaintiffs have refused to do. Those allegations simply do not fit the parameters of either statute. Accordingly, this Court dismisses Count IV alleging violations of RICO.

**Conclusion**

Based on the foregoing discussion, this Court grants in part and denies in part defendants' motions to dismiss [67, 84]. The motions are granted on Counts II, IV, V, VI, VII, and denied on Counts I, III, VIII, and IX.

IT IS SO ORDERED.

Date: September 26, 2017

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge